```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   ELBIT SYSTEMS LAND AND      )(

 5   C4I LTD AND ELBIT SYSTEMS   )(  CIVIL DOCKET NO.

 6                               )(  2:15-CV-00037-RWS-RSP

 7   vs.                         )(  MARSHALL, TEXAS

 8                               )(

 9   HUGHES NETWORK SYSTEM,      )(

10   LLC., ET AL                 )(  JULY 20, 2017

11

12

13                      PRETRIAL CONFERENCE

14              BEFORE THE HONORABLE ROY S. PAYNE

15               UNITED STATES MAGISTRATE JUDGE

16

17   APPEARANCES:

18   FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                          minutes of this hearing.)
19

20   FOR THE DEFENDANT:  (See sign-in sheets docketed in
                          minutes of this hearing.)
21

22

23   COURT REPORTER:  Ms. Tammy L. Goolsby, CSR

24   Proceedings taken by Machine Stenotype; transcript was produced
     by a Computer
25
```

1                          **I N D E X**

2

3     JULY 20, 2017:

4                                                    **PAGE**

5     Appearances                                       1

6     Hearing                                           3

7     Court Reporter's Certificate                    143

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              COURT SECURITY OFFICER:  All rise.

 3              THE COURT:  Good afternoon.  Please be seated.

 4              For the record, we're here for the completion of the

 5    Pretrial Conference in Elbit Systems versus Hughes Network

 6    Systems, Case No. 2:15-37 on our docket.

 7              Would counsel state their appearances for the record?

 8              MR. HILL:  Good afternoon, Your Honor.  Wesley Hill

 9    on behalf of Plaintiffs.  With me today is Ms. Andrea Fair,

10    Ranga Sudarshan, Patrick Flynn, Wallace Lee, and Yale Fu, and

11    we are ready to proceed with the evidentiary hearing.

12              THE COURT:  All right.  Thank you, Mr. Hill.

13              MS. SMITH:  Good afternoon, Your Honor.  Melissa

14    Smith on behalf of Hughes.  I'm joined by Kurt Pankratz, Mr.

15    Chris Ponder, Ms. Melissa Butler, Mr. Brad Bowling, and Mr.

16    Ali Dhanani, and we're ready to proceed, Your Honor.

17              THE COURT:  All right.  Thank you, Ms. Smith.

18              I know that there has been a motion filed seeking a

19    stay or continuance, and I would like to hear argument on that

20    before we move on to the matters regarding exhibits, so if

21    whoever wants to address that on behalf of the Movant?

22              MR. PANKRATZ:  Thank you, Your Honor.  Kurt Pankratz

23    for Defendant.

24              We filed the emergency stay yesterday in view of the

25    fact that we have also filed writs at the Federal Circuit
```

 1   seeking clarification on unsettled law on the state of venue,

 2   as well as the convenience transfer.

 3         We believe that similar to the Cray case in front of

 4   Gilstrap, which Judge Gilstrap sua sponte stayed pending

 5   Federal Circuit review, I believe, yesterday he stayed the Cray

 6   case, that this case should be stayed so that the Federal

 7   Circuit can sort out what the state of the law is and we can

 8   figure out before we waste a lot of resources going through a

 9   trial that we can figure out what the state of the law will be

10   going forward on where this case should proceed.

11         THE COURT:  All right.  I was frankly confused when

12   I read the writ that y'all filed yesterday because it

13   really -- it didn't look like the case that I ruled on, but I

14   didn't see a mention of waiver until halfway through it.

15   I'm -- in any event, what -- how does your writ request

16   address the waiver issue?

17         MR. PANKRATZ:  Your Honor, the writ does address two

18   separate, both the 1404 and 1406 transfers, and the 14 -- I

19   was not intimately involved in the drafting of that, so you'll

20   have to forgive me if I can't recite everything in there.

21         But the waiver is addressed, Your Honor, through the

22   fact that it is Defendant's position that there was no waiver

23   because the defense of improper venue was maintained in the

24   original answer that was filed in this complaint.

25         The Defendants in that answer reserved the right to

1  challenge the venue based on the T.C. Heartland case, which at

2  the time was pending at the Federal Circuit.  There had been no

3  decision there.  The Defendants are of the position that that

4  was a reservation and a preservation of their rights to

5  challenge venue and, thus, there has been no waiver.

6          THE COURT:  And that's the sentence that started by

7  saying Hughes does not contest that venue is proper?

8          MR. PANKRATZ:  Correct, Your Honor.  We were not

9  contesting other than by reserving the right to challenge it

10  should the T.C. Heartland case changed the state of the law,

11  and the sentence we believe should be read in its entirety,

12  and it certainly was in no way what the Plaintiffs have

13  chopped it up to say that we admitted venue was proper.  We

14  did not -- we did not at that time file a motion to contest

15  venue, but we reserved the right to challenge it should the

16  law change.

17          THE COURT:  You were expecting then the Court to

18  proceed with the case as we have done because you did not

19  contest venue.

20          MR. PANKRATZ:  Your Honor, I believe we did.  We

21  were challenging that venue was proper.

22          THE COURT:  Did you file a motion to dismiss?

23          MR. PANKRATZ:  We did not, Your Honor.

24          THE COURT:  You did file a motion to dismiss earlier

25  that did not include venue; right?

1          MR. PANKRATZ:  Yes, Your Honor, we did.

2          THE COURT:  And is that your understanding of the

3    way Rule 12 works, that you can file a motion under Rule 12B

4    that doesn't include venue and then come back later and move

5    to dismiss based on venue?

6          MR. PANKRATZ:  I would -- I would say two things in

7    response to that question, Your Honor.  First, we believed

8    that if the original answer preserves a dispute as to venue,

9    which our first answer did --

10          THE COURT:  This is after the Rule 12 motion had

11    been filed.

12          MR. PANKRATZ:  Correct, Your Honor.  But we believe

13    that under Rule 12 that is still a proper preservation, and we

14    also believe that a Rule 12 motion and the operation of Rule

15    12 requires only that those issues that were available be

16    raised in a Rule 12 motion and that the defense of improper

17    venue at the time this Court had written its opinion was a --

18    not a meritorious defense and that it would have been

19    frivolous for us to have filed such a motion because the state

20    of the law at the time was that it was not an available

21    defense to us.

22          THE COURT:  Now, one of your Co-Defendants did file

23    a motion to dismiss based on improper venue --

24          MR. PANKRATZ:  Correct, sir.

25          THE COURT:  -- proceeding on a similar theory to the

1  one you're asserting now?

2          MR. PANKRATZ:  No, it was -- it was a different

3  theory for that Defendant.  That Defendant was a

4  Louisiana-based company that did not sell to any -- as I

5  understand it, and I'm stretching the bounds of my memory and

6  recollection, but my recollection from reading the papers on

7  that is that the company did not sell to any companies

8  actually in the district.  They sold for use in offshore

9  activities.

10          THE COURT:  And so tell me again how your

11  understanding of Rule 12 is that you can file a Rule 12B

12  motion and not waive something as long as you later include it

13  in an answer.

14          MR. PANKRATZ:  Will Your Honor indulge me just a

15  second while I pull up the text of Rule 12?

16          THE COURT:  Okay.

17          MR. PANKRATZ:  To begin, Your Honor, Rule 12B, how

18  to present defenses, states that every defense to a claim for

19  relief in any pleading must be asserted in the responsive

20  pleading if one is required.

21          And we would argue that Hughes did in its responsive

22  pleading identify improper venue and reserve its right to

23  challenge to the extent that the law changed, and we believe

24  that that was the most efficient way of doing so, rather than

25  wasting this Court's time with yet another order saying that we

1   had filed a meritorious and frivolous motion under Rule 12.

2              THE COURT:  I don't think that your analysis is

3   addressing Rule 12H which deals with waiver, but in any

4   event --

5              MR. PANKRATZ:  And for that, Your Honor, I

6   believe -- and I'm missing the part where it talks about

7   availability, but it makes clear that the motion must only

8   address those defenses that are available, and we contend that

9   something that is contrary to law is not an available defense.

10             THE COURT:  So when the Supreme Court said that the

11  Fourco decision was the law in 1957 and remains the law 60

12  years after, are you saying that they were wrong?

13             MR. PANKRATZ:  Your Honor, you're -- you're catching

14  a lowly trial court lawyer here with Supreme Court law.  I

15  don't know the exact response to give you other than the state

16  of the law as it was applied in this district and throughout

17  the country was as articulated based on the change of the law

18  as interpreted by the Federal Circuit.

19             And so Fourco was the law.  Then the statutes were

20  altered.  The altered statutes were interpreted by the Federal

21  Circuit, and that was the law that was applied for 40 years,

22  and as this Court acknowledged, it was a meritlesss motion

23  under the state of the law as it existed to file a motion to

24  transfer for improper venue back in 2015 or so when this case

25  was filed, and so we would submit that the law has changed.

1          THE COURT:  Well, we could discuss that matter.  I

2   have concerns about the fact that you did not file your motion

3   for convenience transfer until almost a year and a half after

4   the case was filed.  When you filed it, you didn't file it as

5   a motion so that it would come to the Court's attention.

6          And I understand now that you contend that you did

7   bring it to our attention and we ignored it by mentioning it at

8   the bottom of your joint claim construction and pre-hearing

9   statement as a clause after a sentence that begins Defendants

10  do not believe that there are any motions that are necessary

11  for the Court to resolve prior to the claim construction

12  hearing; however, and then you mention this motion.

13          MR. PANKRATZ:  Respectfully, Your Honor, we believed

14  that the best way to raise it with the Court and not be

15  pestering was to flag it as a motion that should be heard

16  before this Court engaged in any substantive patent activities

17  with respect to this, that the Markman hearing would be the

18  first time this Court began to substantively dig into this

19  case, and we thought that the -- again, the best way to raise

20  it was to note it, request that it be ruled on before the

21  Markman proceedings began, and that was the path we took.

22          So respectfully, Your Honor, we thought we were doing

23  the right thing in terms of when we raised it with the Court,

24  and that was the intention.

25          THE COURT:  This -- you understand that this

 1   document, this joint claim construction pre-hearing statement,

 2   is largely a matter for notice between the parties that rarely

 3   even comes to the Court's attention, and putting it in this

 4   was what you thought was the best way to bring to our

 5   attention that you had misfiled this motion?

 6          MR. PANKRATZ:  Your Honor, we -- I respectfully am

 7   now hearing that that is not something for notice to the

 8   Court, and I apologize if we misunderstood the purpose of

 9   that -- that filing.  We thought we were bringing it to the

10   Court's attention.

11          And I understand now that whether or not it was filed

12   as a motion or brought to the Court's attention is really not

13   an issue that's being addressed going forward because I

14   understand that that was viewed as not truly relevant to the

15   determination ultimately on the convenience motion in Judge

16   Schroeder's opinion.

17          And, again, I have not read word for word all these

18   different opinions and orders, but my understanding is that

19   Judge Schroeder's ultimate decision to affirm Your Honor rested

20   on his perceived problems about when the transfer motion was

21   filed and then ultimately analysis of the Gilbert Volkswagen

22   factors.

23          THE COURT:  All right.  Thank you, Mr. Pankratz.

24          MR. PANKRATZ:  Thank you, Your Honor.

25          THE COURT:  Mr. Hill?

1          MR. HILL:  Thank you, Your Honor.

2          Your Honor, I think that the Mandamus petition that

3    has been filed by the Defendants in this case Hughes Network

4    Systems is a dishonest presentation of the facts.  It's a

5    dishonest presentation of what occurred in this Court, and it

6    is in -- it is made on the hope that by presenting those facts

7    in a misleading fashion, they might convince the Appellate

8    Court that something has happened here that hasn't and, as a

9    result, trigger some emergency relief before we have a chance

10   to file our responsive papers with the Appellate Court and

11   correct that record.

12         Now, we hope that won't happen.  We hope the

13   Appellate Court first will look at this Court's order, Judge

14   Schroeder's order, the transcript from the hearing with Judge

15   Schroeder last Friday, all of which contain an accurate

16   reflection of the actual facts of what went on in this Court,

17   and hopefully this attempt to mislead will fail.

18         But, Your Honor, I want to talk about three specific

19   things, and the Court has hit on several of them that I think

20   bear that out, and they're relevant.

21         The reason I raise it now, Your Honor, is not simply

22   to inflame or throw mud; but it is because it is relevant to a

23   stay, I think, because a stay is a remedy that a party must

24   seek in good faith and a remedy that a party is only entitled

25   to if they come to a Court with relatively clean hands in terms

 1   of yes they want it.  It can't just be a dilatory tactic, and

 2   we suggest that's what is.

 3           Your Honor, they present to the Court of Appeals that

 4   they preserved in an original answer -- I think that's a bit of

 5   a misleading term -- what clearly was waived previously without

 6   acknowledging the prior motion to dismiss and the plain

 7   operation of Rule 12H1A.  They filed a motion to dismiss that

 8   didn't raise venue.  The rule text is plain.  That's waiver.

 9           They pretend, Your Honor, in the motion, the

10   Mandamus, that we dismissed parties suddenly because we're

11   venue manipulators upon this Court's decision on the 1404A

12   motion, pretending that it happened just days later for the

13   first time out of surprise.

14           They say that despite months earlier, knowing that

15   months earlier, 45 days or so earlier at least, we had raised

16   with them our offer to dismiss those parties prior to this

17   Court's decision on the 404A motion, and, in fact, this Court

18   discussed that offer in your order docket number 388 when you

19   ruled on the 1406 issues.

20           They don't tell the Appellate Court that.  They

21   didn't tell Judge Schroeder about that.  I pointed that out to

22   him.  Showed him the email strings where those issues came up

23   on June 5th, well before this order.

24           And they pretend that the case that this Court has

25   previously decided the 1400B issue, the substantive issue of

1    does Hughes have a regular and established place of business in

2    the district, an issue the Court knows you didn't address, you

3    decided this matter on waiver, you didn't reach those points,

4    yet they asked the Court of Appeals in a Mandamus context for

5    the first time to decide that issue and hold this Court abused

6    its discretion when you've not even had a chance to exercise

7    your judgment on that point.

8              Your Honor, all these things show that this is not an

9    honest effort for a stay.  This is a chance to delay.  It's a

10   dilatory tactic that is yet one of many more we've seen in this

11   case and what we've -- more importantly what we see, Your

12   Honor, is that if a stay was granted in this case -- and,

13   again, we have not had our chance -- I'll confess to Your

14   Honor.  I haven't read their motion to stay filed late

15   yesterday.  I was preparing for this hearing.

16             But what we see, Your Honor, is if they are granted a

17   stay, what we have done is we have rewarded dilatory conduct, a

18   party that delayed 16 months from the filing of suit

19   inexplicably until they finally filed a motion to transfer

20   venue on a convenience basis.

21             They tell Judge Schroeder that that delay was because

22   they had learned about this new entity Sevis.  They blame us

23   because we alerted them in, they say, the second amended

24   complaint to the existence of a component supplier.  What we

25   know, what we showed Judge Schroeder, Your Honor, is that we

 1   attached exhibits to our original complaint which address

 2   Sevis, their component supplier for the accused system, which

 3   is in Denton, Texas, in the district.

 4          What we would do with the stay now, Your Honor, is

 5   reward delay.  We would reward a party for letting these issues

 6   come up at the end of a case, for doing exactly what the case

 7   law has said is the reason a party can waive venue defenses by

 8   not being diligent so that this doesn't happen, so that on the

 9   eve of trial we don't face dilatory pleas on preliminary

10   matters like venue.

11          Your Honor, it would be highly prejudicial to Elbit

12   at this stage to continue a case on the cusp of a trial after

13   the logistics have been arranged, witnesses from all over the

14   globe have been arranged, and we stand fully ready to go to

15   trial on a case that Hughes has had just as long as we have had

16   to fully litigate if they wished.

17          The one last thing I'll mention, Your Honor, with

18   regard to the PR4-3 notice they say should have alerted this

19   Court, that PR4-3 notice was filed two months after their

20   original motion to transfer venue.  They don't offer this Court

21   any explanation for what they did for those next 11 months.

22   They sat for 11 months after that PR4-3 statement without

23   uttering a peep.  Inexcused delay is exactly what this Court

24   found.  A stay would only reward such conduct, and we would ask

25   the Court to deny any motion for stay.

1          If the Court is going to give any serious

2    consideration to the motion to stay, Your Honor, I think the

3    Court can deny it on the record that exist.  I would hope we

4    aren't put through the additional burden of being distracted

5    from our trial preparations to have to draft a written response

6    and file it, but if the Court believes that would be

7    beneficial, we would certainly do it.

8          THE COURT:  All right.  Mr. Hill, I will let you

9    know if you need to file a written response, so at this point,

10   unless you hear from the Court that you do, don't.

11         MR. HILL:  Thank you, Your Honor.

12         MR. PANKRATZ:  Your Honor, may I follow?

13         THE COURT:  Yes, certainly.

14         MR. PANKRATZ:  Certainly I take offense at being

15   called dishonest, misleading.  I think that's strong language,

16   and I'm going to step through.

17         Again, I was not the lawyer present arguing against

18   Mr. Hill on all of these issues, but I think I know enough of

19   the facts to know that he's not being honest when he says we're

20   not being honest.  I believe there is an honest dispute between

21   the parties.  Each side has a position, but, again, we are not

22   being dishonest in any way, and I take offense to that.  I

23   don't think that's fair.

24         Let me first again address why I think the motion to

25   stay should be granted.  There is no question that there is an

1    unsettled state of the law right now as to what will constitute

2    a waiver or not, and whether or not we put it in a Rule 12 or

3    put it in our answer is really ignoring the fact that the

4    Federal Circuit will very likely be making a decision on

5    whether you could possibly have waived the T.C. Heartland

6    defense at all.

7            And so to say that we're being dishonest by telling

8    them we put it in our original answer, we think that

9    distinguishes us from some of the others that the Federal

10   Circuit is considering, but, again, it's unsettled state of the

11   law, and we believe that the stay is appropriate, just as it

12   was in the Cray case that, again, Judge Gilstrap sua sponte

13   stayed, that the stay is appropriate here.

14           And I would like to answer a couple of these specific

15   points of supposed dishonesty.  He says we pretend they

16   dismissed suddenly these parties and that we were somehow

17   surprised.

18           We didn't say we were surprised.  We said it was very

19   clear that the sudden dismissal basically before the Court even

20   opened up the next day of these parties that they had, in our

21   view, added purely for venue reasons is proof that they had

22   added them purely for venue reasons and --

23           THE COURT:  Even though they offered to dismiss them

24   before the Court had ruled on the venue motion.

25           MR. PANKRATZ:  Your Honor, they offered to dismiss

 1   them only for the first time when we met and conferred on the

 2   1406 improper venue motion, and we think it's clear that they

 3   did so because one of those Defendants Bluetide -- there was

 4   virtually no dispute that venue was improper for Bluetide.

 5   Bluetide had filed a 12B improper motion and that they didn't

 6   have a chance of fighting on it.

 7          And so we think, again, it was, you know, they

 8   suddenly found that the anchor they thought for -- was there

 9   for maintaining convenience transfer suddenly became an anchor

10   on them for trying to fight 1406 improper venue.

11          And in offering to drop those parties, they said that

12   we had to drop them, but give up our right for attorneys' fees,

13   something that we even had to bring to Your Honor for

14   resolution, and we didn't think that was fair.  If those

15   parties were dismissed, we wanted to preserve our right, as

16   we're entitled to for those parties, for them to seek

17   attorneys' fees.

18          So, again, it wasn't that there was some massive

19   surprise that they dropped them less than a court day later.

20   In fact, that wasn't surprising.  It was merely the timing of

21   waiting to get rid of them until right after the convenience

22   motion is decided.  That was in our minds the important point

23   there.

24          They say we pretend to the Federal Circuit that the

25   Court addressed the underlying 1406 regular and established

1   place of business.  Again, I have not read the brief in

2   word-for-word, but I would be shocked if it could be

3   characterized as pretending that the Court did anything that

4   the Court did not.  We -- we are accurate and cite to the

5   record, I'm confident of that.

6          And then the 16-month delay and this repeated

7   statement that it's inexplicable, in his next breath Mr. Hill

8   brought out some of the very reasons why there was an

9   explanation.  There were multiple complaints filed.

10          And, Your Honor, I understand that there's an honest

11  dispute between the parties and that the Court has viewed this

12  and viewed it in a different lens than we do, but we believed

13  that --

14          THE COURT:  I don't think there is an honest dispute

15  that an amended complaint does not resuscitate venue

16  objections between the same parties.

17          MR. PANKRATZ:  And -- I -- I guess I don't

18  understand the Court's -- are you talking about convenience?

19          THE COURT:  I'm talking about venue.

20          MR. PANKRATZ:  For -- for -- under 1400?

21          THE COURT:  I don't care what provision you're

22  under.  Venue is something that you have to raise in

23  connection with the original complaint, and if you don't, you

24  don't get a chance to raise it again when there's an amended

25  complaint.

1        MR. PANKRATZ:  Your Honor, I would contend that for

2   a convenience motion, the Fifth Circuit law states that as

3   long as you file it within a reasonable period of time that it

4   is -- that the timeliness of it can't be used to deny it.

5        THE COURT:  And what is -- how does waiting 16

6   months amount to a reasonable period of time?  You didn't

7   realize that you were based in Maryland and we're in Texas

8   until 16 months later?

9        MR. PANKRATZ:  Your Honor, again, I -- I was not the

10  attorney who prepared this.  I -- I wish I had the slide

11  sitting in front of us because there is a lot of activity in

12  that 16-month period of time in which, for example, Hughes

13  raises with them that we intend to file the motion to transfer

14  for convenience.

15        They delay for a period of many weeks, only after --

16  and this is more than six months before the motion was filed.

17  We're attempting to get this on file.  They are delaying our

18  ability to do so.  They, being Elbit, are refusing to meet and

19  confer.  Only when they finally say, okay, let's put a meet and

20  confer on the calendar, right before they meet and confer, they

21  file an amended complaint that adds venue-related facts.

22        We then go back to follow up on those specific facts,

23  find the witnesses that are implicated by it, and actually find

24  that those witnesses -- the witness is in Virginia, get a

25  declaration from that third party witness, and then two weeks

```
 1    after, or less, it might have been a matter of days after

 2    obtaining that third party witness' declaration where they are

 3    in availabiity, we filed the motion to transfer.

 4            I don't know all the specific other instances, but,

 5    Your Honor, I can say we Hughes were taking steps to file that

 6    motion, and I would submit that the amended complaints, the

 7    dilatory tactics on the meet and confer, the identification of

 8    new third party witnesses, were things that we had to overcome

 9    before we could file it.

10            And so it wasn't a matter of us sitting for 16 months

11    and then suddenly waking up and deciding we should file this

12    motion.

13            THE COURT:  You know, the tone that I may be

14    reflecting in my voice is based on the fact that this petition

15    or Mandamus misrepresents the record of these proceedings in

16    that it suggests to the Circuit Court that venue is something

17    that you were hotly contesting and that the Court was

18    deliberately ignoring and does not have any dates in it in the

19    opening section by which a reader would come to understand

20    that 16 months went by between the filing of the complaint and

21    your motion asserting it and that you filed the motion under a

22    clearly wrong event code.

23            And we have been together in this courtroom as often

24    on this case as any case I can recall, and nobody brought this

25    up, and then you say that the fact that it was mentioned in
```

1  this joint claim construction statement under a however clause

2  should have given us notice, and that petition states that this

3  Court, being me, was deliberately ignoring your motion to

4  transfer, and that's not true.

5          MR. PANKRATZ:  I apologize sincerely if there is a

6  misrepresentation of this Court that's in that filing.  I do

7  sincerely apologize.

8          THE COURT:  I don't know that I have ever commented

9  on the record before about an appellate filing, but it's hard

10  for me to hear this discussion and not say that.

11          In any event, we'll get a ruling on your emergency

12  motion to stay, and let's move on to the exhibit matters that

13  bring us here.

14          MR. PANKRATZ:  Thank you, Your Honor, and thank you

15  for raising this.  I appreciate you.

16          THE COURT:  All right.

17          MR. PANKRATZ:  Thank you.

18          THE COURT:  Thank you, Mr. Pankratz.

19          MR. HILL:  Your Honor, we're certainly open to the

20  Court's guidance about how you would like to address the

21  exhibit issues.  There are a couple of, I think, broader

22  exhibit issues that we can tee up first if the Court would

23  like.

24          One has to do with a gentleman named Mr. Messineo.

25  He's the gentleman who was deposed in relation to the PES

 1  demonstration.  This grew out of our last hearing, Your Honor.

 2  You'll recall we had a motion in limine to preclude the PES

 3  system and demonstrative demonstration from occurring.

 4          The Court, in the context of concern about the

 5  authenticity of that system, allowed an additional deposition

 6  to occur.  That deponent was this Mr. Messineo, so it occurred

 7  just this past week, and Mr. Sudarshan is prepared to argue

 8  that point based upon the result of that deposition, if that

 9  would be of aide to the Court.  We would propose that we start

10  there.

11          The second issue, Your Honor, again, a remnant from

12  before, was our trial procedure stipulation.  The parties have

13  narrowed that substantially.  We have a few minor disputes

14  there that we'll need to get resolved.

15          But other than that, Your Honor, we then have our

16  respective exhibit lists, and we have categorized the

17  objections and would be prepared to present those to the Court.

18          THE COURT:  All right.  Let's start with the

19  exhibits, and we'll take up the trial procedures and the

20  carried motion in limine afterwards.

21          MR. HILL:  Your Honor, we would ask to start with

22  Defendant's objections to Plaintiff's exhibits in the first

23  instance, and I'll get out of the way and let the Defendants

24  drive the boat there, I suppose, since they will be raising

25  the objections that they have remaining.

```
 1              THE COURT:  All right.
 2              MR. PONDER:  Your Honor, we actually understood that
 3   we would be taking up Defendant's objections to Plaintiff's
 4   exhibits first.  We did not obtain a categorization of --
 5              THE COURT:  I think that's what we are doing.
 6              MR. PONDER:  Oh, sorry, Your Honor.  I think I
 7   got turned around.
 8              THE COURT:  Defendant's objections --
 9              MR. PONDER:  Defendant's objections to Plaintiff's
10   exhibits.  Sorry.
11              THE COURT:  Yes.
12              MR. PONDER:  Your Honor, before the hearing, we
13   handed up to the Court a bucket list.  I believe you might
14   have it.
15              THE COURT:  Yes, I do have that.  Thank you.  That's
16   they helpful.
17              MR. PONDER:  We will start with the bucket on page
18   five, which is the State of the Art, and Mr. Bowling will
19   begin.
20              MR. BOWLING:  Good afternoon, Your Honor.
21              THE COURT:  Good afternoon.
22              MR. BOWLING:  Your Honor, the first two categories
23   of documents will be state of the art and then other materials
24   relied on by Plaintiff's infringement invalidity expert Mr.
25   Bruce Elbert.
```

1              So the first bucket is a very narrow one.  It is PX

2      386.  This is a -- this is not a document of either party.  It

3      appears to be a journal article of some type.  We believe that

4      it is hearsay.  There's not been any authenticity testimony or

5      evidence presented that would allow its admission.

6              THE COURT:  All right.  Help me orient now to the

7      exhibit buckets that you have filed.  Where are we in that?

8              MR. BOWLING:  Yes, sir, on page five --

9              THE COURT:  All right.

10             MR. BOWLING:  -- at the bottom here is -- you'll

11     have to excuse the typographical error.  It should be '073

12     state of the art.  I hit the key next to it and it stays '037

13     date of the art.

14             THE COURT:  All right.  I am with you on page five

15     now.  All right.

16             MR. BOWLING:  So here we have the cover of PX 386

17     and you can see that it is a journal article.  It's not a

18     document of either party in this case, and we've not seen any

19     testimony or other evidence.

20             THE COURT:  So this is a hearsay objection then?

21             MR. BOWLING:  Hearsay and authenticity, Your Honor.

22             THE COURT:  Hearsay and authenticity.  All right.

23     And let me hear the response to that.  Thank you, Mr. Bowling.

24             MR. LEE:  Your Honor, Wallace Lee for the

25     Plaintiffs.

1          This document is being offered for -- it's relevant

2    to secondary considerations and it's a -- it's also a learned

3    treatise from a journal.

4          THE COURT:  All right.  So if you're going to use it

5    as a learned treatise, you know it would not be an exhibit

6    that would be presented to the jury.

7          MR. LEE:  It's a non-hearsay use, Your Honor,

8    because it -- because it would be used to -- only for -- to

9    show the -- I don't know what's controlling the screen right

10   now, but the reason that we would want to use this article is

11   because it talks about how the difficulties of using TCP/IP

12   over satellite links in the 1997 time frame.

13         THE COURT:  It sounds like you're wanting to use it

14   for the truth of what it says.  It is describing the

15   difficulties of using it?

16         MR. LEE:  Your Honor, but it's not so much the truth

17   of what it says as it is what the industry believed at the

18   time or what was out there in the industry publications at the

19   time.

20         THE COURT:  And so what is the relevance of the

21   industry's belief at the time if it was a mistaken belief?

22         MR. LEE:  This is one of several -- it was -- it --

23   those in the art who are reading these publications at the

24   time would have seen articles about difficulties of using

25   TCP/IP over satellite links.

1          MR. HILL:  Your Honor, if I may, I think it shows

2     skepticism or teaching away from the solution that the

3     inventors ultimately reached, and so what it's showing is the

4     effect on the listener, the effect on other developers out

5     there, that they would see this type of material and believe

6     this was not the path, the solution.

7          We think that's a non-hearsay use, much like prior

8     art is a non-hearsay use because you're just showing the state

9     of mind of an industry at the time through this circumstantial

10    evidence of it.

11         THE COURT:  Of course, prior art is a non-hearsay

12    use because it is the fact that the art existed at the time

13    that's at issue, not whether or not it was accurate.

14         MR. HILL:  Your Honor, our point with this is that

15    this -- this -- there was -- this shows, just as with prior

16    art, what was known at the time, the perception at the time.

17    Doesn't matter whether it was difficult or not, whether it was

18    actually a difficult solution.

19         But what was known at the time was it was perceived

20    as a difficult solution, and it's that perception based on

21    things of this sort that we believe establishes a non-hearsay

22    use for where it's showing the effect on the listener, the

23    effect on the relevant community here, as opposed to being

24    offered for its truth.

25         THE COURT:  All right.  Thank you, Mr. Hill.  Let me

1    hear the response to the argument that this is being offered

2    for the fact of the utterance and not the truth.

3                MR. BOWLING:  I believe, Your Honor, that to the

4    extent the article is saying that there is a problem or there

5    is some skepticism, then, in fact, they are offering the

6    article for the underlying fact that there is skepticism and,

7    therefore, it is actually a truth of the matter.

8                Furthermore, I note that this is not merely -- we're

9    not arguing over whether Mr. Elbert properly or improperly

10   considered this.  We're trying to consider whether this should

11   come into evidence and go back to the jury, and whether or not

12   Mr. Elbert considered it should not be relevant for whether it

13   comes in as -- as positive evidence, Your Honor.

14               THE COURT:  I agree with you on the last point.  I

15   guess I'm -- still, if they are saying that the state of the

16   art is relevant, are you saying that the state of the art

17   regarding TCP/IP performance back in '97 what is not relevant?

18               MR. BOWLING:  I certainly agree at the state of the

19   art is relevant, Your Honor.  I think what I hear them saying,

20   though, is that we would want to see this article saying that

21   something is impossible or is otherwise very hard to do and

22   that, for example, their invention was able to turn around a

23   mistaken belief in the art, and -- and I don't think we see

24   any evidence of that.

25               THE COURT:  All right.  Well, I -- it does seem to

 1  me that the state of the art is relevant, and, therefore, this

 2  would be a non-hearsay use.  As to the authenticity of the

 3  document, where does it purport to be from?  You mentioned, I

 4  think, Mr. Bowling, that you -- it was a journal article?

 5           MR. BOWLING:  At the bottom it appears -- if we can

 6  zoom in on the bottom here, we see that it has the mark of the

 7  IEEE, but, otherwise, we don't have any other information

 8  about it, other than what we see on the page itself.  We

 9  haven't seen any declaration or other testimony to

10  authenticate it.

11           THE COURT:  Is there any reason to doubt that this

12  is an IEEE network publication?

13           MR. BOWLING:  I do not know of any, Your Honor,

14  other than I've not pulled it up myself.

15           THE COURT:  All right.  Well, I think that

16  authenticity requires that there be sufficient evidence to

17  support a belief that it is what it represents itself to be,

18  and I -- this looks to me like an authentic copy of that

19  journal article, and I'll overrule the objection to Exhibit

20  386.

21           MR. BOWLING:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           MR. BOWLING:  In your materials, the next bucket

24  we've called Over.  It's on page 13, Your Honor.

25           THE COURT:  Okay.

1          MR. BOWLING:  I'll note that --

2          THE COURT:  We are skipping certain buckets.  Is

3   that because there's no objection in those buckets any more?

4          MR. BOWLING:  No, Your Honor.  It turns out that the

5   buckets are arranged in an alphabetical order, and it turns

6   out that these buckets are very similar in that they're third

7   party documents that are relied on by Mr. Elbert, so I'm

8   choosing to argue them together because I think the arguments

9   will be very similar.

10          THE COURT:  All right.  That's fine.  I just wanted

11   to make sure I understood the procedure.  Go ahead.

12          MR. BOWLING:  I believe with respect to Exhibit 705

13   at the bottom, that has been withdrawn by Plaintiffs, so I

14   won't be speaking to that.

15          With respect to the remainder of the exhibits, I'd

16   like to discuss them in two sub buckets.  Leaving article PX

17   383 in a second, Exhibits 382, 389, 390, and 391 are all

18   hearsay articles as well and lack of authentication.

19          THE COURT:  All right.

20          MR. BOWLING:  Once again, I believe Mr. Elbert

21   relies on these for secondary indicia, perhaps skepticism or

22   long felt need.  It's our position, Your Honor, that any

23   statement of a long felt need or any other secondary indicia

24   is, in fact, a positive use, a truth of the matter use of

25   the -- of the articles.

1          THE COURT:  All right.  Thank you.  Let me hear the

2    response to that objection.

3          MR. LEE:  Your Honor, Mr. Bowling is correct that

4    these are relevant to objective indicia if non-obviousness,

5    and in particular these articles praise Shiron.  The company

6    that the asserted patents were assigned to, they praised their

7    InterSky product.

8          THE COURT:  And so what --

9          MR. LEE:  So it's -- it's -- I'm sorry, Your Honor.

10          THE COURT:  What is your response to the hearsay

11    objection?

12          MR. LEE:  The response is that it's not the truth of

13    the matter that's asserted that the Plaintiffs are offering

14    the exhibits for, but rather that there was industry praise

15    for -- for the -- for Shiron's products.

16          THE COURT:  All right.  And what about the

17    authenticity objection?

18          MR. LEE:  Your Honor, these -- these documents are

19    periodicals, and under 90 -- they're self-authenticating under

20    901.  I don't have the subsection in front of me right now,

21    but as newspapers are periodicals.

22          THE COURT:  Did Mr. Elbert in his report indicate

23    that he had found these documents?  Are these documents that

24    he referred to in his report?

25          MR. LEE:  I believe so, Your Honor.

```
 1            THE COURT:  All right.  Can you show me a for

 2   instance of one of these, how you're contending it's

 3   self-authenticating?

 4            MR. LEE:  Yes, Your Honor.  Your Honor, if you look

 5   about two-thirds down the page, for example, this article

 6   says, quote, the new IRG -- well, a little bit further down.

 7            The IRG-30 is a powerful broadband solution for ISP

 8   points of presence, corporate offices, financial institutions,

 9   government offices, small and medium enterprises, and internet

10   cafes.  The terminal is ideal for a wide range of IP

11   applications and allows smooth connectivity to any standard

12   equipment.

13            MR. HILL:  Your Honor, if I may, to the -- I think

14   what the Court's question was about how these

15   self-authenticate.

16            If we look at the top of the page, we see the logo of

17   the publication.  We see the date on which it was published,

18   the author name, and at the end we'll see including maybe

19   contact information for the publisher and that sort of thing,

20   Your Honor.

21            So I think these are the indicia of the fact that

22   this is printed material purporting to be a newspaper or

23   periodical, and that would be self-authenticating under 9026.

24            THE COURT:  All right.  Thank you.  Let me hear the

25   response.
```

1          MR. BOWLING:  Briefly, Your Honor, I don't believe

2     this is a self-authenticating publication.

3          If you look here at the by line, it purports to be

4     from February of 2004, but if we look at the top left, we see

5     that it was retrieved likely in February of 2016.  I don't --

6     thinking back on Mr. Elbert's testimony, I did see any

7     testimony by him that he himself retrieved it in the course of

8     preparing his report.  It simply was listed as material

9     considered.

10         Furthermore, if we look at the bottom of the page, we

11    have what appears to be an internet address, so it appears this

12    was, in fact, pulled from the internet and it is not a

13    periodical or other journal from a library.

14         THE COURT:  Is there any reason to suspect that this

15    is not an adequate or an accurate copy of what it purports to

16    be?

17         MR. BOWLING:  Your Honor, unlike the previous one,

18    you know, an IEEE journal I'm -- I'm fairly familiar with.

19    I've never heard of this periodical before this case, so I

20    simply don't know.  I have not seen any articles by Space

21    Daily.

22         MR. HILL:  Your Honor, being a periodical of small

23    circulation doesn't make it not a periodical, neither does

24    internet distribution in our current day and age.  9026 is not

25    limited to such.  I think what we have here is an article that

 1  is a -- meets the definition of the rule.

 2          THE COURT:  All right.  I'll overrule the objection.

 3  I think that it is a non-hearsay use since it is just the fact

 4  of industry praise for which it's being offered, and I think

 5  there is adequate authentication.

 6          MR. BOWLING:  Next, Your Honor, I'd like to take up

 7  PX 383.  This one is a special one.

 8          In this case, Your Honor, you're going to hear the

 9  Hughes inventor by the name of Mr. Doug Dillon is -- is the

10  inventor, the true inventor under 102G of the claimed

11  invention.

12          Mr. Dillon in the course of his studies and work as a

13  Hughes engineer -- can we switch, please -- published a

14  technical report dealing with other work that he had done on

15  another Hughes product known as the DirecPC System.  So

16  Mr. Dillon, along with some -- actually Hughes is listed solely

17  as the author here.  If we look at the front, there are two

18  other co-authors.  I believe it's a joint work.

19          It's not our argument here that this is hearsay

20  because Mr. Dillon is a Hughes employee, but we think that the

21  use of this as a secondary indicia article suggests to the jury

22  improperly that based on Mr. Dillon's other statements that

23  he's not an inventor of the claimed invention, and we believe

24  that that's an improper use of this material under secondary

25  indicia.

1          THE COURT:  How is it an improper use?  Are you

2    saying that that's not a relevant issue?

3          MR. BOWLING:  Certainly the secondary indicia are

4    relevant; right?  So if we talk about skepticism in the

5    industry or questions in the industry generally --

6          THE COURT:  Is Mr. Dillon's role in the accused

7    device irrelevant?  I'm trying to figure out what part of this

8    you're saying is improper.

9          MR. BOWLING:  So the article as a whole is directed

10   to another product that Mr. Dillon worked on.  Earlier in

11   time, Mr. Dillon had worked on an enterprise class product

12   that we contend is invalidating prior art and that this

13   discussion by him at his work on this other product suggests

14   to the jury that he is non-infecting inventor of the product

15   we will be talking about under not as a straightforward time,

16   but under the auspices of secondary indicia of

17   non-obviousness.

18         THE COURT:  Well, you're saying that it has

19   relevance to another issue, which is whether Mr. Dillon was

20   the inventor of the accused system?

21         MR. BOWLING:  I believe that the Plaintiff will use

22   it to suggest that Mr. Dillon was, in fact, not the inventor

23   or could not have been the inventor when he published work

24   like this.

25         THE COURT:  And what I'm trying to figure out is

1    what's wrong with their use of it for that if that's a

2    relevant question?

3              MR. BOWLING:  We simply believe that it's -- it is

4    improperly prejudicial, Your Honor.

5              THE COURT:  I'm -- where -- I understand it's

6    prejudicial.  I assume everything they're offering is

7    prejudicial.  I'm trying to figure out why it's improperly or

8    unfairly prejudicial.

9              MR. BOWLING:  There's a universe of publications

10   that they can draw on to show what the industry thought or how

11   the industry was skeptical, and the fact that they picked

12   Mr. Dillon specifically I believe goes beyond what they needed

13   to do to bolster their --

14             THE COURT:  Well, what if they wanted to offer it

15   just to imply that Mr. Dillon is not the inventor like he says

16   he is?

17             MR. BOWLING:  I don't believe I've seen it offered

18   for that purpose in this case as part of the expert report.

19   I've only seen it for the purpose of bolstering the secondary

20   indicia.

21             THE COURT:  Well, what I'm struggling with is you're

22   suggesting that this document has another possible use, and

23   I'm trying to figure out why that other use is improper.

24             MR. BOWLING:  My response to that, Your Honor, is

25   it's just simply based on prejudice.  That's the strongest

 1   argument I can make here.

 2            THE COURT:  Okay.  All right.  Well, I will overrule

 3   the objection to Exhibit 383.  What's next?

 4            MR. BOWLING:  Mr. Ponder will be back, Your Honor.

 5            THE COURT:  All right.

 6            MR. PONDER:  Good afternoon, Your Honor.  Chris

 7   Ponder.

 8            The next bucket is the Anditel bucket.  It's

 9   around --

10            MR. HILL:  I'm sorry, Mr. Ponder, to interrupt.

11            Your Honor, just for clarity as we move forward with

12   this, I know these need to be presented categorically.  After

13   the Court has resolved the categorical question, I think,

14   anything that's not of like kind the parties have drawn out,

15   can we for the record assume that if a party does not present

16   something specific from that bucket once the Court makes a

17   ruling, that those issues are resolved as categorized by the

18   Defendant?

19            THE COURT:  Mr. Ponder, what about that?  I'm

20   understanding that that would be true or that we'll deal with

21   the rest of the bucket?

22            MR. PONDER:  Well, Your Honor, we obtained a new

23   exhibit list last night that dropped a number of these

24   exhibits, so the objections are not withdrawn.  I guess I'm

25   just trying to think what would be the most efficient way to

1    approach this because I don't think we should read in all the

2    ones that have been withdrawn.  I think if the exhibits -- we

3    should specify which exhibits the objections are being

4    overruled, Your Honor, would be my suggestion.

5            THE COURT:  So what you're telling me is that it's

6    your understanding that a lot of the exhibits that are on this

7    bucket list are no longer being offered by the Plaintiff?

8            MR. PONDER:  About 200 exhibits were dropped last

9    night, and that's taken them from 590 down to 390, so

10   unfortunately, yes, I do think a lot of exhibits will be on

11   here that are withdrawn.

12           MR. HILL:  Your Honor, I'm not -- I'm not trying to

13   use this to slip in things we've previously withdrawn after

14   the fact.  If we withdrew it, we withdrew it.  I'm just trying

15   to make sure for record purposes that we got a clear record

16   that everything in this bucket 382, 83, 89, 390, 391, 705,

17   those objections are now resolved.

18           THE COURT:  Mr. Ponder, why shouldn't the

19   understanding be that those objections are overruled, or if

20   the exhibits have been withdrawn, they're obviously not coming

21   back in just because we didn't address the objection or it was

22   considered overruled, but is that fair to your side?

23           MR. PONDER:  I think it's fair, Your Honor.  If I'm

24   understanding correctly, if an objection -- if an exhibit

25   appears in a bucket and the Court -- and then it's not raised

1   with the Court and the Plaintiff hasn't withdrawn it before

2   today, then the objection is overruled.

3          THE COURT:  I think that's a clear and logical way

4   to do it, and clearly if they have withdrawn the exhibit, they

5   don't get it back.

6          MR. HILL:  Thank you, Your Honor.

7          MR. PONDER:  Okay.

8          THE COURT:  So what we just dealt with, for

9   instance, was the Elbert bucket, and those objections are

10  overruled.  So now we can pick another bucket.

11         MR. PONDER:  I'm -- in my shuffling here, I moved my

12  paper around.  Let me go back to it.  Your Honor, if we could

13  take up the discovery bucket next, it's page 12.

14         THE COURT:  All right.  My page 12 was the Elbert

15  bucket.

16         MR. PONDER:  Page 11, Your Honor.  Sorry.

17         THE COURT:  Okay.

18         MR. PONDER:  Okay.  Of these exhibits, let's start

19  with PX 759, if we can get that up, please.  Your Honor, this

20  is a discovery email from my colleague Mr. Bowling where -- if

21  we can highlight the third sentence starting with we note that

22  source code?

23         So our understanding is the reasons why this exhibit

24  is on their exhibit list is there -- is that Mr. Elbert or

25  Mr. Gooden relied on this statement in his report to say that

1  he looked at the source code corresponding to the HN/HX

2  products and that it was located in a directory called

3  Brighton.  We're not challenging that the source code from that

4  path corresponds to the HN/HX products.

5          THE COURT:  All right.  Mr. Ponder, I -- my

6  presumption is that this shouldn't be admitted.  Let me hear

7  if they can change that.

8          MR. FLYNN:  Your Honor, just briefly, Patrick Flynn

9  for the Plaintiffs.

10          We discussed this with counsel for Hughes the other

11  day at the meet and confer.  I'm a little surprised they're

12  raising it today.  We agreed to not seek to admit this exhibit

13  unless and until this became an issue at trial.

14          This is something our expert relied on -- our source

15  code expert relied on in forming his opinions and confirming

16  that the source code in this directory was the right one.

17  Counsel for Hughes represented to us, just like as they did

18  today, that they don't intend to challenge this statement, and

19  we said we're not going to seek to admit it.

20          The only reason it's still on our list is if they do

21  back off that and seek to challenge it, because it's not a

22  stipulated fact or anything in the pretrial order, if they do

23  later come back and try to challenge it, we just left it on the

24  list with the objections and we're --

25          THE COURT:  All right.  Well, I'm going to show then

1   that 759 should be withdrawn from the list, but if this

2   becomes a disputed fact, then you can raise it with the Court,

3   but I don't expect it to based on Mr. Ponder's representation.

4            MR. PONDER:  We'll note for the record we're

5   withdrawing our objections to PX 786 and PX 787, and my

6   understanding is PX 769 has been withdrawn, and with that,

7   that's --

8            MR. FLYNN:  That's correct, Your Honor.

9            THE COURT:  All right.  Then we've accomplished that

10  bucket.

11           MR. PONDER:  If we could move to the

12  misappropriation bucket, and that is page 43, Your Honor, if I

13  can get --

14           THE COURT:  All right.

15           MR. PONDER:  Actually can we get Exhibit PX 135

16  first, Mr. Aquino?

17           Your Honor, this is an email chain within Hughes, and

18  the reason why we're objecting to this is primarily on 403

19  grounds because it's being used to suggest that Hughes

20  improperly obtained access to an Elbit document.

21           If we could scroll to the last page?  Go another

22  page.  Okay.  Page three, please.  Page two, please.  Page one.

23  Okay.  Your Honor, so this -- this is an email chain that's

24  talking about a particular customer that had sent an attachment

25  to Hughes, and if -- if I could show you Mr. Elbert's report,

1    this is his rebuttal report at page 921, paragraph 921.

2              The problem is that Mr. Elbert in the body of his

3    report, he appears to be suggesting in paragraph 921 that this

4    document is evidence, right there, that an Anditel employee,

5    Mr. Navarro, immediately and without Elbert's authorization

6    shared Elbit's competitive analysis with a Hughes employee.

7              And so that's what these Exhibits 115 and 135 are.

8    135 is the email that Mr. Elbert intends to say shows that

9    Hughes obtained document 115 improperly.  There is no trade

10   secret misappropriation claim here, Your Honor.  These

11   documents are from 2014, well after any alleged infringement.

12   It's highly prejudicial to Hughes to have it suggested that in

13   the course of competition they obtained a confidential

14   document.

15             The real problem here, too, is there's no fact

16   support for this.  There's no witness cited or anyone to

17   suggest that this was confidential information, and even if it

18   was confidential information and there was misappropriation,

19   that's not relevant to any patent issues here, Your Honor.

20             THE COURT:  All right.

21             MR. PONDER:  So we would ask for 115 and 135 be

22   excluded.

23             THE COURT:  Thank you, Mr. Ponder.  Let me hear the

24   response.

25             MR. FLYNN:  Your Honor, again, I'm a little puzzled

1   why we're hearing argument on this document because we

2   discussed this on the meet and confer with counsel, and we

3   informed them that we do not intend to have our expert present

4   any sort of misappropriation argument to the jury.

5           THE COURT:  Are you withdrawing the exhibits?

6           MR. FLYNN:  No.  We believe the exhibits are

7   relevant, and I believe counsel for Hughes indicated they

8   intended to address this in the next bucket as well.

9           There's a common customer between Shiron and Hughes

10  called Anditel -- or between Elbit and Hughes called Anditel,

11  and this email chain is a document between Anditel and Hughes

12  regarding competing for that contract and, you know, the sort

13  of back and forth, well, here's what Shiron is telling me, how

14  are you guys better, so we think it's relevant to just the

15  general competition between the parties.

16          THE COURT:  And the general competition between the

17  parties is relevant how?

18          MR. SUDARSHAN:  Your Honor, it also goes to the

19  Georgia Pacific factors and damages in the case to the extent

20  the parties are competing in the same market for the same

21  customers, and to the extent that there was enough -- enough

22  attention being paid to show Shiron/Elbit in the marketplace

23  by Hughes, that there was information being passed to Hughes'

24  marketers about what Elbit was up to.

25          We have testimony in this case from Hughes' employees

1   that they weren't monitoring Elbit or Shiron at all, that they

2   didn't even know about them, and so we think we're entitled to

3   confront those witnesses with evidence that Hughes did, indeed,

4   know about Shiron and Elbit.

5            THE COURT:  So show me in the email Exhibit 135

6   where there is a relevant statement about that.

7            MR. SUDARSHAN:  Can you switch to yours?  So we have

8   a Hughes employee here Hugo Frega forwarding this to other

9   high level Hughes marketing executives discussing Francisco,

10  who is the customer contact at Anditel, shared Elbit

11  competitive analysis and sent direct directly to him and then

12  they're analyzing the main strengths of Hughes' -- of Hughes'

13  system.  That's what we think the relevant -- the relevant

14  piece of this is, Your Honor.

15           We're not intending to suggest there's anything

16  improper about this.  We understand this happens in competition

17  and in the marketplace that, you know, the customers comparison

18  shop and between different proposed vendors, so we're not

19  suggesting anything improper.  We're just presenting this as

20  relevant to the competition between the parties in the -- in

21  the Georgia Pacific factors.

22           THE COURT:  How does the fact that the competitive

23  analysis was shared relate to that, that that particular

24  document was sent?

25           MR. SUDARSHAN:  Your Honor, there's a -- there's a

1  willfulness claim in this case, and we believe there's a

2  variety of facts that we are going to put together in our case

3  that go to willfulness.

4         One of them is, of course, knowledge of the patents,

5  but kind of continued knowledge of what Elbit and Shiron were

6  doing in the marketplace after that knowledge of the patent we

7  think is certainly relevant to our willfulness claim.

8         THE COURT:  I mean, why can't you accomplish what

9  you're saying you need by having the rest of this email, but

10  without the part about sharing the competitive analysis

11  document?

12         MR. SUDARSHAN:  I think -- I think the problem with

13  that, Your Honor, is because the fact that the competitive

14  analysis was being shared goes to the very -- the very notion

15  that Elbit mattered as a company and Elbit and Shiron

16  technology mattered.

17         We believe they're going to put on a case that

18  they're the only innovator in this space and that we've had

19  many of their employees say under oath that they never heard of

20  us, and so we think this goes to that narrative, and we ought

21  to be able to put on evidence from their files where they were

22  very actively monitoring Elbit and Shiron in the marketplace as

23  of relatively recently.

24         And if you take that fact out, that it was -- it was

25  one of the customers -- a common customer, then I think its

1   relevance goes away.  The fact that it's a common customer that

2   both of them were vying for shows that Elbit and Shiron

3   actually had technology that was relevant.

4           THE COURT:  All right.

5           MR. PONDER:  Your Honor, I want to correct a few

6   misstatements here.

7           First of all, I don't think the testimony was that no

8   one ever looked at or knew about Shiron.  I think the answer is

9   Shiron is a company that I think in its heyday had maybe 2 to

10  3 percent, so I think the issue is they just weren't very

11  relevant.  But we -- we think that, you know, a competitive

12  analysis in 2014, which is less than a few months before the

13  filing of this lawsuit, is -- is not very relevant towards the

14  willfulness issue.

15          Here, this is being offered to suggest that there was

16  a trade secret misappropriation, and I'd like to show you one

17  of the many other documents that they are trying to put on

18  about Anditel that do not have this aspect that makes the

19  point, for example, Your Honor.

20          If we can take a look at PX 140, which is in the

21  Anditel bucket, Your Honor.  This is another contemporaneous --

22  this is from 2013 talking about how Anditel is competing with

23  Hughes and Shiron.  They have it on their exhibit list.  It

24  does not have the tinge of a trade secret misappropriation,

25  Your Honor.

1      THE COURT:  You know, Mr. Ponder, it seems to me

2   that the problem with this originates from that expert's use

3   of that document to argue that Hughes had engaged in wrongful

4   behavior.

5      Why wouldn't that be adequately addressed if the

6   Court enters an in limine ruling now that directs the Plaintiff

7   not to make any such argument without seeking leave and --

8   because I -- I believe that the document, this email and the

9   competitive analysis, has some relevance.  I think it's just

10  the possible misuse of it that would be problematic.

11     MR. PONDER:  Your Honor, if I'm understanding the

12  suggestion what the limine ruling would be, it would be -- I

13  think if it was a ruling precluding Elbit from suggesting or

14  implying that Hughes obtained confidential information.

15     THE COURT:  Well, that this particular document was,

16  that there was anything wrongful about the sharing of that

17  competitive analysis document.

18     MR. PONDER:  I think that would be fine, Your Honor.

19  Actually, if we can see the -- the email where it said it was

20  shared?  I believe that was 135.

21     Yes, Your Honor, we would just ask that it be noted

22  that the preliminary ruling precludes the introduction of the

23  paragraph 921 of Mr. Elbert's report.

24     THE COURT:  All right.  Let me hear the response to

25  that.

1      MR. SUDARSHAN:  Your Honor, we're fine with that

2   limitation.  Our expert will not address this in his testimony

3   and try to link this to a misappropriation.

4      THE COURT:  All right.  So the in limine ruling will

5   be that the expert not provide testimony in accordance with

6   paragraph 921 of his report and that the Plaintiff not argue

7   that there was anything wrongful about the sharing of that

8   competitive analysis document and that --

9      MR. PONDER:  If I can just clarify, it's the Elbert

10  rebuttal report, Your Honor, not his opening report, just to

11  have the paragraph number correct.

12     THE COURT:  All right.  So ordered.  What's next?

13     MR. PONDER:  If we can go back to the Anditel

14  bucket, Your Honor, which was page six.

15     THE COURT:  All right.

16     MR. PONDER:  With respect to PX 140, we think this

17  document is -- scroll down to the bottom of page one.  We'll

18  withdraw our objection, Your Honor, to 140.

19     THE COURT:  Okay.

20     MR. PONDER:  We'll withdraw our objection to 155 and

21  260, Your Honor, and I understand that the remainder of those

22  exhibits have been withdrawn.

23     MS. FAIR:  That's correct.

24     THE COURT:  Very good.  Thank you.

25     MR. PONDER:  For the next bucket, I'd like to go to

1    the Raven Video bucket, Your Honor.

2              THE COURT:  And that's on what page?

3              MR. PONDER:  That is page 46.  It's -- there's three

4    exhibits in that bucket, Your Honor, and this relates to

5    Mr. Raven.  He is a Hughes employee, and in his personal time,

6    he gave a presentation.  I believe his deposition testimony

7    established -- his deposition in this case established that he

8    gave a presentation on satellite cellular backhaul

9    technologies for a company called Explorer Gate that's

10   affiliated with his wife.

11             This is not something he did in connection with his

12   employment, so we think it should not allowed to be introduced

13   into evidence here as admissions against Hughes, so the

14   objections we are standing on, Your Honor, are the 802

15   objection and the 403 objections, Your Honor.

16             THE COURT:  Well, I understand the hearsay

17   objection.  Is there some unfair prejudice that you want to

18   explain on 403 or is it just that he wasn't -- he didn't say

19   this in his capacity as an agent and, therefore, it's hearsay?

20             MR. PONDER:  Your Honor, what I believe that they're

21   trying to use it is to introduce the operations of cellular

22   backhaul, and one of the key issues in this case is, you know,

23   what you do with the non-data carrying time slots.

24             I believe his general description of this technology

25   is being used to suggest that the Hughes products operate in

1    that manner; and, therefore, it's prejudicial when we have

2    evidence here, we have the source code, we have witnesses being

3    asked questions exactly how the Hughes product works, as well

4    as how it works with the third party supplier components that

5    supply important functionality, how those products operate.

6            And so generic testimony by someone who is not

7    operating in his agency capacity shouldn't be introduced as a

8    way to suggest that that is how Hughes's products operate.

9            THE COURT:  All right.  Thank you, Mr. Ponder.

10           MR. FU:  Good afternoon, Your Honor.  I'm Yale Fu

11   for the Plaintiffs.

12           THE COURT:  Mr. Fu.

13           MR. FU:  So our response to the fact that there is a

14   hearsay issue is that during the deposition of Mr. Raven, who

15   is an executive of Hughes, he testified that -- or he had an

16   opportunity to respond about whether he believed the video was

17   true and whether he had any disagreements with it.

18           So we believe that, you know, he as an executive of

19   Hughes and having manifested his belief that the video was

20   accurate and true would resolve the hearsay issue.

21           THE COURT:  So you're contending that this is an

22   adopted admission?

23           MR. HILL:  Your Honor, I believe what we're

24   contending is this is an opposing party statement.  If you

25   look at 801D2D specifically, the statement is offered against

1    an opposing party and was made by the party's agent or

2    employee, no dispute about that, on a matter within the scope

3    of that relationship.  This statement concerns a matter within

4    the scope of his relationship with Hughes.

5            It doesn't have to be in the course and scope of his

6    employment.  It only has to be on a matter within the scope of

7    that relationship and while it existed, and there's no question

8    he was an employee at the time the statement was made as

9    executive vice president.

10           THE COURT:  Well, the scope of his agency with

11   Hughes would be Hughes' business.  Do you contend that this

12   relates to the business of Hughes?

13           MR. SUDARSHAN:  We do, Your Honor, for a couple of

14   reasons.  Just for some more context here, Mr. Raven is a very

15   well-known figure in the world of satellite communications.

16   He's one of Hughes' main marketing faces.  So when he speaks,

17   it's our belief that he represents Hughes.

18           We also asked him in his deposition, did you get

19   Hughes' approval before making those videos, and he said, I

20   advised Ramesh that I was making some videos.  Now, he said

21   he -- that he didn't show the script to Ramesh -- Ramesh is the

22   head of the international division for Hughes, but he did say

23   he advised Mr. Ramaswamy, who is the lead of the international

24   division, that he was making the videos, so that's one point.

25           The other point, Your Honor, is from a technological

1   standpoint.  What's being described in this video is a very

2   general explanation of how generally cellular backhaul

3   technology works, and so there -- we think it's certainly fair

4   to -- for our expert and for that evidence to make it to the

5   jury because it's our claim that the -- that the '874 patent in

6   this case is a very early technology for satellite and cellular

7   backhaul.

8           So to the extent that Hughes is describing this

9   technology very generally and it is consist with how we think

10  the accused products work as well, we think that's certainly

11  fair game.

12          THE COURT:  All right.  Mr. Ponder, is there any

13  dispute that satellite cellular backhaul is something that

14  would be within the scope of Mr. Raven's employment?

15          MR. PONDER:  Mr. Raven works on Hughes -- the sales

16  and marketing of Hughes' BStat products that can be used for

17  Hughes' satellite backhaul technology.  It's not within his

18  scope to describe cellular backhaul technology generally.

19          And I didn't hear that they said that Mr. Raven was

20  talking about how Hughes' products operated.  They said it's

21  background, which sounds like they're offering him as kind of a

22  lay expert witness to explain the technology in general.

23          He -- he had to get permission because he realized it

24  wasn't part of his work, and it sounds like he was concerned

25  that it was some kind of improper moonlighting, so I think that

1    tells you that he didn't think that he -- he goes and gets

2    presentations on satellite cellular backhaul technology, and

3    doing it for this other company not related to Hughes clearly

4    is with inside the scope.

5           And we haven't heard anything that establishes that

6    what his work was in this unrelated entity had to do with

7    describing accurately how cellular technology -- cellular

8    backhaul technology works with respect to Hughes, Your Honor,

9    so that's why I think it's prejudicial.  We have experts here

10   on both sides.  They're going to explain the background, the

11   technology, as well as the inventor.

12          THE COURT:  I can understand it could be

13   prejudicial, but I don't think it's unfairly so if your own

14   employee makes statements, and I think that -- I understand

15   the issue that these were not statements that he was being

16   paid by Hughes to make, but it does seem to me that they

17   relate to the work that he does with Hughes, and that's what

18   makes it an admission.  It's there.

19          Then you have the ability, because you control him,

20   to call him and have him explain the statements if they need

21   explanation, but I -- I'm satisfied that they fall within the

22   provision of Rule 801, so I'll overrule that objection.

23          Is there anything else in that bucket?

24          MR. PONDER:  No, that completes that bucket, Your

25   Honor.

```
 1            THE COURT:  All right.  I tell you what, while you
 2   select the next bucket, we're going to take the afternoon
 3   recess and we'll come back and resume.  Thank you.
 4            COURT SECURITY OFFICER:  All rise.
 5            (Recess taken.)
 6            COURT SECURITY OFFICER:  All rise.
 7            THE COURT:  Good afternoon.  Please be seated.
 8            Mr. Ponder, what bucket are we on?
 9            MR. PONDER:  Your Honor, before we do that, if we
10   can read in some agreements?
11            THE COURT:  All right.  Go ahead.
12            MR. PONDER:  Plaintiffs are withdrawing their
13   objection to the Feldman prior art reference, and Hughes will
14   withdraw the Quick and Kou references.
15            We will, of course, file something, Your Honor, with
16   these numbers.  We're just putting the agreement in the record.
17   I don't know if Plaintiffs want to affirm that.
18            MR. LEE:  Affirm, Your Honor.
19            THE COURT:  All right.
20            MR. PONDER:  Second, the parties have reached a
21   stipulation on a number of exhibits that will be pre-admitted.
22   The agreement is recorded in Mr. Fu's email sent on July 19th
23   at 8:12 p.m.  We will turn that into a list of exhibits by
24   exhibit number for filing with the Court, Your Honor.
25            THE COURT:  All right.  Is that correct?
```

1              MR. HILL:  Yes, Your Honor.

2              THE COURT:  All right.

3              MR. PONDER:  Your Honor, if we turn to the Martinez

4    bucket, it is page -- I believe it's 41, Your Honor.

5              THE COURT:  Very good.  I'm there.

6              MR. PONDER:  So, Your Honor, these documents are

7    hearsay documents.  Appear to be all documents that Elbit's

8    damages expert Mr. Martinez relies upon, so we're not

9    objecting to his reliance on them.  We just think that these

10   articles are -- you know, they're hearsay.  They don't have

11   any place in being admitted.

12             MR. HILL:  Your Honor, we withdraw all of these

13   items.

14             THE COURT:  Very good.  The Martinez Hearsay bucket,

15   the exhibits are withdrawn.

16             MR. PONDER:  Apologies, Your Honor, but I didn't

17   have that noted.

18             If we can turn next to the Hughes Financial bucket,

19   that is on page 30.  Of the exhibits in here, Plaintiff has

20   withdrawn 121.  With respect to the ones that are called --

21   let's start with the Hughes BCR financial reports, if you could

22   bring up PX 91.

23             Our objection to these, Your Honor, is that they are

24   essentially the company's financial records or financial

25   reports.  They show rating numbers, service numbers for

```
 1   multiple lines of business, including lines of business that

 2   are not accused of infringement.

 3            For example, the Enterprise bucket includes not only

 4   sales and writing new information for accused products, it also

 5   includes for non-accused services, such as terrestrial internet

 6   access and consulting services, Your Honor.

 7            We understand Mr. Martinez relies on them in

 8   various -- various manners, but, you know, we think introducing

 9   this kind of -- publishing this information to the jury is

10   highly prejudicial.  We would note that neither experts'

11   damages opinions turn on any kind of profitability analysis,

12   specific numbers.

13            The royalties are based upon a per unit royalty

14   that's based upon allegedly comparable licenses, Your Honor, so

15   we don't think Hughes' total revenues are permissible, and we'd

16   ask for the BCR financial reports to be excluded as violating

17   the entire market value role.

18            THE COURT:  So help me understand what this

19   demonstrates.  You're saying that these numbers, for instance,

20   the service sales are for the company for Hughes' entire

21   service revenue?

22            MR. PONDER:  So, for example, this one that we're

23   looking at, BCR stands for business center review, and this

24   one is the North America Financial Analysis, and you see that

25   there's multiple different buckets here.
```

 1              We have a service for enterprise, and that includes

 2   more than just services for enterprise.  An example is the

 3   terrestrial communication services that Hughes provides.  For

 4   example, if you're a large company and you have a lot of

 5   facilities, you contract with Hughes, and Hughes handles

 6   getting you a cable modem, a DSL modem, all technologies that

 7   are not implicated here, and they manage it for you as a

 8   service, so they basically are your one-stop shop, Your Honor.

 9              So these are not tied to the specific accused

10   products, although accused revenue would be included in here,

11   and, again, if we can keep going --

12              THE COURT:  Well, that's good enough.  That gives me

13   an idea, and I'll -- let me hear the response.  I'll give you

14   a chance to reply.

15              MS. FAIR:  Good afternoon, Your Honor.  On these

16   documents, as Mr. Ponder talked about, our -- our expert --

17   these are consolidated financials, so there is information in

18   here that's not used by our damages expert, but he does use

19   information from these spreadsheets in coming up with his

20   reasonable royalty analysis, and so --

21              THE COURT:  Why does he need to show these to the

22   jury then?

23              MS. FAIR:  Your Honor, I don't know which specific

24   portion -- these are pretty big documents.  I don't know which

25   specific portion is intended to be shown to the jury other

 1   than what he actually uses.

 2          And so this isn't an issue where we're going to be

 3   flashing up revenues and -- and entire market value rule

 4   concerns in front of the jury as part of his demonstrative or

 5   focusing on that in front of the jury.

 6          And so the fact that a consolidated financial has

 7   additional information that is not considered by the damages

 8   expert, but also has information that is considered by him,

 9   doesn't warrant exclusion of the entire document, nor --

10          THE COURT:  It doesn't warrant introduction of the

11   entire document, and if it's got a lot of irrelevant financial

12   information that has a bunch of big numbers, I don't see why

13   it should be shown to the jury.

14          I mean, your expert can rely upon the contexts of

15   these, and if Hughes questions his source, said, you know, this

16   number is wrong, then I think, fine, and that would open the

17   door to your using this if this is the source of the number,

18   but I don't think that there's a good reason to put all of

19   Hughes' financial documents into evidence in front of the jury.

20          MS. FAIR:  And, Your Honor, I think this just goes

21   to the BCR reports, which is where the revenue information is.

22   The other documents that are in this category are closer tied

23   to unit sales and information that's not as inflammatory, I

24   guess I would say, and doesn't raise the entire market value

25   rule concerns that we're hearing right now.

1          THE COURT:  Well, what I'm going to do then is I'm

2    sustaining the objection to the BCR reports, which are

3    Exhibits 91 through 98, and I'll hear the objection to the

4    other documents in that bucket.

5          MR. HILL:  And, Your Honor, if I can just maybe help

6    us with some of this as we work through it, part of this --

7    the reason for these, these are underlying financial documents

8    that support the expert's opinions.

9          The expert has summarized most of these documents and

10   schedules to his report, the portions of them that he uses.

11   There's some been back and forth between the parties -- we

12   haven't gotten to them yet -- to agreeing 1006 summaries, using

13   those -- those summary things that -- the schedules at the end

14   of the report as 1006 summaries, so that they would be actually

15   in evidence.

16         Assuming the parties can work through that, that may

17   eliminate the need for any of these documents, so I'll just

18   point that out so that the Court has a little better context of

19   why this stuff is still in play.

20         THE COURT:  Well, Mr. Ponder, I think what I'm

21   hearing is a suggestion perhaps that we carry the rest of this

22   bucket until later in the proceeding to see if -- because I

23   don't think we're going to finish this afternoon, so we'll be

24   back here.  Do you think that that's a helpful suggestion?

25         MR. PONDER:  Your Honor, I think that may be helpful

1   for some of these BCRs, Your Honor, but there are a few I

2   think we can go ahead and handle, for example, the 10K filing

3   and annual reports.

4          THE COURT:  Okay.  Well, let's go ahead and turn to

5   them, but before -- actually before we move on to that, I see

6   that there are other exhibits in this bucket that are also

7   BCR, such as 258, 284, 286.

8          MR. PONDER:  Your Honor, I can read them in.  I

9   might be able to do it quicker.

10          THE COURT:  Okay.

11          MR. PONDER:   it's 284, 285, 286, 288, and, Your

12   Honor, --

13          THE COURT:  What about 258?  I mentioned that one,

14   but you didn't.

15          MR. PONDER:  Sorry, Your Honor.  I was picking up

16   after -- after you had gotten that far, so, yes, 258 as well.

17          THE COURT:  All right.  Then that's fine.  Those are

18   included in the BCR ruling, so if you want to take up 265, the

19   10K now, I'll be happy to take that up.  Let me hear from the

20   Plaintiff on that.

21          I'll tell you that I have typically ruled over the

22   years that 10K documents should not be admitted because of all

23   of the irrelevant and potentially prejudicial information they

24   have, but if you have a paragraph or a page or whatever out of

25   it that your expert needs, then let's focus on that.

 1              MS. FAIR:  Your Honor, we're withdrawing that one.

 2              THE COURT:  All right.  Thank you, Ms. Fair.

 3              MS. FAIR:  Your Honor, I'm being informed that I

 4    think there's been a misunderstanding on a couple of these

 5    exhibits.  284, 285, 286, and 288 are not the large

 6    spreadsheets that we saw with Exhibits 91, 92, 93 that we

 7    looked at earlier.

 8              They're actually documents that contain competitive

 9    analysis information about Hughes tracking Shiron, which is

10    something we discussed earlier in the hearing.

11              THE COURT:  All right.  Well, then let's take a look

12    at those and get a ruling on them.  Any of the exhibits that

13    have the business center review in the name of them that you

14    do want to use, show me.

15              MR. PONDER:  If I can ask, was the first one you

16    wanted to raise 284?

17              MR. FLYNN:  Yes.

18              MR. PONDER:  So, Your Honor, I think the difference

19    with these ones is a BCR is what is called a -- business

20    center review is a periodic management reporting thing, so we

21    saw -- the earlier versions we saw were strictly the

22    spreadsheet, and this looks like the cover slides.  If we can

23    look at -- but they -- they typically have these kind of

24    summaries.

25              If we can turn to page -- it's the fifth page, if we

 1  can rotate that.  It has total revenue numbers here, and

 2  actually this one is also publishing third party Comsys

 3  marketing reports, which we think can be problematic, Your

 4  Honor.

 5          But starting on page 15 is the income statement for

 6  the entire business.

 7          THE COURT:  All right.

 8          MR. PONDER:  Oh, I'm sorry.  Thirteen, Your Honor,

 9  page 13.  I misspoke.

10          So we -- we think the financial statement income

11  statements should come out of all of these types of things.  I

12  think this is the same issue we have for the other BCRs is we

13  think the financial statements should come out and total

14  revenue numbers, if they're summarized in the cover slides.

15          If it's a -- like a periodic activity report, you

16  know, where it says we're working on this project, we're

17  working on that project, that's not the focus of the objection

18  here.  The focus of the objection is these income statements,

19  these here's our revenue in this division type of things, Your

20  Honor.

21          THE COURT:  All right.  Thank you, Mr. Ponder.

22          MS. FAIR:  We might be able to resolve this, Your

23  Honor.  The page we're interested in is obviously not this

24  income statement.  It's, I believe, page three of the exhibit.

25          THE COURT:  Well, then you should restrict your

1   exhibits to the part that you're interested in.  I think

2   that's a good rule generally.

3           MR. PONDER:  Your Honor, may I perhaps suggest

4   something to short circuit this a bit?

5           THE COURT:  You may.

6           MR. PONDER:  I would perhaps suggest that the

7   Plaintiff propose redacted versions, send them over this

8   afternoon, and we can agree on them.  I think, you know, that

9   will eliminate a lot of these problem for these business

10  center reviews, Your Honor.

11          THE COURT:  All right.  And perhaps that would be

12  appropriate for the rest of this bucket as well.

13          Ms. Fair, if you can just meet and confer with Mr.

14  Ponder or whoever on the Defendant's side and show the parts

15  that you want in, and if they're not the parts they object to,

16  then that sounds like we would have a solution.

17          MS. FAIR:  Yes, Your Honor.

18          THE COURT:  Okay.  Then we'll carry the rest of this

19  bucket until tomorrow.

20          MR. PONDER:  Your Honor, if we could move to

21  bucket -- let me see here.  If we can take up the Rog Response

22  bucket, this is on page 47.

23          Our objection to these three exhibits is they're --

24  one, they're particular responses to interrogatories, what

25  we've -- what we've proposed and what we've disclosed with

 1   respect to as having exhibits for interrogatories.

 2          We think that what should go on the exhibit list and

 3   be available at trial would be the most recent response with

 4   all the prior responses in a single exhibit with the objections

 5   redacted.

 6          So the problem with these is we haven't received

 7   redacted versions of these where general objections, specific

 8   objections have been removed, and these are earlier responses

 9   that don't include the later response.

10          We're not saying that a party can't use the earlier

11   response and point out the differences, but we think that if

12   you're going to use the interrogatory as an exhibit at trial,

13   it should be -- what we propose is that the exhibits be just

14   the pages for each interrogatory with all the responses.

15          So that, for example, there's a Exhibit 751, for

16   example, would be all of Hughes's responses to interrogatory

17   number one, in one exhibit with the objections redacted, Your

18   Honor.

19          THE COURT:  All right.

20          MS. FAIR:  We've agreed to this already, Your Honor.

21          THE COURT:  Very good.  I'll put that the objections

22   to the Rog Response bucket are overruled subject to the

23   agreement that has been reached.

24          MR. PONDER:  If we could turn to the Hughes' Price

25   bucket, and that is page 34, Your Honor.

1           THE COURT:  Okay.

2           MR. PONDER:  I believe Exhibit 802 has been

3    withdrawn, so the only exhibit remaining is PX 294, if we can

4    have that.  Okay.  We don't have it.  It's an aide document.

5           What this document is, Your Honor, it's a

6    spreadsheet.  It's the raw sales data of -- of Hughes'

7    products.  It's the total revenue.  There we go.

8           These are raw sales transactions.  I mean, they're

9    voluminous native documents -- we're not really sure how these

10   would even be able to go back to the jury -- where it has the

11   full order detail for customer orders, including every

12   component that was sold to them that relates to Hughes products

13   and includes the entire pricing, if we can scroll towards the

14   right and find the revenue numbers.

15          So it has the shipment -- shipment amounts for some

16   products, for example, $70,000 for one -- for one good.  We

17   don't think because the entire market value has not been

18   satisfied here that the entire value of hardware being sold to

19   Hughes should be put in evidence.

20          Now, if the reason why this is here, Your Honor, is

21   that they want to establish the quantities of products sold,

22   Your Honor, we would point out that we originally produced all

23   of these documents.  These were all sales data numbers and

24   included them as a Rule 33D response.

25          And the Court granted a motion to compel ordering

1  Hughes to provide a summary that gave on a product-by-product

2  basis an exact accounting in units by year.  We told the Court

3  that was very laborious for us.  We lost on that, but we spent

4  a lot of money and a lot of time to put the quantity sold in an

5  interrogatory response that is a table that's easier to

6  understand, does not have specific customer numbers, and

7  doesn't have the entire sales prices for the equipment sold on

8  them.

9       So, Your Honor, we would ask that that be allowed in

10 as opposed to raw sales data that includes revenue not related

11 to the infringing feature and not apportioned to the infringing

12 feature.

13      THE COURT:  All right.  What's the response?

14      MR. LEE:  Your Honor, we're not intending to put the

15 spreadsheet in front of the jury, but these are, again,

16 underlying -- this is underlying information that Mr. Martinez

17 uses in his report, and we want it for the record, not for

18 showing total revenues, and, in fact, --

19      THE COURT:  I don't know what you mean you want it

20 for the record.  The record is what the jury sees and relies

21 on in deciding the case.

22      MR. LEE:  Yes.  What I meant was that we don't plan

23 on calling attention to this document, but subject to any --

24 reaching some kind of agreement on schedules coming in or some

25 compilation of summaries coming in, this is what we -- this is

1   the evidence that we have of the -- the sales.

2           And I don't -- I don't know right now whether the

3   interrogatory response that Mr. Ponder mentioned would have the

4   same information, but we could certainly look into that.

5           THE COURT:  What --

6           MR. LEE:  I don't know right now whether the

7   interrogatory response that Mr. Ponder was referring to would

8   give us the same information, but we can certainly look into

9   it.

10          THE COURT:  What use do you plan to make of this

11  document during the trial?

12          MR. LEE:  We don't plan to put it in front of the

13  jury, but Mr. Martinez relies on the information here to come

14  up with figures for Hughes sales.

15          THE COURT:  Exhibits are documents that are to be

16  put before the jury, so you're not planning to use this as an

17  exhibit, I'm taking it?

18          MR. LEE:  That -- that's right, Your Honor, we're

19  not.

20          THE COURT:  All right.  Then I'll sustain the

21  objection to it, and if you need to use it for some reason to

22  impeach or to rebut an argument raised on cross-examination,

23  you can seek leave to do so, but I'll sustain the objection to

24  294 at this time.

25          MR. LEE:  Thank you, Your Honor.

1           MR. PONDER:  At this time I'm going to turn it over

2    to Mr. Bowling for the next set of objections.

3           THE COURT:  All right.

4           MR. BOWLING:  Your Honor, I'd like to address the

5    Hughes-Cellular bucket on page 25 of the document.  I'm

6    informed it's actually at page 24.  I have an earlier copy.

7           THE COURT:  All right.  And this is which of the two

8    buckets on page 24?

9           MR. BOWLING:  Hughes-Cellular.

10          THE COURT:  Cellular Backhaul.  Okay.  I have that.

11          MR. BOWLING:  And I'll note that Exhibits 126, 268,

12   277, and 283 were withdrawn earlier today.

13          MR. LEE:  Your Honor, I have -- I have a correction

14   if I can make it now.  I think 283 was not withdrawn, but 169

15   was withdrawn.

16          THE COURT:  I don't see 169 on the list.

17          MR. BOWLING:  Do you mean 196?  I think 283 has not

18   been withdrawn.

19          THE COURT:  Well, why don't you tell me the ones

20   that are objected to.

21          MR. BOWLING:  The sole remaining objection will be

22   to 195, Your Honor.

23          THE COURT:  All right.

24          MR. BOWLING:  If we pull this up, so this is a

25   presentation to a company named Zain, Your Honor, for the

1   Hughes Cellular Backhaul Solution, if we can go to page two.

2           The proposed -- Your Honor, we discussed the '874

3   patent for the cellular backhaul.  The claim is to a -- to a

4   system.  The entire proposal here is for an extra territorial

5   installation in the Middle East, Middle Eastern and African

6   countries.

7           THE COURT:  So is this a relevance objection?

8           MR. BOWLING:  It's both relevance -- it is

9   relevance, Your Honor.  It also goes to prejudicial in that

10  it's showing large numbers of overseas sales influencing --

11  potentially influencing the jury to think that this is a very

12  successful product in the United States where infringement

13  would be relevant, Your Honor.

14          THE COURT:  All right.  Let me hear what the

15  relevance is, and I'll give you a chance to respond.

16          MR. SUDARSHAN:  Your Honor, relevance is that the --

17  the products are undisputedly manufactured in the United

18  States, and we have a claim in this case that there is induced

19  infringement based on export of components that are intended

20  for an infringing use overseas.

21          THE COURT:  All right.

22          MR. BOWLING:  I'll address those in order.  First of

23  all, the system is only complete when the hardware named in

24  the claim is hooked up to a cellular -- cellular circuit, so

25  we do dispute that the system was made in the United States.

1              THE COURT:  Isn't that a dispute then for the jury?

2              MR. BOWLING:  I don't believe that there's any

3    allegation that it is hooked up to a cellular network in the

4    United States, Your Honor.  With respect to export 271F,

5    that --

6              THE COURT:  Whether or not that's what it takes to

7    be infringing is the issue; right?

8              MR. BOWLING:  Whether it meets the claim is.  I've

9    not seen any evidence that we manufacture it in a way that

10   it's hooked up to a cellular network, though.  There is simply

11   no evidence of that in the case.

12             THE COURT:  All right.  I'm just trying to see what

13   is your response to the relevance argument that Mr. Sudarshan

14   made?

15             MR. BOWLING:  So actually starting with the second,

16   with respect to export, 271F has not been pled in this case.

17   We do not believe that a claim under 271F can go forward.

18             With respect to manufacture in the United States, we

19   don't believe there's any evidence of that, and that the

20   purpose of showing extra territorial installations would be

21   prejudicial to the jury, who should only be judging actual

22   infringing acts in the United States.

23             THE COURT:  They are arguing that this is relevant

24   to their claim of induced infringement?

25             MR. BOWLING:  There is no such claim.  The induced

1    claim is under 271F, if I understand correctly, which was not

2    pled.  There's no alleged induced infringement in the United

3    States.

4              THE COURT:  All right?  Mr. Sudarshan?

5              MR. SUDARSHAN:  Your Honor, there is expert

6    testimony and fact testimony about testing of these systems in

7    the United States where the parts were all hooked up and

8    connected to a system that was live.

9              Now, Dr. Wicker in his deposition said he did not

10   believe that that qualified for the claims, didn't qualify as a

11   live cellular network, but that's -- that's -- as the Court

12   said, that's a fact dispute between the parties.

13             And we do -- we have reserved a 281F claim in the

14   case.  I'm prepared to walk the Court through that if the Court

15   finds that would be helpful, but we have -- we have indirect

16   infringement allegations in our complaint that lay out all the

17   factual allegations underlying 271F.

18             I think to be -- just to be candid for the record,

19   Your Honor, the words 271F do not appear in the complaint.

20   Mr. Bowling is correct about that, but we have pled indirect

21   infringement.  We disclosed a theory of 271F in Mr. Elbert's

22   opening infringement report, and Dr. Wicker acknowledged in his

23   deposition that he considered that opinion in responding to

24   Mr. Elbit's report.

25             So to the more clear, our complaint at docket 53

 1   alleges, number one, that Hughes makes components of the

 2   infringing system in the United States.  That's paragraph 63.

 3   Paragraph 65, the complaint alleges that Hughes knowingly sells

 4   them to customers.

 5            Paragraph 66, we allege that the customers are

 6   actively encouraged to infringe using Hughes components, and

 7   the customers are not limited to customers in the United

 8   States.  It's broadly Hughes customers, and we'll cite to the

 9   Court a Fifth Circuit case Hamachi versus Conversion Services

10   holding that a pleading is sufficient if it states a claim,

11   even if it fails to categorize correctly the legal theory

12   giving rise to the claim.

13            So we did not say the words 271F, but we have laid

14   out an indirect -- we certainly have mentioned induced

15   infringement.  We've laid out all the factual allegations in

16   the complaint, and I'll note -- Mr. Flynn, could you bring up

17   the fourth slide?

18            This Mr. Elbert's expert report at paragraph 733, his

19   February 13th report, that lays out exactly the allegations

20   of -- of induced infringement based on export of parts for

21   infringing combination overseas.

22            Mr. Elbert opined that -- he looked at the record and

23   opined that he was surprised these products were used in

24   overseas deployments and also pointed to numerous internal

25   marketing documents relating to cellular backhaul applications

1   that in his view showed that Hughes was actively inducing

2   infringement of the claim cellular telephone network in the

3   overseas backhaul.

4           And on the next slide, Dr. Wicker confirmed that

5   counsel for the Defendants had advised him about the 271F

6   theory in the case and he also considered that in forming his

7   rebuttal opinions.

8           THE COURT:  All right.  Thank you, Mr. Sudarshan.

9           Mr. Bowling, my thought on this is that the Plaintiff

10  has articulated relevance.  Whether or not it's a viable claim

11  I think is a different matter that we don't have to decide on

12  an objection to the exhibits, but I'll overrule the relevance

13  objections.

14          What else do we have?

15          MR. BOWLING:  That's all for this bucket, Your

16  Honor.

17          THE COURT:  All right.

18          MR. DHANANI:  Good afternoon, Your Honor.  Ali

19  Dhanani.

20          THE COURT:  Good afternoon, Mr. Dhanani.

21          MR. DHANANI:  I'll turn Your Honor to page 13, and

22  there's two sections on page 13 that concern Elbit business

23  presentation and Elbit general, and those are the two buckets

24  that I'll start with.

25          The easy one first.  We'll withdraw the one on Elbit

 1  business presentation 464; and on PX 573, going down to the

 2  general bucket there, the objection there is that the Elbit

 3  company profile is from 2016.  That's, one, after the lawsuit

 4  was filed; two, basically after Elbit admittedly had sold off

 5  the underlying Shiron assets.

 6          And there's also discussion, for example, if you

 7  could -- could you please switch the production?  If you look,

 8  for example, at page 44 of this company profile for Elbit

 9  Systems, it also contains references, if you could blow up the

10  SOTM antennas.

11          It contains references to satellite systems that

12  Elbit provides that have nothing to do with the case, and

13  Elbit's attorneys have represented on the record that the SOTM

14  satellite on the move do not cover any technology or have any

15  relationship to the '073 or '874 patents in this lawsuit.  That

16  was during the course of a deposition of Ms. Rospsha.

17          So there's nothing in this document from 2016 that

18  has relevance to the case for the '073 and '874 patents.  It

19  concerns Elbit, and it is also prejudicial to the extent that

20  it identifies quite a bit of technology that Elbit does.  For

21  example, if you go to page --

22          THE COURT:  All right.  Mr. Dhanani, let me hear the

23  response.

24          This is Elbit's marketing document?

25          MR. HILL:  Your Honor, this is an Elbit business

 1   description document.  It's a business record.  It's a

 2   document made in the ordinary course.  We'll have a sponsoring

 3   Elbit witness who can describe it and what it is.  It

 4   describes who Elbit is, what it is.

 5          We'll entitled to introduce our company, our client,

 6   explain to the jury who we are and what we do.  There's nothing

 7   inflammatory about it.  There's no 403 issue.

 8          THE COURT:  This is not -- how is this a business

 9   record?

10          MR. HILL:  Your Honor, it is a document that Elbit

11   creates in the ordinary course of its business based on

12   information that's available and known by those people who

13   created Elbit.  I mean, it's a description of their business.

14          THE COURT:  And how is it relied upon in the course

15   of the business?  I mean, this is -- this is a marketing

16   brochure.

17          MR. HILL:  Your Honor, it is -- it is a marketing

18   document.  There's no doubt.  It's how we communicate to the

19   world, to customers what we do, what our business is.

20          THE COURT:  And you can communicate to the jury

21   through a witness.

22          MR. HILL:  And that's what this was going to

23   accompany, Your Honor.  We were going to put on a witness who

24   will testify about Elbit, the technologies that it's involved

25   in.  It's kind of a who we are story, and so for that purpose,

 1   Your Honor, it's -- we think it does qualify as a -- as a

 2   record of their business.

 3           It's a -- it's, you know, documenting what they do

 4   year in, year out, and we ought to be able to present that, and

 5   there's no -- I mean, there's nothing prejudicial about telling

 6   the jury who we are as a company.

 7           THE COURT:  It is primarily just hearsay is the

 8   problem.  I'm afraid, Mr. Hill, that's not what 8036 is about.

 9           MR. HILL:  And, Your Honor, again, I don't know if

10   their objection is to the document as a whole or to this

11   particular portion that they brought out, but this particular

12   portion is of no, you know, real significance to the purpose

13   of the overall use of the document.

14           THE COURT:  I understand that.  No, my issue is that

15   this is hearsay.  I understand you're entitled to introduce

16   your business, but you have to do that through proper

17   evidence, and I'll sustain the objection to 573.

18           MR. HILL:  Your Honor, may I ask a question about

19   that?

20           THE COURT:  You may.

21           MR. HILL:  To the extent that this brochure is

22   demonstrative in the sense that it demonstrates the various

23   systems and things that Elbit uses and works on, develops, you

24   know, the pictures, for instance, throughout it, we still have

25   resort to those?

1          THE COURT:  I think you can offer the pictures as

2     demonstratives, and if they have objections to them, they'll

3     raise them in the course of what I hope is the trial procedure

4     that I think I'm going to hear about, but I'm just saying it's

5     not a proper exhibit.

6          MR. HILL:  Thank you, Your Honor.

7          MR. DHANANI:  Thank you, Your Honor.

8          Turning you to page 15, and that's the bucket called

9     the Gilat Agreement, and the PX number is PX 215.  The argument

10    here is simply one of preservation, Your Honor.

11         We did file a Daubert, which Your Honor considered

12    and denied, and the Daubert, the argument involved that the

13    Gilat agreement is not comparable, different patents, parties,

14    no economic comparability, limited time frame.  It was limited

15    in terms of inventory, and it acted as a de facto injunction,

16    among other things on docket 314, and this is simply to

17    preserve the objection, Your Honor.

18         THE COURT:  All right.  Your objection is overruled

19    but preserved.

20         MR. DHANANI:  Thank you.  Moving you to page 24, I

21    believe the bucket should be Hughes-Business.  The first two

22    are simple.  177 has been withdrawn by Plaintiffs.  180 we're

23    withdrawing our objection.

24         As to PX 494, can you pull that up?  This document is

25    a presentation from 2003 concerning Spaceway.  It's a lengthy

 1   document, but Spaceway is not relevant because it's not an

 2   accused product in this case, and that's essentially the basis

 3   for our objection.  I'm happy to go through and --

 4              THE COURT:  No, let me hear the relevance first and

 5   then maybe you can respond to that.  Mr. Flynn?

 6              MR. FLYNN:  Your Honor, while the title of this

 7   presentation may have the Spaceway term in it, this is a

 8   presentation Pradman Kaul gave at an industry forum, so it's

 9   clearly -- you know, and Pradman Kaul is the CEO of Hughes.

10              THE COURT:  They're not claiming it's hearsay, so --

11              MR. FLYNN:  Relevance, I understand.  What we are

12   using this document for is -- it is Mr. Kaul's explanation of

13   the Direcway system, which was the existing system at the time

14   they were introducing the Spaceway system, and this is -- the

15   Direcway system are part of the accused units in this case.

16              THE COURT:  So is this a limited portion of the

17   document is about the Direcway system and that's what you want

18   to use?

19              MR. FLYNN:  Yes, Your Honor.

20              THE COURT:  All right.  Do you have any problem with

21   redacting the part of it that deals with Spaceway?

22              MR. FLYNN:  No, Your Honor.

23              THE COURT:  Okay.  Does that address the objection,

24   Mr. Dhanani?

25              MR. DHANANI:  Yes, Your Honor.  Thank you very much.

1    That would address the objection for us.

2            THE COURT:  All right.  Then the objection will be

3    overruled subject to redaction of the Spaceway portion of it,

4    and I'm not saying all mention of Spaceway has to come out,

5    but the part of it that's just about Spaceway should be

6    redacted.

7            Okay.  What's next, Mr. Dhanani?

8            MR. DHANANI:  Page 26, and that's Hughes competitive

9    analysis.

10           THE COURT:  All right.  What's the objection there?

11           MR. DHANANI:  Sure.  Based on some of the

12   discussions today, we're withdrawing the first six of those.

13   That's 111, 112, 116, 117, 118, and 120.

14           THE COURT:  You're withdrawing your objections to

15   those?

16           MR. DHANANI:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MR. DHANANI:  I believe 124 has already been

19   withdrawn by Plaintiffs.  I'll just turn to the ones that we

20   we're maintaining an objection.  146 is one, and it's -- the

21   objection in 146 is similar to some other issues that are on

22   the back page, so I'll just address it with 146 to start off

23   with.

24           This is a presentation for Hughes competition.  In

25   particular, we believe that the objections that we've made here

1   are -- the sections that are in here that relate to potential

2   copying issues are one subject to a MIL that Your Honor has

3   carried.

4           And then, secondly, we believe that the sections in

5   here related to Shiron and competition are not relevant to any

6   particular issues that remain in the case since they're

7   basically no longer asserting lost profits.

8           So if you could turn to the particular slide?  If we

9   can switch, Ms. Andrews?  Thank you.  And it's page 24 of the

10  exhibit.  And if you page through a slide, and starting off it

11  basically has some background information and information about

12  InterSky and product offerings.

13          And if you could go to the next slide here, it talks

14  about Shiron InterSky products, and what we understand is that

15  one -- there's no longer a claim for lost profits that's being

16  made, I believe, and Plaintiffs have represented that, as I

17  understand it, so the objection here is now what's the

18  relevance of these exhibits that discuss Shiron.

19          THE COURT:  All right.

20          MR. SUDARSHAN:  Your Honor, our relevance response

21  would largely mirror our previous discussion on Hughes'

22  monitoring of Shiron's business activities competing on common

23  customers.

24          Their general -- Hughes' general knowledge of Shiron

25  in the marketplace is relevant to the facts we intend to stitch

1  together for our willfulness claim.  It's also relevant to the

2  Georgia Pacific factors relating to the relative positioning in

3  the marketplace and whether or not the parties were

4  competitors.  This is directly relevant to that.

5           THE COURT:  All right.  Mr. Dhanani, that sounds

6  like a reasonable relevance argument.  How is anything in here

7  prejudicial?

8           MR. DHANANI:  In particular in here, there are

9  characterizations of Shiron itself, so what I -- from what I

10  understand is that the argument that they want to make on

11  relevance is there was monitoring going on at Shiron.

12           And if that's the case and that's the limitation of

13  it, the only further response I have is we would want this to

14  not be used for the purposes of basically stating copying, and

15  that was part of the motion in limine that we filed that Your

16  Honor had carried, so the remaining portion of the objection

17  here is that they're not offering this for the purposes of

18  later accusing us as copiers.

19           THE COURT:  Okay.  Well, the copying issue will be

20  dealt with on the motion in limine, but I'll overrule the

21  objection to 146.

22           MR. DHANANI:  And it will be the same point on 299

23  and 300, so that will resolve those issues as well.

24           THE COURT:  All right.

25           MR. DHANANI:  The remaining issue on 153 -- there's

 1   actually two other issues, but first let me turn to 174, if

 2   that's okay, PX 174.  Could you turn to the slide on InterSky

 3   on this one?  Keep going.

 4           So this particular one, Your Honor, it's basically --

 5   one, it's cumulative of the information already provided, but

 6   the extra prejudice here is that there is a description, if you

 7   keep going, of the InterSky product.

 8           And in this case, the view is that the jury could get

 9   confused, and that's the prejudice here, and perhaps consider

10   that they ought to do a comparison of the two products as

11   opposed to doing a comparison of the patent claims to the

12   products to determine infringement.

13           If they see things related to DVBS-2 forward channel,

14   return channel descriptions, there's going to be a temptation

15   by the jury to try to compare products to arrive at

16   infringement, and that's the prejudice, as opposed to comparing

17   claims to the product, which is an irrelevant inquiry.

18           So they have the exhibits that deal with the

19   competition to make the case on Georgia Pacific, and the other

20   relevance that Mr. Sudarshan mentioned, the additional point of

21   InterSky products and the description specifically of return

22   channels, could confuse the jury to do that type of comparison

23   for product to product, as opposed to claims to product.

24           THE COURT:  All right.  Well, the jury will receive

25   instructions that I think will deal with that, but I'll

 1   overrule that objection.

 2          MR. DHANANI:  Thank you.  Moving up to 153, the

 3   objection here, Your Honor, is this is -- the article that's

 4   mentioned below is -- this was an email sent within Hughes,

 5   but the consideration here is that it's an article, and it's

 6   not something that Hughes wrote.  That's why we're maintaining

 7   a hearsay objection to the article.

 8          THE COURT:  All right.

 9          MR. SUDARSHAN:  Your Honor, we're not offering it

10   for the truth contained within the article.  We're offering it

11   to the extent that there is a list within Hughes called

12   competition where they were tracking as of 2008, at least,

13   what Shiron was up to in the marketplace, and we think it's

14   certainly relevant for the reasons we've discussed before

15   about the general -- the parties' general positioning in the

16   marketplace and the extent to which Hughes thought Shiron's

17   technology was valuable.

18          THE COURT:  All right.  I don't believe that's a

19   hearsay use, so I'll overrule the objection.

20          MR. DHANANI:  I believe quite a bit of the ones on

21   the next page have been withdrawn, and we can get you a list

22   of that either right now if you like or --

23          THE COURT:  Tell me which ones there are live

24   objections to, and that's good enough for me.

25          MR. DHANANI:  The ones that -- so the ones there are

 1   live objections to are 181, 299, 300, and 301, but they

 2   address the same issues you've already addressed with respect

 3   to the other issues we've talked about.

 4            THE COURT:  All right.  So those objections will be

 5   overruled as well.

 6            What's the next bucket?

 7            MR. DHANANI:  The next bucket, Your Honor, is one

 8   that we're -- it's the DirecPC bucket on page 29.  The only

 9   live issue on that one is on 272, and we're going to go ahead

10   and withdraw those objections -- that objection.  I believe

11   the other ones have already been withdrawn by Plaintiff.

12            THE COURT:  All right.

13            MR. DHANANI:  Turning you to the Hughes HN/HX --

14            MR. FU:  If you can confirm that 123 is also in that

15   bucket, DirecPC?

16            THE COURT:  I don't have that one grouped in the

17   DirecPC bucket.

18            MR. FU:  I'll double check that.

19            MR. DHANANI:  Turning you to page 32, Your Honor,

20   Hughes HN/HX documents.

21            THE COURT:  All right.

22            MR. DHANANI:  The first live objection remaining is

23   on PX 182, and on that one, our basic objection on this one is

24   relevance here since this is a draft document, an executive

25   summary which appears to be a draft, and there's plenty of

1    other documents regarding cellular backhaul, so we're just --

2    we're not really sure of what the relevance of this particular

3    document is now to the case.

4            THE COURT:  All right.  So it's a relevance

5    objection.  What's the response?

6            MR. SUDARSHAN:  Your Honor, I'm not sure it is some

7    type of draft in progress.  We've seen lots of documents

8    within the company that get released as a 1.0 and then a 2.0

9    and then a 3.0.

10           So there is no indication of red lines within the

11   document that it's some type of -- kind of neither here nor

12   there document, not really reflecting something in a particular

13   state and time.

14           I think this document purports to provide an

15   executive summary of the HX system for backhaul at a certain

16   point called 1.0 was the name of the document, so I don't see

17   it as a --

18           THE COURT:  All right.  I'm satisfied.  I think the

19   Defendant can explain if there is something that needs to be

20   explained about it, but I'll overrule the relevance objection.

21           MR. DHANANI:  Okay.  Going to 193, Exhibit 193 on

22   Hughes Satellite Broadband Technology, the main objection

23   here, Your Honor, is page two contains the full revenue, and I

24   believe there is another reference to the full revenue as

25   well, so if we can agree to remove those and redact those,

 1    then we would be satisfied on that one.

 2              THE COURT:  The part you would be talking about

 3    redacting is the line that says 2006 revenues $858 million?

 4              MR. DHANANI:  Yes, Your Honor.

 5              THE COURT:  All right.  Is there an objection to

 6    redacting that?

 7              MR. SUDARSHAN:  No, Your Honor.

 8              THE COURT:  All right.  So ordered.

 9              MR. DHANANI:  The next live objection is at Exhibit

10    PX 208, Your Honor.  This one there's a relevance and

11    prejudicial objection here, Your Honor, since this is a

12    document, Heritage of Hughes Solutions, that does reference

13    Hughes' products, but it mentions certain facts and

14    information, or purports to do so, regarding Personal Earth

15    Station and other aspects talking about internet capabilities

16    for various products, which is going to be a contested issue,

17    and this doesn't offer a complete picture of that particular

18    history.

19              THE COURT:  Is this a Hughes document?

20              MR. DHANANI:  It is, Your Honor.

21              THE COURT:  So -- and your objection is that it is

22    misleading?

23              MR. DHANANI:  Yeah, this particular document is

24    misleading, Your Honor, yes.

25              THE COURT:  Why shouldn't that be something that you

1   explain?  I'm -- how is this document misleading?

2          MR. DHANANI:  It starts with the phrase our VSAT

3   network communication experience began with narrowband systems

4   such as Personal Earth Station, and PES has quite a bit of

5   other features other than just narrowband.  And what we

6   understand is the Defendants (sic) are going to try to make

7   some use of this to try basically claim that PES was limited

8   to a narrowband solution as opposed to being -- having broader

9   capabilities.

10         THE COURT:  Well, I think as the creator of the

11  document, you can explain that, but I'll overrule the

12  objection to it.

13         MR. DHANANI:  All right.  As to the remaining ones,

14  we understand 108 has been withdrawn, and we're withdrawing

15  our objections as to the rest.

16         THE COURT:  All right.  What's the next bucket?

17         MR. PONDER:  Your Honor, if we can turn to the

18  Hearsay Publication bucket, this is page 17.

19         THE COURT:  Okay.

20         MR. PONDER:  So the first set of objections I'd like

21  to talk about, Your Honor, are all these publications that are

22  the Comsys reports.  Our objection to them, I would propose,

23  should be revolved in a similar manner as we were earlier

24  talking about the entire market value rule.  What we're

25  seeking to keep out of these or redact it out are the overall

1    revenue numbers of Hughes.

2              I can -- let's go ahead and take a look at PX 329,

3    and it is on page -- I just lost the page.  We believe this

4    document has -- it has a total -- it has a total revenue number

5    in it.  It talks about the strength of the company on page

6    three of the document.

7              So, for example, if we look at 2.2, we can see it

8    talks about how Hughes was acquired for $2 billion by Apollo

9    Private Equity Group, there in the middle, and it talks about

10   the corporate ownership.  Over here on the other side, it's got

11   total revenues, operating profit and losses.

12             So we would just propose, rather than stepping

13   through all these documents, if the Court is so inclined, to

14   suggest that the Plaintiff propose redacted ones that do not

15   have the financial -- overall financial information, kind of

16   like with the 10K's.

17             THE COURT:  All right.

18             MR. HILL:  We can do that, Your Honor.

19             THE COURT:  All right.  Then that will be this --

20   which documents are we dealing with?  Is this the whole

21   Hearsay Publication bucket?

22             MR. PONDER:  It's all of the documents that Comsys,

23   C-O-M-S-Y-S, in the name.

24             THE COURT:  Okay.

25             MR. PONDER:  And then we can -- I'll step through

1  the other ones.

2          If we could go to PX 456, this is on page 18.  This

3  is the Broadband Satellite Markets report.  If we look at page

4  98 of the document --

5          MR. HILL:  And, Your Honor, if I can, just to

6  clarify, for those Comsys reports we just discussed, I noticed

7  Mr. Ponder identified some things in text, things that aren't

8  apparent, you know, EMV related issues.

9          Can we ask as part of this as well that Hughes will

10  identify for us what it is they're most concerned about with

11  these documents?  We want to make, you know, sure we redact,

12  one, what matters and, two, what they're pointing at here.

13          THE COURT:  I certainly understand that they're

14  going to identify the numbers in there that they object to.

15          MR. HILL:  Thank you, Your Honor.

16          MR. PONDER:  Your Honor, one thing we'd ask on that,

17  if you can take a look at just the list, we have the Comsys

18  report in many different forms.  These are very large

19  documents.  Some versions of it I've seen get up to a hundred

20  pages, Your Honor.

21          I don't think -- first of all, they're hearsay market

22  publications.  I -- I think the issue is there are numbers

23  through it.  I think it would be easier if Plaintiff could

24  excerpt what they want and then we can tell them if the pages

25  they need have the problematic portions.

1          THE COURT:  Well, what is the response to the

2     hearsay objection on these Comsys documents?

3          MR. HILL:  Your Honor, these Comsys documents are

4     80317 market data.  This is -- this is sales data on a market

5     segment that's regularly published by an entity Comsys that's

6     in the business of publishing market data, and that's what

7     these are.  These are market reports, and so they have a

8     hearsay exception under 80317.

9          With regard to the issue of only using portions of

10    the document, Your Honor, I've been on both sides of that fence

11    where I get criticized for putting in an incomplete document,

12    but then criticized for putting in too complete of a document

13    or the complete document, so if the Court has a preference and

14    wants us to limit these in some way, we certainly can endeavor

15    to do that.

16          THE COURT:  I would prefer to criticize you for an

17    incomplete document, so --

18          MR. HILL:  I understand, Your Honor.

19          THE COURT:  I think that you should just limit them

20    to the part you want, and if you get criticized for it being

21    incomplete, you just blame me.  I'll back you up on it.

22          MR. HILL:  I hope the jury will be receptive to my

23    defense, Your Honor.

24          THE COURT:  You can say you were ordered to do so,

25    but I -- no, I don't think that it's proper to just put in

 1   entire market compilations if you're only seeking to rely on a

 2   portion of them.

 3            MR. HILL:  Yes, sir.

 4            THE COURT:  So I think it would be fair to put it on

 5   the Plaintiff to identify the parts of these documents that

 6   they want and then on the Defendant to object if there's a

 7   part of it that they think is problematic.

 8            MR. HILL:  Thank you, Your Honor.

 9            THE COURT:  All right.

10            MR. PONDER:  If we can turn back to -- it's exhibit

11   number PX 456, Your Honor.  It's on page 18.  This is the

12   Broadband Satellite Markets report.  I think this one has a

13   similar issue if we can go back to page 98, Mr. Aquino.

14            So, for example, this is a market compilation that

15   purports to say that two -- two-way broadband VSAT revenue in

16   various parts of the world.  You know, for 2019 they were

17   predicting a total of $602 million in North America.  In Latin

18   America it's $290 million.  Grand total at the bottom two

19   trillion -- wait, $2 billion.  I mean, these numbers are --

20   shouldn't be coming in.

21            MR. HILL:  Your Honor, the concern in Uniloc

22   regarding skewing the damages horizon by talking about numbers

23   is not concerned with the size of the market as a whole.

24   That's what this is.  These aren't Hughes' sales.  These are

25   not any individual sales.  This is the market as a whole by

 1    region worldwide.

 2              It's relevant to show the nature of the market that

 3    the parties compete in, and it doesn't implicate the concern

 4    that the Uniloc case presented about skewing the damages

 5    horizon by talking about a particular parties' gross revenues.

 6              THE COURT:  And what's the relevance of the size of

 7    the worldwide market?

 8              MR. HILL:  Your Honor, it goes to commercial success

 9    of the product in terms of showing how the product is and

10    commercial success in various regions, and then also as you

11    get into these documents, it goes a little more granular than

12    just two-way broadband VSAT.  It gets into other related

13    technologies where you can see comparisons between, I guess,

14    the variety of technologies in the market and the relative

15    success.

16              MR. PONDER:  Your Honor, on that point, commercial

17    success, the only way you can claim commercial success here

18    based upon these sales being rolled into this lawsuit if their

19    position is that everybody's making use of their patented

20    technology.

21              Now, obviously -- let's just start at the high level.

22    We're talking about U.S. patents.  We can't tie any commercial

23    success to a U.S. patent to sales in Sub-Saharan Africa.

24              But to back up, there are a number of player in the

25    marketplace that they haven't sued and they haven't licensed,

1  and they shouldn't be permitted to say, oh, our technology is

2  important and it's enabled, you know, North American two-way

3  VSAT to be a $602 billion marketing year.

4         They have no -- they -- they want to preclude Hughes

5  from pointing out those products are -- they don't want us to

6  talk about those products, and yet they're trying to get the

7  benefit of the sales of those products to tell the jury, hey,

8  these patents are really worth something, and that's -- you

9  know, that's a big problem.

10         THE COURT:  What are they preventing you from

11  talking about?

12         MR. PONDER:  Well, Your Honor, I think we talked

13  about before non-infringing alternatives, these other products

14  that are in the marketplace, and they say, well, we haven't --

15  we haven't sued them and you haven't shown that they infringe

16  and there's nothing about them in the case.

17         If there's nothing about them in the case being

18  infringing or non-infringing how are they able to point to the

19  sales of those products if their experts don't have competent

20  evidence and opinions to show that those products practice the

21  patents.

22         THE COURT:  All right.

23         MR. PONDER:  Your Honor, to simplify it, I think the

24  point is commercial success, you have to show a nexus between

25  the sales that you're saying are evidence of success and the

 1    patent.

 2           Saying that there were 602 -- $602 million in sales

 3    in North America two-way broadband VSAT across all participants

 4    in the market, there's no evidence to tie that back to these

 5    patents.

 6           THE COURT:  I can understand that the relevance of

 7    this may be marginal, but I don't see the prejudice since

 8    there is no claim that these are Hughes' revenues.

 9           MR. PONDER:  Well, Your Honor, the problem is Hughes

10    is a significant player in the market, and some of

11    these things these other parts of these reports are going to

12    say is that Hughes has 50 percent of the market in North

13    America, that it has probably 30 percent, or something like

14    that, globally.

15           And so if you're going to have the expert talking

16    about market share and he's going to mention, oh, well, the

17    worldwide market is in North America, well, that's $602

18    million, and then around the world it's $2 billion.  I mean,

19    the jury is not stupid.  They can figure out the implication

20    that Hughes is making a billion dollars from selling things

21    around the world.

22           And we have the actual market sales data.  We've

23    produced all of our actual sales.  We've produced the

24    quantities.  They know the pricing, and they're only going for

25    a royalty that's based upon a one-time running royalty per sale

1    of a product of $18.  So trying to say, oh, $18, but look at

2    how many -- you know, that comes out to $60 million when you're

3    making 602 million in 2019 is very prejudicial.

4            And that's the exact type of skewing that was in

5    Unilock and the other entire market cases where the Plaintiff

6    was trying to say, oh, Microsoft should kick over here a couple

7    of dollars because they're selling Microsoft Office for several

8    hundred dollars.  That's the exact type of skewing that the

9    entire market value rule is trying to prevent.

10           THE COURT:  I believe that there are relevant uses

11   of this document.  There may be improper arguments that could

12   be advanced based on it.  If those arguments are advanced,

13   then they can be dealt with, but I'll overrule the objection

14   to this exhibit.

15           MR. PONDER:  If we could turn to Exhibit 574, this

16   is a hearsay document that purports to be the Shiron press

17   release announcing that they won an award.

18           THE COURT:  All right.  Is there a response to the

19   hearsay objection?

20           MR. HILL:  Your Honor, yes, there is a response to

21   the hearsay objection.  I apologize for the delay on our side.

22   Your Honor, what we're showing here is Shiron's praise in the

23   market.

24           THE COURT:  By Shiron?

25           MR. HILL:  It is -- I guess it is in that sense, but

1    they were awarded a third party award recognizing their place

2    in the market.  That's what they're promoting.  It's not an

3    award they gave themselves.

4              THE COURT:  I understand that.  I -- my problem is

5    it does appear to be hearsay, so I'll sustain the hearsay

6    objection to 574.

7              MR. PONDER:  Turn to -- we will withdraw the

8    objection to -- oh, I'm sorry -- the exhibit was withdrawn.

9    Never mind.  We will withdraw the objection to 588.

10             Can you put up 587?  Your Honor, we object to this

11   one as being a hearsay document.

12             THE COURT:  All right.

13             MR. SUDARSHAN:  Your Honor, the basis for including

14   this is we believe it has admissions from a party opponent,

15   namely Mr. Pradham Kaul, in the article DirecPC.  There were

16   statements made by DirecPC that go to questions in our case as

17   to what the technology limitations were at the time of the

18   invention.  DirecPC was the one-way service prior to the --

19             THE COURT:  What's the answer to the hearsay

20   objection to the overall document?

21             MR. SUDARSHAN:  I can see that's tough, Your Honor.

22   I -- I think the statements within, though, are certainly not

23   hearsay.

24             THE COURT:  The trouble is you can't prove the

25   admissions by hearsay, so I'll sustain the objection.

1          MR. SUDARSHAN:  I understand, Your Honor.

2          MR. PONDER:  If we can have Exhibit 589?  I believe

3    this is a similar document, Your Honor, appears to be an

4    article printed off from WestLaw entitled Hughes to offer two

5    way DirecPC service.

6          MR. HILL:  Your Honor, this is of like kind.  I

7    think the Court's prior ruling would control this as well.

8          THE COURT:  All right.  So ordered.

9          MR. PONDER:  Next one, Your Honor, is 591.  I think

10   this is similar, Your Honor.

11         MR. SUDARSHAN:  Yes, Your Honor.

12         THE COURT:  All right.  I'll sustain the objection.

13         MR. PONDER:  The next two exhibits were withdrawn.

14   The next exhibit with objection is 594.  This is an internet

15   print of -- I believe it's -- it purports to be an article in

16   the McKinsey Management Consulting Firm publication.  We

17   believe it's hearsay and not admissible as well.

18         THE COURT:  All right.  And what's the response to

19   the hearsay objection?

20         MR. FU:  Your Honor, this is similar to an article

21   that we had looked at earlier which is used to show skepticism

22   in the industry.  It's not used to show, you know, that it

23   wasn't possible.  It's just used to show that people in the

24   industry were generally questioning it.

25         THE COURT:  And point out to me --

1              MR. FU:  The statement?

2              THE COURT:  -- the language that you rely upon.

3              MR. FU:  Yeah.

4              MR. SUDARSHAN:  Your Honor, it's on the second page.

5              MR. FLYNN:  We can pull it up online.

6              MR. FU:  Yeah, we -- yeah, we -- if we can switch

7    the -- yeah.  Satellite technology isn't capable except in

8    conjunction with another pathway of providing the two-way

9    interactivity necessary for broadband access.

10             So this is skepticism in the industry.  McKinsey

11   is -- puts out reports of generally what goes on, and, you

12   know, so it's expressive of --

13             THE COURT:  This is for none-obviousness?  Is that

14   what --

15             MR. FU:  Yes.

16             THE COURT:  Okay.

17             MR. PONDER:  Your Honor, the problem and difference

18   between this and the earlier article, the earlier article was

19   at least a technical publication and the IEEE, which is at

20   least a respected actual -- you know, but those are POSITAs

21   out there.  Those are engineers.

22             This is a management consulting firm.  I mean, this

23   would be the same as if Deloitte & Touche with their award

24   saying that Shiron is great.  It's the same as them saying, oh,

25   well, this technology is innovative.

1              The case law for secondary consideration says that

2     praise by others and that sort of thing requires a tie to the

3     industry, and industry is, you know, the technical term of the

4     art referring to -- to people that invent and work in that

5     area, and McKinsey Management --

6              THE COURT:  Of course, this is not praise.  That's

7     not the issue here; right?

8              MR. PONDER:  No, Your Honor.  That rule applies also

9     for long felt need as well as failure by others, all of those.

10    They're only relevant if there is a showing that it's by

11    people in the industry.

12             If I say, for example, Your Honor, there's no -- you

13    know, it's not practical to have supersonic airliners and I put

14    that in my Wall Street Journal article, that's not a POSITA.

15    There's not -- that isn't enough under secondary

16    considerations.  Now, if somebody who works in the industry,

17    somebody working for Boeing, for a jet manufacturer, that's

18    enough where people that keep up with --

19             THE COURT:  Whether this would be enough to support

20    their position, if it's the only evidence that's worth

21    arguing, but I'm assuming that will not be the case, and I do

22    think this is relevant and for a non-hearsay use, and I'll

23    overrule the objection to 594.

24             MR. PONDER:  The next one, Your Honor, is 597.  Ms.

25    Andrews, if we can get -- thank you.  This is an article from

1   the New York Times, Your Honor.  We would say it's hearsay.

2           MR. HILL:  Your Honor, I'm sure the Court can tell

3   by just looking that this bears the imminent signs of

4   reliability because it's an ancient document.  It's over 20

5   years old, so I think we have a hearsay exception to this one.

6   It's a printed publication periodical, so it's

7   self-authenticating.  I think that gets us there.

8           THE COURT:  All right.  I think that does get them

9   past the hearsay objection.  Is there any other objection?

10          MR. PONDER:  Okay.  Your Honor, that's our argument

11  for that one.

12          THE COURT:  All right.  I'll overrule the objection

13  to 597.

14          MR. PONDER:  Go to 612, Your Honor.  So this is an

15  article that -- actually, could you scroll down?

16          Your Honor, this is another document that relates the

17  Gilat agreement issue that Mr. Dhanani referred to earlier

18  about the Gilat agreement, Gilat lawsuit not being comparable,

19  so we're objecting to the introduction of this document.  It's

20  a press release describing the infringement allegations in that

21  case, Your Honor.

22          THE COURT:  All right.

23          MR. HILL:  Your Honor, it's a press release.

24  There's no hearsay issue, and the Gilat agreement, as the

25  Court knows, has been the subject of objections that will be

1  overruled in terms of its relevance and admissibility, so we

2  ask that it come in.

3         THE COURT:  Are you just preserving your position on

4  it, Mr. Ponder, or do you have further --

5         MR. PONDER:  Yes, Your Honor.  I think it was argued

6  for quite a long time in the Daubert, and we didn't want to

7  take up --

8         THE COURT:  All right.  Then I'll overrule the

9  objection.

10        MR. PONDER:  We will withdraw our objection to

11 Exhibit 676.  If we can move to Exhibit 694.  This is a

12 hearsay article, Your Honor.

13        THE COURT:  All right.

14        MR. PONDER:  It appears to be from 2001.  It's

15 actually -- we also -- it's not actually clear the

16 publication.

17        MR. LEE:  Your Honor, this exhibit was withdrawn.

18        THE COURT:  All right.

19        MR. PONDER:  I believe that resolves the Hearsay

20 bucket, Your Honor.  If you can turn to the Bluetide bucket,

21 Your Honor, this is on page eight.

22        So if I -- let me start by referring to the Bluetide

23 as the former customer that's been dismissed with prejudice.

24 Exhibits 9, 10, 11, 28 -- my apologies, 28 has been

25 withdrawn -- 47, 51 are -- and 74 are the reseller agreements

1    between Hughes and Bluetide.

2              We don't think that those are relevant.  It's a party

3    that's been dismissed from the case with prejudice.  In

4    addition, we don't think there's any claim to any royalty that

5    can be based upon those products by application of patent

6    exhaustion, Your Honor.

7              MS. FAIR:  Your Honor, the sales made to Bluetide

8    were by Hughes, so there's still sales that are at issue in

9    this case.  There was no money paid for Bluetide being

10   dismissed, so there's not a patent exhaustion issue.  The

11   dismissal with prejudice only affects Bluetide's liability,

12   and, therefore, these documents are still relevant.

13             MR. PONDER:  Your Honor, under the applicable case

14   law, the only issue for patent exhaustion to attach is whether

15   a good has been licensed, and the case law is -- we submit is

16   clear that a dismissal with prejudice with respect to those

17   products operates as a covenant not to sue, in other words, a

18   license with respect to those products.

19             We're talking about 200 units.  They were dismissed

20   with prejudice.  That includes the right to have had them made,

21   to sell them, to use them.  There are no -- the patentee has no

22   further right at this point with respect to the Bluetide units,

23   Your Honor.

24             THE COURT:  All right.

25             MR. PONDER:  And I would just note that there is no

1   requirement under the case law that a license be supported by

2   a royalty, Your Honor.  A dismissal with prejudice is a

3   license nonetheless.

4            MS. FAIR:  Your Honor, I believe the Federal Circuit

5   recognizes a distinction between a dismissal with prejudice,

6   which extinguishes liability for a Defendant who has been

7   dismissed, and a covenant not to sue, which is forward

8   looking.  That's the Revolution versus Aspects Eye Wear case.

9            And so the issue of Bluetide's dismissal with

10  prejudice, because it didn't come with any payment and it

11  didn't come with any covenant not to sue, is not forward

12  looking.

13           THE COURT:  But these are past sales.

14           MS. FAIR:  Yes, Your Honor, they are.  But the

15  license exhaustion issue only arises if you have a license.

16  There is no license when you only have a dismissal with

17  prejudice of a Defendant and that Defendant's liability for

18  past sales is extinguished, not other Defendants that may or

19  may not be in the same chain.

20           THE COURT:  Do you have any case law that you can

21  offer on that, Ms. Fair?

22           MS. FAIR:  Your Honor, I don't have it to hand, but

23  we can provide that to the Court later this evening if the

24  Court wishes.

25           THE COURT:  What I'm going to do at this point is

 1   sustain the objection, but if you come up with case law that

 2   bears on this, I will consider that case law.

 3                MS. FAIR:  Yes, Your Honor.

 4                MR. PONDER:  Your Honor, Exhibit 69 was the invoice

 5   for -- to Bluetide from Hughes.  We believe that's the same

 6   issue we were just looking at the agreements.  The other thing

 7   to note is it's with a foreign entity.  This is actually

 8   Hughes Brazil, not a party to this lawsuit.

 9                THE COURT:  And what exhibit is this?

10                MR. PONDER:  It's PX 16, 16, 1-6.

11                THE COURT:  I don't see that on --

12                MR. PONDER:  Apologies, Your Honor.  It's Exhibit

13   69, and I forgot that the Plaintiff's exhibit sicker -- that's

14   a deposition exhibit sticker, Your Honor.  I apologize.  It's

15   69.  The description is invoice Bluetide Hughes with Bates

16   number 64850.

17                MS. FAIR:  We withdrew this exhibit, Your Honor.

18                THE COURT:  All right.

19                MR. PONDER:  The next documents are emails between

20   Mr. Regard, Your Honor, and Hughes.  We would submit that

21   these are all dealing with the relationship in sales and

22   relationship between Bluetide and Hughes.  We don't -- we

23   don't see any relevance in those exhibits, Your Honor.

24                THE COURT:  And that's which exhibits?

25                MR. PONDER:  I believe the only ones that are left

1  are 60, 63, 64.

2          MR. SUDARSHAN:  Your Honor, we have the Court's

3  tentative ruling on the Bluetide issue.  Our recommendation

4  would be that we need to just think about that a little bit

5  more.

6          I think, Your Honor, Bluetide, even if there's patent

7  exhaustion, which I'm not sure there is, even if there's patent

8  exhaustion, some of these documents we think could be relevant

9  to the case still because they're evidence of pricing of the

10 accused products to customers.

11          So even if there's not a live claim against Bluetide,

12 this is evidence we took in the case that shows that our

13 damages expert has relied on for how these things are priced in

14 the marketplace upstream and downstream.  We think that's

15 relevant to his analysis, so we think --

16          THE COURT:  Well, he can still rely upon them.  It's

17 just a question of are they appropriate to show to the jury,

18 and the jury is going to think that these are sales that are

19 part of the damages of the Plaintiff if you show them these

20 particular documents, so I --

21          MR. SUDARSHAN:  Your Honor, on that point, our

22 expert has been clear that he's not -- his tabulation of our

23 royalty doesn't double dip.  He does not -- he does not double

24 count units as between Bluetide and Hughes or as between

25 Hughes and downstream customers.

1          His tabulations are solely based on the Hughes units

2    and the Hughes database, so I don't think there was a risk of

3    some type of double counting just because we show the jury an

4    exhibit that goes to a customer's pricing.

5          And certainly there would be not -- because Bluetide

6    is not in the case, we would agree there would be no testimony

7    coming in on how many units were sold to Bluetide.  I think the

8    limited relevance of this is pricing.

9          THE COURT:  Well, if you have one of these documents

10   that you can offer just to show the price involved, then I'll

11   consider that, but, you know, I -- in the abstract, I don't

12   have any way of determining whether you've got that.

13         But if you can come to back to me tomorrow and show

14   me that you've got a document that shows price in a relevant

15   way that doesn't go into revenues from sales to Bluetide,

16   then --

17         MR. SUDARSHAN:  Thank you, Your Honor.

18         THE COURT:  -- we'll look at that.

19         MR. SUDARSHAN:  All right.  Thank you, Your Honor.

20         MR. PONDER:  Your Honor, I believe the only other

21   exhibits left are 800, which is a spreadsheet of sales revenue

22   for Bluetide, which I think that would be covered by the

23   Court's prior ruling.  I don't know if the Plaintiff wants to

24   argue this one specifically or agree that the current ruling

25   on Bluetide covered it.

1          MR. SUDARSHAN:  We will take the Court's suggestion

2    under advisement this evening and come back on that.

3          THE COURT:  All right.

4          MR. PONDER:  So, Your Honor, I believe we've covered

5    every exhibit in the Bluetide bucket.  All of them have been

6    sustained or withdrawn by Plaintiff at this point.

7          THE COURT:  They're reserving the right to come back

8    and try again tomorrow, but at this point that's right.

9          MR. PONDER:  We can move on to the ILeverage bucket,

10   Your Honor.  We can start with Exhibit 7.

11         THE COURT:  And what page are we on?

12         MR. PONDER:  This is page 35, Your Honor.  It's --

13   to provide context, ILeverage was the patent broker that was

14   engaged by Shiron in 2008 to consider selling the patents.

15   Exhibit 7 --

16         MR. FU:  Your Honor, we withdraw Exhibit 7.

17         MR. PONDER:  Your Honor, if we could confer for a

18   moment and see if there's any others that have been withdrawn

19   in this bucket before we proceed any further.

20         THE COURT:  All right.  Go ahead.

21         MR. HILL:  Your Honor, while they confer, if I can

22   raise -- just a timing, I guess, request.

23         The issue we mentioned at the outset about the PES

24   demonstration and some new exhibits that have arisen because of

25   this deposition, we were -- just selfishly on our side, because

1    of staffing issues for when we may see the Court again, we were

2    curious if we could get that in front of you today because we

3    have one team member who was there who took the deposition, he

4    has all the firsthand knowledge, and we want to make sure that

5    we have him in front of you when that issue comes up.

6              THE COURT:  All right.  I was thinking I would do

7    that in the morning, but if you are afraid you won't have that

8    person available then, then we can do it this evening.

9              MR. HILL:  I'm going to ask that person.  Will we

10   have you in the morning?  Okay.  We can make it work in the

11   morning, Your Honor, if that's your preference, what you want

12   to do, but we just wanted to raise it.

13             THE COURT:  I frankly was just going to --

14             MR. HILL:  We were unsure when you would have the

15   time.

16             THE COURT:  Refresh my recollection about the issue,

17   but if you -- that will just be a challenge for your advocacy,

18   if you can refresh my recollection.

19             MR. HILL:  Well, --

20             THE COURT:  But let -- Mr. Ponder, tell me where we

21   are on this bucket and then we can take a break and take up

22   the other matter.

23             MR. PONDER:  We do have one, two, three -- eight

24   exhibit objections for this bucket.

25             THE COURT:  All right.  There are eight exhibits

1    remaining?  Which ones are they?

2                MR. PONDER:  Five, 6, 227, 228, 623, 624, 737, and

3    740.

4                THE COURT:  And those have not been withdrawn?

5                MR. PONDER:  Those have not been withdrawn.

6                THE COURT:  Okay.  All right.  Let's see if we can

7    get through them quickly and then we'll turn to the other

8    matter.

9                MR. PONDER:  Your Honor, Exhibit 227, if we can look

10   at that, this is an important document.  This is a document

11   that the Plaintiff is using to assert willful infringement.

12   We have one objection to this.  It's a very narrow issue, Your

13   Honor.

14               This document is an email that was between Hughes'

15   in-house lawyer Mr. Plastrik and an engineer Mr. Choquette, and

16   you can see that it has attachments.  These attachments are

17   patent numbers, and the critical issue here is that Plaintiffs

18   are trying to submit just the cover email without the

19   underlying attachments, and it's highly prejudicial.

20               MR. FLYNN:  We agree to include all the attachments

21   with these two exhibits, 227 and 228.

22               MR. PONDER:  Okay.  Well, then that takes care on

23   227, Your Honor, and 228.  There is no objection to it so long

24   as the exhibit comprises -- Exhibit 227 will be replaced with

25   an exhibit that includes all those attachments that are listed

1    there by Bates number.

2              THE COURT:  Okay.

3              MR. HILL:  Your Honor, I hate to squash agreements,

4    but I want to point out to the Court when we do this, it's

5    going to make this about a 200-page exhibit, and it's going to

6    be -- 190 of those pages are things we'll never use in front

7    of the jury.  It's going to be unrelated patents that we don't

8    care anything about, so --

9              MR. PONDER:  I can help with that, Your Honor.  What

10   we care about is that the attachment that is for the '073

11   patent and the '874 patents be included and just a slip sheet

12   noting that the other attachments have been omitted, and the

13   reason why it's -- go ahead.

14             THE COURT:  All right.

15             MR. HILL:  Yes, sir, we'll do that.

16             THE COURT:  So greed.

17             MR. PONDER:  If we could turn to -- if we could turn

18   to number six, Your Honor, this is the licensing spreadsheet.

19   This is a document that Elbit purports shows that the general

20   counsel at Hughes was contacted about -- was contacted by

21   ILeverage.

22             THE COURT:  What's the objection?

23             MR. PONDER:  403.

24             THE COURT:  And how --

25             MR. PONDER:  I'm sorry.  403 and 803 hearsay.

1          THE COURT:  Let's take the hearsay first.  What's

2     the response to the hearsay objection?

3          MR. SUDARSHAN:  Your Honor, I believe, and one of

4     our team members will correct me if I misspeak.  I believe

5     there was a foundation laid at the testimony of Mr. -- during

6     the deposition of Mr. Aloush that he kept this record during

7     the course of his business at ILeverage.

8          And there was -- there was testimony that this is how

9     he tabulated who he had contacted on a running basis during the

10    course of his broker business, so this is a business record as

11    to ILeverage, and the foundation we would submit has been laid

12    during his deposition.

13          THE COURT:  All right.

14          MR. HILL:  There's one additional basis for that as

15    well, Your Honor.  It is a business record no doubt, but the

16    way it was used in his deposition and the way he explained it,

17    it was used as a recorded recollection under 8035 that

18    refreshed his recollection about who exactly he contacted at

19    Hughes.

20          THE COURT:  All right.  Mr. Ponder?

21          MR. PONDER:  Your Honor, I think we would need to

22    see what that testimony is to see that it was recorded

23    recollection.  I don't -- I don't have that recollection.  I

24    believe he was walked -- he was walked down a primrose path of

25    did you contact them, isn't that what this document shows,

1   Your Honor.

2          THE COURT:  It says, you know, under 8035 that it

3   cannot be admitted as an exhibit unless it is against an

4   adverse party, which this --

5          MR. PONDER:  This is Mr. Aloush, who is aligned with

6   the Plaintiff, the Plaintiff's, they claim, agent, Your Honor.

7   So the document should not be admitted under 8035.

8          THE COURT:  But we're on to the business record

9   issue.

10          MR. PONDER:  Okay.  As to the business record, Your

11   Honor, this is a one off transaction for Shiron contacting

12   people about selling a patent portfolio, Your Honor.  There's

13   no indication that he actually relies on this.  It's a

14   one-time project.  It didn't have the hallmarks of reliability

15   of, say, somebody keeping a list of things they sold that day,

16   a medical record or anything like that.  It's a self-serving

17   document.

18          THE COURT:  I guess I'll have to see his testimony.

19          MR. SUDARSHAN:  I have it here, Your Honor.

20          THE COURT:  All right.

21          MR. SUDARSHAN:  If we can have the document camera,

22   the Elmo, please?

23          Bottom left square, Your Honor.  This is where the

24   witness Mr. Aloush was asked, and it's referring back to

25   testimony that it was a spreadsheet maintained by Mr. Aloush.

 1   He confirms.

 2           What was the purpose of the spreadsheet?

 3           It was to collect the information of the addressees

 4   to whom we -- yeah, potential receivers of our sales material.

 5           I'm not familiar, Your Honor, with any testimony

 6   where he said it was limited to some type of one off thing, and

 7   I also understand the record shows --

 8           THE COURT:  Where were you just reading from?

 9           MR. SUDARSHAN:  I'm sorry, Your Honor.  It's in this

10   area here.

11           And to be clear, Your Honor, this Shiron transaction

12   was something that the ILeverage folks worked on for an

13   extended period of time.  This was their business.  It was to

14   go out and try to find buyers, and so there's pretty good

15   testimony here that that's the purpose of the spreadsheet is to

16   track who he's reached out to.  Comes directly from his files.

17           THE COURT:  Is he going to be a witness in this

18   case?

19           MR. SUDARSHAN:  Through deposition, Your Honor.

20           THE COURT:  And does he have further answer at the

21   top?

22           MR. SUDARSHAN:  I think it flows over here, Your

23   Honor.

24           THE COURT:  Oh, I see.  All right.  Mr. Ponder, why

25   isn't that sufficient?  He is the custodian of that record.

 1   He is the one who created it, maintained it.  He said he did

 2   it in the course of his business.

 3            MR. PONDER:  Your Honor, we would just submit that

 4   a -- a patent sale, a significant transactional activity that

 5   is supposed to be fundamental for the company, was selling off

 6   their entire patent portfolio, that is not a regular -- that

 7   is not an enterprise that one conducts in a regular manner as

 8   contemplated in the business record exception, Your Honor.

 9            THE COURT:  All right.  Well, I'll overrule the

10   objection to Exhibit 6.

11            MR. PONDER:  The next one, Your Honor, is PX 623.

12   Your Honor, this purports to be a claim chart direct -- if we

13   go to the next page, Mr. Aquino.  Or back one page.  Oh, yes,

14   this purports to be a claim chart, and Plaintiffs are claiming

15   this as evidence of willfulness.

16            If we go back to the first page.  We think it's

17   highly prejudicial for this document to be introduced.  We

18   don't think it's appropriate considering the limitations that

19   were put on it.

20            The Plaintiff's agents specifically represented that

21   this chart, if it was actually transmitted to Hughes, and there

22   is a factual dispute as to that, that this was not to be

23   considered for any purpose other than to consider whether they

24   would buy -- whether it should buy the patent.

25            The second sentence says no opinion of infringement

1    validity or enforceability is expressed or implied.  The last

2    sentence is this sales presentation is confidential and should

3    not be used for any purpose other than the purchase of the

4    Shiron patent portfolio.

5            So there is a problem with this.  It's highly

6    prejudicial for it to be coming in.  It's a document --

7            THE COURT:  What's the prejudice?

8            MR. PONDER:  They're claiming that this is the

9    document that put Hughes on notice of willful infringement.

10   Behind here is a claim chart that they say maps the claim

11   elements against the Hughes product.

12           THE COURT:  Okay.  And what's unfair about that?

13           MR. PONDER:  What's unfair about it is back when

14   they talked to Hughes, they said we're not putting you on

15   notice of infringement, we just want you to take a look and

16   see if you're interested in buying the patents.  They made

17   that expressed presentation.

18           For them to now be able to assert in litigation that

19   it is wilfulness when they said the only thing you're supposed

20   to use this for is to decide whether you should buy the

21   patents, and in the second sentence they say we're not even

22   telling you if you infringe.  It's highly prejudicial and

23   unfair, Your Honor, and shouldn't be allowed as evidence of

24   willful infringement.

25           And we'd also offer that the witnesses are not sure

 1  whether these exact documents were sent to Hughes, so these

 2  were produced out of -- this particular document was produced

 3  by Mr. Rosenfeld, so it's out of his files, but he produced a

 4  number of claim charts, and he didn't have any recollection as

 5  to which charts went to which companies.  They contacted a

 6  number of companies.

 7          So putting this type of evidence in front of the jury

 8  is highly prejudicial to suggest that this created notice when

 9  they specifically said that that's not what we're doing when we

10  send you this notice.

11          THE COURT:  I don't think that the limiting

12  information there is of particular import, but if there is not

13  evidence from which a reasonable jury could conclude that this

14  was sent to Hughes, then that's a different matter.  What's

15  the response from Plaintiffs?

16          MS. FAIR:  Your Honor, Mr. Aloush, who provided

17  these claim charts to Hughes, gave a deposition in this case,

18  and both parties have designated testimony from that

19  deposition where Mr. Aloush testifies that he made these claim

20  charts available to Hughes on his website and that he emailed

21  Hughes telling Hughes that they were available on the website.

22          Now, there's some deposition designations that Hughes

23  has that they say dispute that and undermine other parts of

24  Mr. Aloush's testimony, but it goes to the weight and not the

25  admissibility.  There is evidence and testimony from Mr. Aloush

 1   that he put these claim charts on his website and directed

 2   Hughes to the claim charts on the website.

 3            And so a reasonable juror could conclude from that

 4   that Hughes was on notice of the allegations made in the claim

 5   charts.

 6            THE COURT:  All right.

 7            MR. PONDER:  Your Honor, Mr. Aloush did not

 8   authenticate this exhibit.  This was an exhibit to

 9   Mr. Rosenfeld's deposition that was held the next day.  If we

10   could go back out to the first page --

11            THE COURT:  Well, are you disputing that Mr. Aloush

12   testified that this document was on his website and that he

13   told Hughes that they could access it there?

14            MR. PONDER:  He did not talk about this document.

15   Mr. Aloush had his own versions that he produced, and they're

16   different documents that he testified about.

17            Basically there's a huge stack of very different

18   charts.  They can't use Mr. Aloush's testimony on this

19   document.  This document wasn't used with Mr. Aloush's

20   deposition.  It's the one that is out of Mr. Rosenfeld's file.

21            THE COURT:  All right.  Ms. Fair, what basis is

22   there to connect this to Mr. Aloush's testimony that you

23   referred to?

24            MS. FAIR:  Your Honor, Mr. Aloush was at -- part of

25   this goes to where the documents came from.  Mr. Aloush

1    produced them in response to a subpoena, and there were some

2    that were Bates-labeled and some that were not.

3            And so at his deposition, the specific documents that

4    when the Plaintiffs were questioning Mr. Aloush, the ones that

5    were asked about during that portion of the deposition were not

6    Bates-labeled.  Those were the exhibits that we originally had

7    on the list.

8            Hughes objected and said these don't have Bates

9    labels, so we said, okay, we'll replace them with the

10   Bates-labeled version, so these are the same claim charts that

11   Mr. Aloush testified about in his deposition, and at Hughes'

12   request, we have replaced them with the ones that are

13   Bates-labeled.

14           MR. PONDER:  Your Honor, I think that may be true

15   with other documents.  I don't know that that's the issue

16   here, but they're trying to use Mr. Rosenfeld -- this is the

17   document that was produced out of Mr. Rosenfeld's file.

18   Mr. Rosenfeld didn't produce the documents to Mr. Aloush.

19   They're two different guys.  They don't get along.  They're

20   former business partners that sued each other.

21           THE COURT:  Well, do you dispute what Ms. Fair said,

22   that this is just another copy of the document that Mr. Aloush

23   testified about?

24           MR. PONDER:  I can't remember if this one is

25   because, frankly, there's about 20 to 30 of these, Your Honor,

 1  and they change in different ways.  The witnesses couldn't

 2  tell you difference.  If they have one that's page by page,

 3  Your Honor, then I would just submit that we should bring this

 4  back up tomorrow.

 5          THE COURT:  Well, at this point I'm going to

 6  overrule this objection, and you can bring it back up if you

 7  find something that is helpful on that, but 623 is overruled.

 8          MR. PONDER:  Give me one moment, Your Honor.  I'm

 9  looking for the deposition transcript.  I misplaced mine.

10  Here it is.  If we can bring up Exhibit 623.  Oh, that's the

11  one we just did.  Apologies.  If you can go to 624.  Oh, okay.

12          Your Honor, this is a document that was produced by

13  Mr. Rosenfeld.  It's a hearsay document.  It's a document he

14  prepared that purports to be a summary of what the '874 patent

15  covers.

16          There is no evidence that this was ever transmitted

17  to Hughes or anyone else.  It was his like internal work

18  product.  He's a patent lawyer.  We can't see any relevance to

19  his assessment of what this patent covers.

20          If we can scroll down a little bit.  It has a

21  background section here where it talks about what the

22  technology generally is.  Scroll down, it has kind of a --

23          THE COURT:  All right.  The objection is hearsay and

24  relevance.  Let me hear the response and I'll give you a

25  chance to reply.

 1          MR. PONDER:  Your Honor, if I can also say it's also

 2   unfairly prejudicial because he's not an expert and shouldn't

 3   be describing what the patent covers.

 4          THE COURT:  All right.

 5          MS. FAIR:  This is very similar to the last document

 6   in that it is part of the ILeverage documentation that was

 7   provided to Hughes that put them on notice both for marking

 8   purposes and for willfulness, which Your Honor knows are both

 9   at issue in this case, so it's not a hearsay use of the

10   document.  It's the fact it was transmitted to Hughes.  We

11   don't --

12          THE COURT:  What's the evidence that it was

13   transmitted to Hughes?

14          MS. FAIR:  I believe -- and we're trying to find --

15   again, the records that Mr. Aloush produced did not have Bates

16   numbers, so those were the ones we originally included on the

17   exhibit list.  This is the one from Mr. Rosenfeld's file, so

18   we're trying to find to make sure that this is the same one

19   that Mr. Aloush testified about that was provided to Hughes,

20   but that was the intent.

21          THE COURT:  Okay.  Well, at this point you cannot

22   cite me evidence that says this was shown to Hughes?

23          MS. FAIR:  I have to look in Mr. Aloush's deposition

24   and make sure this is the same document, but that's -- that's

25   why it's on our list, so if it's not, then we would withdraw

 1  the exhibit.  If you would give us until the morning, we can

 2  find that testimony or withdraw it.

 3           THE COURT:  Okay.  At this point, I'm going to

 4  sustain the objection to 624.  If you get me evidence that

 5  supports it, I'll take it back up.

 6           MS. FAIR:  Yes, Your Honor.

 7           MR. PONDER:  If we can go to Exhibit 737.  So, Your

 8  Honor, this is the version that I think they're saying

 9  Mr. Aloush testified to.  If you would go down to the bottom,

10  please?  I'm sorry.  Can I get the whole frame so I can see

11  the Bates number?  There is no Bates label, Your Honor, so

12  actually this goes back to the argument we just had.

13           They kept on their exhibit list the ones that don't

14  have Bates numbers, so we would ask you to reverse your ruling

15  with respect to the one that was from Mr. Rosenfeld's

16  deposition and say that the ruling with respect -- 623, and we

17  would make the same argument with respect to 319 that we did

18  for 623.

19           MS. FAIR:  We're just going to use one, Your Honor,

20  so if we -- if Hughes prefer we use this one, we're happy to

21  use this one.

22           MR. PONDER:  We don't prefer the use of either one,

23  Your Honor, but I would say the arguments we would make are

24  the same, so I think that -- we don't have to re-argue it,

25  Your Honor, but this would --

1          THE COURT:  I'm thoroughly confused.

2          MR. PONDER:  I'm sorry, Your Honor.  This is the

3   document Mr. Aloush's testimony you saw earlier was about.

4   The one for 623, Mr. -- Mr. Rosenfeld wasn't the subject.

5          THE COURT:  Just a moment.  So this exhibit you

6   admit Aloush said he put on a website and told Hughes they

7   could access it?

8          MR. PONDER:  We don't admit that that is the import

9   of his testimony.  I'll admit, Your Honor, that that was how

10  you interpreted Mr. Aloush's testimony that was just shown a

11  few minutes ago.

12         I -- Your Honor, we don't admit that any documents

13  were ever sent to Hughes.  I'm saying the testimony you saw in

14  connection with Mr. Rosenfeld you found supported the idea that

15  the '874 claim chart went to Hughes.  That's -- what's what

16  we're saying, Your Honor.

17         THE COURT:  I think I only heard about that

18  testimony.

19         MR. PONDER:  Oh, we didn't see it.  Well, can we see

20  the testimony since we have Mr. Aloush's exhibit here?  I

21  think Rosenfeld's should come off and we should see the

22  testimony for this.  I'm sorry.  I'm a little confused.

23         MS. FAIR:  Can I have the Elmo, please?  So here is

24  deposition testimony from Mr. Aloush about an email that he

25  sent to Mr. Plastrik, a Hughes employee, where he says -- and

1  I'm starting here at the bottom of page 147 -- in particular I

2  would like to refer you to the claim charts showing the read

3  of the patents on actual VSAT and cellular backhaul

4  applications.

5              So we have testimony here from Mr. Aloush where he

6  sent an email to Hughes saying I'm talking about the claim

7  charts that I provided to you.

8              THE COURT:  And is there testimony somewhere that

9  says that this is one of those charts?

10             MS. FAIR:  Yes, Your Honor, give me just one moment

11 and I'll pull it up right now.

12             THE COURT:  Okay.

13             MR. PONDER:  Your Honor, I think we can actually see

14 the testimony again, the part that was also highlighted on the

15 page.  If you can bring up Aloush 119, I think he actually --

16 I'm sorry.  Deposition transcript.  I believe we were just

17 looking at page 119.  Go to the next page.  Actually if we

18 could ask Ms. Fair what four pages were on the part that you

19 just showed?

20             MS. FAIR:  It was starting on line 24 of page 147.

21             MR. PONDER:  Okay.  If we could go to 149, I

22 believe.  Yeah, I would just point out that the follow-up

23 question there was -- if we can go to page 148?

24             The question was, is it your understanding that you

25 never sent him any confidential information; right?

1          Yes, your question is -- and then we go to the next

2    page -- whether or not I sent him claim charts?

3          No, any confidential information.

4          Well, based on what I see here, I didn't send

5    anything to him.  I just referred him to the website.

6          As of that time, do you have any recollection that

7    there were any claim charts on your website?

8          Oh, sorry.  If we could go to page 148 and look at 15

9    to 19, lines 15 through 19.  So there's -- Mr. Aloush's email

10   didn't attach anything to it, and the response from Hughes was

11   that we're not going look at any of your confidential

12   information.  There's -- there's no actual evidence that the

13   transmission of any claim charts he used.

14          THE COURT:  There's no evidence that they read them.

15   There is evidence that they were expressly given access to

16   them.

17          Well, so I think that that is relevant evidence, so I

18   will -- and which is the document that we have settled on?  I

19   think it -- I think it had an evidence tag of 319, but that may

20   have been a deposition.

21          MR. PONDER:  That's right.  It's Exhibit 737.  So if

22   I understand, you're sustaining the objection with respect to

23   623, but overruling the objection with respect to 737.

24          THE COURT:  All right.  So ordered.

25          MR. PONDER:  Take a look at Exhibit 740.  Your

1    Honor, this is another version of the email involving

2    Choquette.  Can we propose the same agreement, that the

3    attachments be -- the '874 patent and the '073 patent be

4    attached?

5              MR. HILL:  Yes, Your Honor.

6              MR. PONDER:  And with that, Your Honor, we are done

7    with the ILeverage bucket.

8              THE COURT:  Okay.  Mr. Hill, if you want to take

9    back up the matter regarding Mr. Messineo?

10             MR. HILL:  Yes, sir, Your Honor.  Mr. Sudarshan is

11   going to address the issue for the Court.

12             THE COURT:  All right.

13             MR. SUDARSHAN:  Your Honor, I have a few paper

14   copies.  May I approach the bench with those?

15             THE COURT:  Yes.

16             MR. SUDARSHAN:  And, Your Honor, I have these in

17   electronic form to pull up on the screen as well.

18             Let me propose, Your Honor, proceeding in the

19   following way:  And, first of all, thanks to the Court.  We

20   appreciate the Court's indulgence in giving us the opportunity

21   to seek additional discovery on the authentication of the PES

22   demonstration system.

23             Just to refresh the Court's recollection, this was a

24   system that we -- a demonstration system that we challenged in

25   limine on the basis of authentication, and the Court granted us

 1   leave to take the deposition of the gentleman who was purported

 2   by Defendants to be able to authenticate it.

 3          We believe that the deposition which proceeded on

 4   Monday in Detroit confirmed our suspicions that Hughes is not

 5   able to authenticate the dates and origins of the so-called

 6   demonstration system in a way that's sufficient to establish

 7   relevance to the jury.

 8          So let me -- let me proceed by giving the Court an

 9   overview of the components of the system, and then what I would

10   propose to do is just walk through the testimony from Mr.

11   Messineo and explain our view of how that shakes out with the

12   overall question before the Court, which is is this relevant

13   evidence of a prior art system.

14          On the first slide here, slide two, we have displayed

15   -- these are images that come to us from pictures that were

16   produced as attachments to Hughes' expert report.  These are --

17   what you're seeing here, Your Honor, are pictures from the

18   system in Michigan.

19          There's one exception.  The terminal outdoor unit, we

20   were not produced with pictures of those, so I'm just giving

21   you a sense of what those look like.

22          But this is the system overall.  It's composed of

23   satellite dishes outside.  In the middle you've got an operator

24   console.  The console is hooked up to a hub -- various hub

25   equipment and also various terminal equipment.

1          And the way they've set this up to work is you've got

2    a laptop computer on the bottom right that accesses -- that's

3    connected via an Ethernet cable to one of the systems on the

4    bottom left.

5          And -- and what they've set up in the demonstration

6    is a way to use this overall terminal plus hub to access the

7    internet on the other side.  So on one with side you've got

8    terminals.  On another side you've got a hub.  So the laptop is

9    connected to the terminal, and then the hub is connected to an

10   internet connection.

11         So the experiment, if you will, Your Honor, was they

12   were trying to show that with a laptop can you use this system

13   they created to get on the internet via the hub, and so what

14   I'll do here is walk the Court through the various parts here.

15         On the next slide, in terms of orientation, Mr.

16   Messineo was very clear that the system that he put together

17   did not exist in time before.  This was -- this was a specific

18   combination of components that he brought together for purpose

19   of this litigation using particular software that was installed

20   for those purposes.  So we view this as a custom built

21   litigation demonstration.

22         On the next slide is a summary of what I'd like to

23   show the Court.  We believe there are a number of components of

24   the system that cannot be authenticated and that that was

25   confirmed by Mr. Messineo's testimony.

1            And before going through that testimony again, the

2    purpose that they're trying to offer the system for, Your

3    Honor, is they want to tell the jury that this is an actual PES

4    system that pre-dates November 1997.  That's the filing date of

5    the patent.

6            And Dr. Wicker has relied on pictures of the system,

7    and we -- we expect that he will tell the jury that this proves

8    that, indeed, one could get on the internet with a pre-1997 PES

9    system, and we think that would be terribly prejudicial with

10   this system because the system itself didn't exist before '97.

11   It consists of parts that post-date 1997 and parts of unknown

12   origin and parts of unknown date.

13           On the next slide, Mr. Messineo told us that he

14   joined the company in '99, so this is -- this is relevant only

15   because 1997 November is the invention date, so Mr. Messineo

16   himself does not have personal knowledge having worked at

17   Hughes during the critical date and time, so he was not there

18   to examine this equipment in time.  His testimony was to the

19   effect, Your Honor, this looks like it could be around that

20   time frame, for certain pieces, not for all.

21           On the next slide, we're diving here into the hub

22   equipment.  So the claims of the '073 patent, Your Honor, cover

23   a system that's comprised of a terminal and a hub and other

24   parts.

25           And so we asked him to explain some of the cards that

1    were in the demonstration hub, and these are particularly

2    relevant because these cards are used as a LAN IO interface

3    module.  That means they are -- they are using these cards for

4    the internet access portion of this, which the parties have

5    greatly disputed in this case as could the PES support internet

6    at the relevant time frame.

7            And so on this point when we asked him what's the

8    date of the interface module, he was unable to give us the date

9    for that, of either card that's involved in the hub system, and

10   that's the actual technology that's serving up the internet in

11   this demonstration system.

12           On the next slide, processor boards, this is the

13   actual logic, the brains of the hub that's processing the data

14   that's actually passing through the hub.  Mr. Messineo thought

15   most likely that those boards pre-date '97, but he wasn't able

16   to confirm under oath that they do.

17           On the next slide, we point you, Your Honor, to Dr.

18   Wicker's testimony, which was -- which is -- which is an

19   interesting contrast.  Dr. Wicker testified in his deposition

20   when we asked him about those very components, we asked him do

21   you have any information that the cards pre-date the filing of

22   the patent.

23           And he said it is my understanding that the equipment

24   itself pre-dated.  I don't have information with respect to

25   specific cards, but it's my understanding that they pre-date

 1   it.

 2          And that was on the basis of counsel's

 3   representations.

 4          And Dr. Wicker is important here, Your Honor, because

 5   the -- the demonstratives that we -- that were at issue and

 6   that caused us to file the motion in limine, those were

 7   presented through Dr. Wicker's expert report.

 8          And in particular there were photographs and videos

 9   that were shown to Dr. Wicker that we found out at his

10   deposition, even though he stated in his report that he had

11   inspected the system, we found out that he had not in person

12   seen the system.

13          He had seen the system through a video chat at a time

14   where, unfortunately, he had an eye procedure and he wasn't

15   able to see, so that's why we felt it was important to show the

16   Court Dr. Wicker's view was that all of this was pre-'97.

17          On the next slide, hub attenuators.  These are the

18   actual dials that you use on the hub to tune them to particular

19   frequencies, and Mr. Messineo testified that he had to

20   configure and dial it -- turn these dials in a particular way

21   to set up the system.  We asked him what was the date of the

22   attenuators.  He said he didn't have the dates.

23          And keep in mind, he's putting all this together into

24   the system.  It's not a system that existed.  He actually put

25   this together.

1          On the next slide, another component of the hub.

2    What's the date of the system IF distribution block?  This,

3    again, goes to the frequency modulation.  He says, I don't have

4    dates for those.  He thought they had been in the facility

5    since 2001, or at least since 2009.  Wasn't able to confirm

6    that they pre-dated '97.

7          Turning now to the terminals, Your Honor.  I've been

8    showing you his testimony on the hub.  The terminal is what the

9    laptop was connected to in the demonstration system, and on the

10   terminals, Mr. Messineo testified that he believed they dated

11   from 1995.  And the basis of that, he said, was a serial number

12   on the terminal that he believed had been shown some type of

13   information to suggest in a database that they were from '95.

14          On the next slide in the bottom left corner is the

15   record that was produced to us on Monday for the very first

16   time in this case.  When we asked him, sir, have you seen that

17   record -- and we asked -- we asked if the record had ever been

18   produced, we found out that they had never produced that

19   record.  Instead, they had -- counsel represented that they had

20   taken data from the record and put it in a letter to us in

21   March or April.

22          But until Monday we were never -- we had never seen

23   the actual business record that had a serial number purporting

24   to track to a particular ship date, and at an appropriate time

25   we'll take up the question of whether that business record is

1    admissible.  We'd submit it's a violation of Rule 26.

2              THE COURT:  What date does it show?

3              MR. SUDARSHAN:  The date -- the date shown in the

4    database purports to have ship dates of -- in one case '95, in

5    some other cases '1997.

6              On the next slide, this is just more testimony, Your

7    Honor, about -- from Mr. Messineo on that database record.  He

8    confirmed that he had no experience with that database.  It was

9    just shown to him with counsel the day before the deposition as

10   he was getting prepared for it, so he wasn't able to confirm --

11   he does not use that database in the ordinary course of his

12   business.

13             And even if we were to take the record at face value,

14   the -- the other problem we have raised in the briefing is the

15   chain of custody, as I address in the next slide.  The

16   terminals were not with Hughes.  The terminals were obtained by

17   a gentleman named Ali Mohadjer, who is a consultant to Hughes

18   in this case.  He's a litigation consultant.  He used to work

19   at Hughes and now he has a business where he re-sells

20   equipment.

21             And so Mr. Mohadjer got some of the terminals from a

22   warehouse that -- from a company that he bought that was in

23   bankruptcy, and during the course of this litigation, he

24   testified that he discovered some of those boxes lying around.

25   Other -- other terminals he discovered -- he -- he actually

1    obtained from another third party, a leasing company, whose

2    name Mr. Mohadjer didn't remember.

3             And when we asked Mr. Messineo -- the next couple of

4    slides get to this, and the reason we think that's relevant is

5    we -- we thought it was important to know whether there was

6    any -- any guarantee that these terminals had not been modified

7    since '97 since they've been out of Hughes' hands since

8    purportedly '95.  It is relevant whether customers had modified

9    terminals.

10            And Mr. Messineo said he didn't know how these

11   terminals ended up with -- with counsel's litigation

12   consultant.  He just -- they had just been provided to him by

13   counsel.

14            And then on the next slide when we asked him do you

15   know you what changes, if any, underwent in the -- in the

16   remote, he said he didn't think it looked like there were

17   changes, but he couldn't say for certain, and so he couldn't

18   confirm.

19            I asked him if he opened up the box, and he said he

20   hadn't opened up the box to see if anything had been modified,

21   which we think is -- is important if they're going to say this

22   is all as it existed before '97.

23            On the next slide, tying back to Dr. Wicker, because,

24   remember, Dr. Wicker was the witness who they had told us in

25   discovery they were going to try to get this through.  And in

1  Dr. Wicker's deposition -- on the next slide, please.  This was

2  back in March.  We asked him you were informed that the

3  terminals were purchased from a third party, and he said he

4  hadn't -- he hadn't been informed of that and didn't know it to

5  be the case.

6          And then we asked him, would you have -- would you

7  have asked whether any modifications were made, and he said --

8  would have wanted to know that and he said, yeah, I would want

9  to know whether it was reflective of the actual operation of a

10  PES system in the early '90s.  So under Dr. Wicker's own

11  testimony, questions that should have been answered were not

12  answered.

13          Next, the outdoor unit, Your Honor, this is what sits

14  up on the roof.  This is basically the antenna for the

15  terminal, and this was not available for inspection.  We didn't

16  see the actual outdoor unit because it was on the roof.  And

17  the long and short of this is Mr. Messineo couldn't

18  authenticate the date of that.  That's also -- that's part of

19  the terminal.  He thought it had been there since 2001.

20          Next, the console, this is -- this is -- admittedly,

21  Your Honor, the monitor is an old one, probably from the early

22  '90s.  Key board and mouse certainly looked to me to be from

23  the early '90s.  I don't have any bones to pick there.

24          But the DAT drive, that's what you see on the right,

25  it's a little bit hard to see, that's the drive that they

1   actually loaded the software on to the system with, so that's

2   how you get the software on to the terminals and the hub.

3           And we said -- and he -- he candidly expressed he

4   tried to use old -- old machinery for everything, but the

5   system that actually loaded this software on to the machine,

6   the smaller DAT drive, he -- he had admitted that those were

7   maybe newer than '97 and that they were used -- that type of

8   drive was used up until the end of PES, which was sometime in

9   the 2000's.

10          Next point, this was what was used to access the

11  internet in the demonstration.  This was a new computer.  This

12  was counsel's -- Hughes' counsel's computer that was used.

13  Mr. Messineo didn't know the vintage, but it was very clear

14  that the laptop was a new one, a modern one, not '97 era.

15          And the next one is the internet gateway.  This is

16  what's actually feeding the internet connection into the hub,

17  and this is particularly prejudicial because they -- they

18  purport to show through the system that the PES could be used

19  to get on the internet.

20          And we asked what's the vintage of that equipment?

21  It was very clear it's a -- it's a 4G or 3G system from the

22  2010's, and Mr. Messineo just didn't know the vintage of it,

23  but agreed it was newer.

24          So that's the March through the testimony, Your

25  Honor.  I suspect you may hear that none of this matters, that

1  the gateway and the -- and the laptop, whether they're pre or

2  post-'97 doesn't matter.

3           I don't know how you'll -- I don't know what the

4  explanation could possibly be for the actual internet IO cards

5  in the hub, how that couldn't possibly matter.  That certainly

6  matters.  Dr. Wicker agreed with that.

7           But the overall point is there's no testimony from

8  anyone, there's no expert testimony that would explain how

9  the -- how the -- that would separate the wheat from the chaff,

10  so to speak.  Why does it not matter that part X is post-'97

11  and part Y is post-'97?  Dr. Wicker was told it was all

12  pre-'97, or at least that's what his testimony suggests he

13  assumed it was.

14           So I think Dr. Wicker -- Dr. Wicker thought that

15  gate -- I think he knew the gateway and the laptop were

16  post-'97.  I think he testified that wouldn't matter, but for

17  all the other things that are inside the demonstration system

18  itself, we would submit there's just too much there that's of

19  unknown origin or the wrong date.

20           THE COURT:  On your slide four, you list the

21  Flexroute software, but you didn't separately address that.

22           MR. SUDARSHAN:  That's right, Your Honor.  I

23  apologize for that.  I didn't -- I didn't put in a slide for

24  that.

25           The relevant point from Mr. Messineo's testimony on

 1   that was he -- he believed that the software itself was -- was

 2   pre-critical date, but he wasn't able to testify that that was

 3   actually ever sent to customers before the date.

 4            So he said I looked at the -- I did a read of the

 5   data.  I looked at the tape which had an October '97 date,

 6   which is awfully close to the critical date, and he said

 7   that's -- I believe that's the date where somebody loaded this

 8   software on to this tape, but then when we asked him when -- do

 9   you know when the tape went to customers, he couldn't confirm

10   that.

11            THE COURT:  All right.

12            MR. SUDARSHAN:  And I -- and -- yeah, I'll stop

13   there, Your Honor.  I think I've shown you what I would like

14   to show you.

15            THE COURT:  All right.  Thank you, Mr. Sudarshan.

16            MR. PANKRATZ:  Your Honor, I'm not sure the specific

17   objection to which I should address, so let me start with

18   authenticity.

19            THE COURT:  I think that is the issue.

20            MR. PANKRATZ:  The deposition of Mr. Messineo

21   proceeded and authenticated exactly what this equipment is.

22   There are broadly three pieces.  There's the hub, there's the

23   Personal Earth Station 5000 terminal, and there is the

24   software that executes on the terminal and the hub.

25            Mr. Messineo made clear that all of the equipment

 1  with the exception of the Personal Earth Station 5000 and its

 2  remote, the outdoor unit, were from Hughes' own supplies, so he

 3  has authenticated where that equipment came from and --

 4           THE COURT:  It's the date of the equipment that's

 5  the issue; right?  Is this something that could have existed

 6  at the time that is relevant.

 7           MR. PANKRATZ:  And, Your Honor, I think perhaps an

 8  analogy.  This case is really about, for example, the

 9  engine -- how does the engine of a 1952 car shift gears.  If

10  they were to complain that you took a 1952 car with a 1952

11  engine and then drove it on a modern road with modern gas,

12  somehow means that the demonstration of the shifting of gears

13  is not relevant, that's -- that's basically what we're seeing

14  here.

15           The date of certain pieces like an antenna doesn't

16  matter.  The antenna works the same, and they are welcome to

17  cross-examine Dr. Wicker and all of our witnesses with the lack

18  of dating on specific things.

19           THE COURT:  What testimony do you have from anyone

20  that everything that matters preceded the date?

21           MR. PANKRATZ:  Your Honor, the -- the software and

22  the Personal Earth Station 5000 terminals themselves are what

23  we view as the critical pieces, the engine that is the subject

24  here of this case, the software, as Mr. --

25           THE COURT:  Who do I have -- I have your statement

1    that that's the critical part.  What I need is testimony from

2    somebody who knows.

3            MR. PANKRATZ:  Mr. Messineo confirmed that the

4    demonstration, that is one of the videos that was produced,

5    and there was another one used during the deposition that was

6    identical.

7            He confirmed -- and this is in his deposition at page

8    134 -- that it operated as a pre-1997 Personal Earth Station

9    system would have operated, and he was able to say that based

10   upon manuals that are pre-1997 that illustrate and describe

11   exactly how the Personal Earth Station system should work.

12           And so he was looking at the operation of

13   pre-critical date software operating on a terminal from which

14   the records -- and we have more testimony from Mr. Mohadjer

15   establishing exactly where this PES terminal came and went and

16   its chain.

17           But the crux of this is there is testimony from

18   Mr. Messineo establishing that pre-critical date software

19   running on a pre-critical date Personal Earth Station terminal

20   operated exactly as the manuals from pre-critical date said it

21   would.

22           And so that, Your Honor, I believe is testimony that

23   is -- that does establish that not only is this authenticate,

24   but it acts as an authenticate Personal Earth Station 5000

25   terminal would have operated.

1            THE COURT:  And how do you respond to the components

2      that are listed out on the Plaintiff's slide four.

3            MR. PANKRATZ:  I think -- Mr. Messineo testified

4      that he was confident that most of those were pre-1997.  I

5      think they're picking on the fact that he can't say he

6      personally knows --

7            THE COURT:  Well, show me that.

8            MR. PANKRATZ:  So, for example, page 78 of

9      Mr. Messineo's deposition, and here he's discussing, for

10     example, modems.

11           These were old.  They were -- and -- and he's talking

12     about how he knows they're older because he knows when he first

13     came on in 1999 that there were newer versions of the modem,

14     and these others that he has used for the demonstration

15     equipment were those that were used in the '80s and '90s.

16           Did he confirm the exact date?  No.  But is he able

17     to state under oath that they're pre-dating 1997?  He's

18     confident that they are likely before 1997.  And so, Your

19     Honor, I believe this testimony establishes that there is a

20     likelihood that these are pre-1997.

21           But, again, I would -- I would submit that the modems

22     here are not the point of the demonstration.  The point of the

23     demonstration is to show the 1995 Personal Earth Station 5000

24     and the 1997 software running on it and how it operates.

25           THE COURT:  How do we know that the way it's

1   operating with all these components is the same way it would

2   have operated in '97.

3          MR. PANKRATZ:  If you can turn to page 14, please,

4   of Mr. Messineo's deposition, and here he's being asked about

5   the operation of the demonstration as the equipment worked,

6   starting at line five on 134.

7          Do you believe the Flexroute system that you

8   configured, do you believe it operated -- and to be clear, he

9   configured it according to a pre-critical date manual.  He used

10  the instructions for something we have proven was sold before

11  the critical date.

12         Do you believe it operated in a manner as indicated

13  to you from your training as it would have operated prior to

14  November of '97?

15         Yes, I do believe.

16         Okay.  Why do you believe that?

17         In all indications, the manual, the way it describes

18  Flexroute, the way it's supposed to operate and the way it's

19  being done or shown during the testing, that's operating the

20  way the manual said it would.

21         THE COURT:  I think, given the hour, what I would

22  like to do is have the parties tender up a copy of

23  Mr. Messineo's deposition and let me review it overnight and

24  we'll resume the argument in the morning.

25         MR. PANKRATZ:  We're checking to see if we have a

 1    paper copy.

 2            MS. FAIR:  If we could send it electronically, I

 3    don't know if that works for the Court.  If the Court needs a

 4    hard copy, we might need to search a little bit to see if we

 5    have one that's not marked up.

 6            MR. PONDER:  I think we have one in the car, so --

 7            THE COURT:  That's fine, as long as I -- is there

 8    other testimony that's important on this issue besides

 9    Mr. Messineo's?

10            MR. PANKRATZ:  I believe Mr. Mohadjer -- they've

11    made the point that they don't believe there is any chain

12    linking the Personal Earth Station 5000 terminal.

13            Mr. Mohadjer did testify about that, and he did

14    testify about the business record that verifies when it was

15    sold, in 1995 or 1997, that specific serial number.

16            And so I would submit that Mr. Mohadjer's testimony.

17    For background, he was a Hughes Network employee at the time

18    when the terminal, the specific terminal was sold to ThruComm.

19    He later bought ThruComm, and then sold that same terminal back

20    to Hughes.

21            THE COURT:  Can you get me this evening also a copy

22    of that?  If it's just one part of his deposition, then that's

23    all I really need, but I would like to see that also before we

24    resume in the morning.

25            MR. PANKRATZ:  Yes, Your Honor, we will get you

1   that.

2           THE COURT:  Okay.  Then we're going to break now and

3   start back up at 8:30 in the morning.

4           COURT SECURITY OFFICER:  All rise.

5

6           (Hearing concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2            I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7    _____          Date:  7/22/17
     Tammy L. Goolsby, CSR
8    Deputy Official Court Reporter
     State of Texas No.:  3101
9    Expiration Date:  12/31/18

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,  on 07/20/2017
144Index: $18..25

---

**$**

**$18**  94:1

**$2**  87:8 90:19 93:18

**$290**  90:18

**$60**  94:2

**$602**  90:17 92:3 93:2,17

**$70,000**  64:16

**$858**  85:3

---

**0**

**037**  24:12

**073**  24:11 73:15,18 109:10 124:3 127:22

---

**1**

**1-6**  103:10

**1.0**  84:8,16

**10**  100:24

**1006**  58:12,14

**102G**  33:10

**108**  86:14

**10K**  59:2,19,22

**10k's**  87:16

**11**  14:21,22 38:16 100:24

**111**  78:13

**112**  78:13

**115**  41:7,9,21

**116**  78:13

**117**  78:13

**118**  78:13

**119**  122:15,17

**12**  6:3,10,13,14,15,16 7:11,15 8:1 16:2 38:13,14

**120**  78:13

**121**  54:20

**123**  83:14

**124**  78:18

**126**  67:11

**12B**  6:3 7:11,17 17:5

**12H**  8:3

**12H1A**  12:7

**13**  28:24 61:9 72:21,22

**134**  138:8 140:6

**135**  40:15 41:7,8,21 43:5 46:20

**13th**  71:19

**14**  4:18 140:3

**140**  45:20 47:16,18

**1400**  18:20

**1400B**  12:25

**1404**  4:18

**1404A**  12:11

**1406**  4:18 12:19 17:2,10,25

**146**  78:20,21,22 80:21

**147**  122:1,20

**148**  122:23 123:8

**149**  122:21

**15**  61:5 76:8 123:8,9

**153**  80:25 82:2

**155**  47:20

**16**  13:18 19:5,8 20:10,20 103:10

**16-month**  18:6 19:12

**169**  67:14,16

**17**  86:18

**174**  81:1,2

**177**  76:22

**18**  88:2 90:11

**180**  76:22

**181**  83:1

**182**  83:23

**19**  123:9

**190**  109:6

**193**  84:21

**195**  67:22

**1952**  137:9,10

**1957**  8:11

**196**  67:17

**1995**  130:11 139:23 141:15

**1997**  25:12 127:4,11,15 131:5 139:17,18,24 141:15

**1999**  139:13

**19th**  53:22

---

**2**

**2**  45:9

**2.0**  84:8

**2.2**  87:7

**20**  99:4 117:25

**200**  37:8 101:19

**200-page**  109:5

**2000's**  134:9

**2001**  100:14 130:5 133:19

**2003**  76:25

**2004**  32:4

**2006**  85:3

**2008**  82:12 106:14

**2009**  130:5

**2010's**  134:22

**2013**  45:22

**2014**  41:11 45:12

**2015**  8:24

**2016**  32:5 73:3,17

**2019**  90:16 94:3

**208**  85:10

**215**  76:9

**227**  108:2,9,21,23,24

**228**  108:2,21,23

**24**  67:6,8 76:20 79:9 122:20

**25**  67:5

| | | |
|---|---|---|
| **258** 59:7,13,16 | **388** 12:18 | **5th** 12:23 |
| **26** 78:8 131:1 | **389** 29:17 | |
| **260** 47:21 | **390** 29:17 37:9,16 | **6** |
| **265** 59:18 | **391** 29:17 37:16 | |
| **268** 67:11 | **3G** 134:21 | **6** 108:2 113:10 |
| **271F** 69:4,16,17 70:1,17,19, | | **60** 8:11 104:1 |
|   21 71:13 72:5 | **4** | **602** 93:2 94:3 |
| **272** 83:9 | | **612** 99:14 |
| **277** 67:12 | **40** 8:21 | **623** 108:2 113:11 118:7,10 |
| **28** 100:24 | **403** 40:18 48:15,18 74:7 |   120:16,18 121:4 123:23 |
| **281F** 70:13 |   109:23,25 | **624** 108:2 118:11 120:4 |
| **283** 67:12,14,17 | **404A** 12:17 | **63** 71:2 104:1 |
| **284** 59:7,11 60:5,16 | **41** 54:4 | **64** 104:1 |
| **285** 59:11 60:5 | **43** 40:12 | **64850** 103:16 |
| **286** 59:7,11 60:5 | **44** 73:8 | **65** 71:3 |
| **288** 59:11 60:5 | **45** 12:15 | **66** 71:5 |
| **29** 83:8 | **456** 88:2 90:11 | **676** 100:11 |
| **294** 64:3 66:24 | **46** 48:3 | **69** 103:4,13,15 |
| **299** 80:22 83:1 | **464** 73:1 | **694** 100:11 |
| **2:15-37** 3:6 | **47** 62:22 100:25 | |
| | **494** 76:24 | **7** |
| **3** | **4G** 134:21 | |
| | | **7** 106:10,15,16 |
| **3** 45:10 | **5** | **705** 29:12 37:16 |
| **3.0** 84:9 | | **733** 71:18 |
| **30** 54:19 93:13 117:25 | **50** 93:12 | **737** 108:2 120:7 123:21,23 |
| **300** 80:23 83:1 | **5000** 136:23 137:1,22 138:24 | **74** 100:25 |
| **301** 83:1 |   139:23 141:12 | **740** 108:3 123:25 |
| **314** 76:16 | **51** 100:25 | **751** 63:15 |
| **319** 120:17 123:19 | **53** 70:25 | **759** 38:19 40:1 |
| **32** 83:19 | **573** 73:1 75:17 | **769** 40:6 |
| **329** 87:2 | **574** 94:15 95:6 | **78** 139:8 |
| **33D** 64:24 | **587** 95:10 | **786** 40:5 |
| **34** 63:25 | **588** 95:9 | **787** 40:5 |
| **35** 106:12 | **589** 96:2 | |
| **382** 29:17 37:16 | **590** 37:9 | **8** |
| **383** 29:17 33:7 36:3 | **591** 96:9 | |
| **386** 24:2,16 28:20 | **594** 96:14 98:23 | **800** 105:21 |
| | **597** 98:24 99:13 | **801** 52:22 |
| | | **801D2D** 49:25 |

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,  on 07/20/2017                    146Index: 802..airliners

**802** 48:14 64:2

**803** 109:25

**80317** 89:4,8

**8035** 110:17 111:2,7

**8036** 75:8

**80s** 139:15

**83** 37:16

**874** 51:5 68:2 73:15,18 109:11
118:14 121:15 124:3

**89** 37:16

**8:12** 53:23

**8:30** 142:3

---

**9**

**9** 100:24

**90** 30:19

**901** 30:20

**9026** 31:23 32:24

**90s** 133:10,22,23 139:15

**91** 54:22 58:3 60:6

**92** 60:6

**921** 41:1,3 46:23 47:6

**93** 60:6

**95** 130:13 131:4 132:8

**97** 27:17 127:10 128:15 130:6
132:7,22 134:7,14 136:5
140:2,14

**98** 58:3 88:4 90:13

**99** 127:14

---

**A**

**ability** 19:18 52:19

**abstract** 105:11

**abused** 13:5

**access** 40:20 55:6 97:9
116:13 121:7 123:15 126:6
128:4 134:10

**accesses** 126:2

**accompany** 74:23

**accomplish** 44:8

**accomplished** 40:9

**accordance** 47:5

**accounting** 65:2

**accurate** 11:15 18:4 26:13
32:15 49:20

**accurately** 52:7

**accused** 14:2 34:6,20 51:10
55:2,4 56:9,10 77:2,15 104:10

**accusing** 80:18

**acknowledged** 8:22 70:22

**acknowledging** 12:6

**acquired** 87:8

**acted** 76:15

**actively** 44:22 71:6 72:1

**activities** 7:9 9:16 79:22

**activity** 19:11 61:15 113:4

**acts** 69:22 138:24

**actual** 11:16 69:21 93:22,23
97:20 122:3 123:12 127:3
128:10,13 129:18 130:23
133:9,16 135:4

**added** 16:21,22

**addition** 101:4

**additional** 15:4 22:5 57:7
81:20 110:14 124:21

**address** 3:21 4:16,17 8:8
13:2 14:1 15:24 21:20 32:11
37:21 42:8 47:2 67:4 68:22
77:23 78:1,22 83:2 124:11
131:15 135:21 136:17

**addressed** 4:21 10:13 17:25
46:5 83:2

**addressees** 112:3

**addressing** 8:3

**adds** 19:21

**adequate** 32:15 33:5

**adequately** 46:5

**admissibility** 100:1 115:25

**admissible** 96:17 131:1

**admission** 24:5 49:22 52:18

**admissions** 48:13 95:14,25

**admit** 39:12,19 121:6,8,9,12

**admitted** 5:13 39:6 54:11
59:22 111:3,7 134:6

**admittedly** 73:4 133:20

**adopted** 49:22

**advanced** 94:12

**adverse** 111:4

**advised** 50:20,23 72:5

**advisement** 106:2

**advocacy** 107:17

**affects** 101:11

**affiliated** 48:10

**affirm** 10:19 53:17,18

**afraid** 75:8 107:7

**Africa** 91:23

**African** 68:5

**afternoon** 3:3,8,13 23:20,21
36:6 49:10 53:2,7 56:15 58:23
62:8 72:18,20

**age** 32:24

**agency** 49:7 50:10

**agent** 48:19 50:1 111:6

**agents** 113:20

**agree** 27:14,18 62:8 84:25
105:6,24 108:20

**agreed** 39:12 63:20 134:23
135:6

**agreeing** 58:12

**agreement** 53:16,22 63:23
65:24 76:9,13 99:17,18,24
124:2

**agreements** 53:10 100:25
103:6 109:3

**ahead** 29:11 53:11 59:2,4
83:9 87:2 106:20 109:13

**aide** 22:9 64:4

**airliners** 98:13

**alerted** 13:23 14:18

**Ali** 3:16 72:18 131:17

**aligned** 111:5

**allegation** 69:3

**allegations** 70:16,17 71:15, 19 99:20 116:4

**allege** 71:5

**alleged** 41:11 70:2

**allegedly** 55:14

**alleges** 71:1,3

**allowed** 22:5 48:12 65:9 114:23

**Aloush** 110:6 111:5,24,25 115:16,19,25 116:7,11,15,24, 25 117:4,11,18,22 119:15,19 120:9 121:6,24 122:5,15

**Aloush's** 115:24 116:18,19, 22 119:23 121:3,10,20 123:9

**alphabetical** 29:5

**altered** 8:20

**alternatives** 92:13

**amended** 13:23 18:15,24 19:21 20:6

**America** 55:24 90:17,18 93:3,13,17

**American** 92:2

**amount** 19:6

**amounts** 64:15

**analogy** 137:8

**analysis** 8:2 10:21 41:6 43:11,23 44:10,14 45:12 46:9, 17 47:8 55:11,24 56:20 60:9 78:9 104:15

**analyzing** 43:12

**anchor** 17:8,9

**ancient** 99:4

**Anditel** 36:8 41:4 42:10,11 43:10 45:18,21,22 47:13

**Andrea** 3:9

**Andrews** 79:9 98:25

**announcing** 94:17

**annual** 59:3

**antenna** 133:14 137:15,16

**antennas** 73:10

**Apollo** 87:8

**apologies** 54:16 100:24 103:12 118:11

**apologize** 10:8 21:5,7 94:21 103:14 135:23

**apparent** 88:8

**Appeals** 12:3 13:4

**appearances** 3:7

**appears** 24:3 28:5 32:11 37:25 41:3 83:25 96:3 100:14

**appellate** 11:7,10,13 12:20 21:9

**applicable** 101:13

**application** 101:5

**applications** 31:11 71:25 122:4

**applied** 8:16,21

**applies** 98:8

**apportioned** 65:11

**approach** 37:1 124:14

**approval** 50:19

**April** 130:21

**Aquino** 40:16 90:13 113:13

**area** 98:5 112:10

**argue** 7:21 22:7 29:8 46:3 47:6 105:24

**argued** 100:5

**arguing** 15:17 27:9 69:23 98:21

**argument** 3:19 27:1 33:19 36:1 42:1,4 46:7 66:22 69:13 76:9,12 80:6,10 99:10 120:12, 17 140:24

**arguments** 29:8 94:11,12 120:23

**arisen** 106:24

**arises** 102:15

**arranged** 14:13,14 29:5

**arrive** 81:15

**art** 23:18,23 24:12,13 25:23 26:8,11,12,16 27:16,19,23 28:1 34:12 53:13 98:4 125:13

**article** 24:3,17 25:10 27:4,6, 20 28:4,19 29:16 31:5 32:25 33:21 34:9 82:3,5,7,10 95:15 96:4,15,20 97:18 98:14,25 99:15 100:12

**articles** 25:24 29:18,25 30:5 32:20 54:10

**articulated** 8:17 72:10

**aspect** 45:18

**aspects** 85:15 102:8

**assert** 108:11 114:18

**asserted** 7:19 30:6,13

**asserting** 7:1 20:21 79:7

**assessment** 118:19

**assets** 73:5

**assigned** 30:6

**assume** 35:6 36:15

**assumed** 135:13

**assuming** 58:16 98:21

**attach** 101:14 123:10

**attached** 14:1 124:4

**attachment** 40:24 109:10

**attachments** 108:16,19,20, 25 109:12 124:3 125:16

**attempt** 11:17

**attempting** 19:17

**attention** 9:5,7 10:3,5,10,12 42:22 65:23

**attenuators** 129:17,22

**attorney** 19:10

**attorneys** 73:13

**attorneys'** 17:12,17

**auspices** 34:16

**authentic** 28:18

**authenticate** 28:10 116:8

Case 2:15-cv-00037-RWS   Document 444   Filed 07/24/17   Page 148 of 173 PageID #:  24876

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017          148Index: authenticated..bucket

125:2,5 133:18 138:23,24

**authenticated** 126:24
136:21 137:3

**authentication** 29:18 33:5
124:21,25

**authenticity** 22:5 24:4,21,22
28:2,16 30:17 136:18

**author** 31:18 33:17

**authorization** 41:5

**availabiity** 20:3

**availability** 8:7

**award** 94:17 95:1,3 97:23

**awarded** 95:1

---

**B**

---

**back** 6:4 8:24 19:22 27:11,17
32:6 36:4 37:21 38:5,12
39:21,23 42:13 47:13 53:3
58:11,24 64:10 78:22 89:21
90:10,13 91:24 93:4 105:13
106:2,7 111:24 113:13,16
114:13 116:10 118:4,6 120:5,
12 124:9 132:23 133:2 141:19
142:3

**background** 51:21 52:10
79:11 118:21 141:17

**backhaul** 48:8,22 51:2,7,13,
17,18 52:2,8 67:10 68:1,3
71:25 72:3 84:1,15 122:3

**bankruptcy** 131:23

**based** 5:1 6:5,23 8:17 19:7
20:14 22:8 26:20 33:22 35:25
40:3 55:13,14 68:19 71:20
74:11 78:11 91:18 93:25
94:12 101:5 105:1 123:4
138:9

**basic** 83:23

**basically** 16:19 56:8 73:4
79:7,11 80:14 81:4 86:7
116:17 133:14 137:13

**basis** 13:20 65:2 77:2 95:13
110:9,14 116:21 124:25 129:2
130:11

**Bates** 103:15 109:1 117:8
119:15 120:11,14

**Bates-labeled** 117:2,6,10,13

**BCR** 54:21 55:16,23 57:21
58:2 59:7,18 60:19

**BCRS** 59:1 61:12

**bear** 11:20

**bears** 99:3 103:2

**began** 9:18,21 86:3

**begin** 7:17 23:19

**begins** 9:9

**behalf** 3:9,14,21

**behavior** 46:4

**belief** 25:21 27:23 28:17
49:19 50:17

**believed** 6:7 9:13 18:12
25:17 49:16 130:10,12 136:1

**believes** 15:6

**bench** 124:14

**beneficial** 15:7

**benefit** 92:7

**big** 56:24 57:12 92:9

**billion** 87:8 90:19 92:3 93:18,
20

**bit** 12:4 31:6 62:4 73:20 82:20
86:4 104:4 118:20 133:25
141:4

**blame** 13:22 89:21

**block** 130:2

**blow** 73:9

**Bluetide** 17:3,4,5 100:20,22
101:1,7,9,22 103:5,15,22
104:3,6,11,24 105:5,7,15,22,
25 106:5

**Bluetide's** 101:11 102:9

**board** 133:22

**boards** 128:12,15

**boat** 22:24

**body** 41:2

**Boeing** 98:17

**bolster** 35:13

**bolstering** 35:19

**bones** 133:23

**bottom** 9:8 24:10 28:5,6
29:13 32:10 47:17 90:18
111:23 120:9 122:1 126:2,4
130:14

**bought** 131:22 141:19

**bounds** 7:5

**Bowling** 3:15 23:18,20,22
24:8,10,16,21,23 27:3,18
28:4,5,13,21,23 29:1,4,12,20
30:3 32:1,17 33:6 34:3,9,21
35:3,9,17,24 36:4 38:20 67:2,
4,9,11,17,21,24 68:8,22 69:2,
8,15,25 70:20 72:9,15

**box** 132:19,20

**boxes** 131:24

**Brad** 3:15

**brains** 128:13

**Brazil** 103:8

**break** 107:21 142:2

**breath** 18:7

**briefing** 131:14

**briefly** 32:1 39:8

**Brighton** 39:3

**bring** 9:7 10:4 17:13 21:13
54:22 71:16 118:3,6,10
122:15

**bringing** 10:9

**broadband** 31:7 84:22 88:3
90:12,15 91:12 93:3 97:9

**broader** 21:21 86:8

**broadly** 71:8 136:22

**brochure** 74:16 75:21

**broker** 106:13 110:10

**brought** 10:12 18:8 20:24
75:11 126:18

**Bruce** 23:25

**BSTAT** 51:16

**bucket** 23:13,17 24:1 28:23
36:8,16,21 37:7,16,25 38:9,
10,13,15 40:10,12 42:8 45:21
47:14,25 48:1,4 52:23,24
53:2,8 54:4,14,18 55:3 58:4,

22 59:6 62:12,19,21,22 63:22,
25 67:5 72:15 73:2 76:8,21
83:6,7,8,15,17 86:16,18 87:21
100:20 106:5,9,19 107:21,24
124:7

**buckets**  24:7 29:2,3,5,6,16
55:25 67:8 72:23

**built**  126:20

**bunch**  57:12

**burden**  15:4

**business**  13:1 18:1 50:11,12
55:1,23 60:13,19 61:6 62:9
72:22 73:1,25 74:1,8,11,13,
15,19 75:2,16 79:22 89:6
110:7,10,15 111:8,10 112:13
113:2,8 117:20 130:23,25
131:12,19 141:14

**Butler**  3:15

**buy**  113:24 114:20

**buyers**  112:14

**buying**  114:16

─────────────

**C**

─────────────

**C-O-M-S-Y-S**  87:23

**cable**  56:6 126:3

**cafes**  31:10

**calendar**  19:20

**call**  52:20

**called**  15:15 28:24 39:2 42:10
48:9 54:20 60:19 76:8 82:11
84:16

**calling**  65:23

**camera**  111:21

**candid**  70:18

**candidly**  134:3

**capabilities**  85:15 86:9

**capable**  97:7

**capacity**  48:19 49:7

**car**  137:9,10 141:6

**card**  128:9

**cards**  127:25 128:2,3,21,25
135:4

**care**  18:21 108:22 109:8,10

**carried**  22:20 79:3 80:16

**carry**  58:21 62:18

**carrying**  48:23

**case**  3:6 4:3,6,10,13 5:1,10,
18 8:24 9:4,19 11:3 12:24
13:11,12 14:6,12,15 16:12
20:24 24:18 32:19 33:8 35:18
42:19,25 44:1,2,17 48:7,22
51:6 65:21 68:18 69:11,16
70:14 71:9 72:6 73:12,18
77:2,15 79:6 80:12 81:8,19
84:3 91:4 92:16,17 95:16
98:1,21 99:21 101:3,9,13,15
102:1,8,20 103:1,2 104:9,12
105:6 112:18 115:17 119:9
128:5 130:16 131:4,18 133:5
137:8,24

**cases**  94:5 131:5

**catching**  8:13

**categorical**  36:13

**categorically**  36:12

**categories**  23:22

**categorization**  23:4

**categorize**  71:11

**categorized**  22:16 36:17

**category**  57:22

**caused**  129:6

**cellular**  48:8,21 51:2,6,13,18
52:2,7 67:10 68:1,3,24 69:3,
10 70:11 71:25 72:2 84:1
122:3

**center**  55:23 60:13,20 62:10

**CEO**  77:9

**chaff**  135:9

**chain**  40:17,23 42:11 102:19
131:15 138:16 141:11

**challenge**  5:1,5,9,15 7:23
39:18,21,23 107:17

**challenged**  124:24

**challenging**  5:21 39:3

**chance**  11:9 13:6,9,13 17:6
18:24 56:14 68:15 118:25

**change**  5:16 8:17 39:7 118:1

**changed**  5:10 7:23 8:25

**channel**  81:13,14

**channels**  81:22

**characterizations**  80:9

**characterized**  18:3

**chart**  113:12,14,21 114:10
121:15

**charts**  115:4,5,17,20 116:1,2,
5,18 117:10 122:2,7,9 123:2,
7,13

**chat**  129:13

**check**  83:18

**checking**  140:25

**choosing**  29:8

**chopped**  5:13

**Choquette**  108:15 124:2

**Chris**  3:15 36:6

**circuit**  3:25 4:5,7 5:2 8:18,21
16:4,10 17:24 19:2 20:16 62:4
68:24 71:9 102:4

**circulation**  32:23

**circumstantial**  26:9

**cite**  18:4 71:8 119:22

**cited**  41:16

**claim**  7:18 9:8,11 10:1 21:1
41:10 44:1,7 51:5 68:3,18,24
69:8,17,24,25 70:1,13 71:10,
12 72:2,10 79:15 80:1 86:7
91:17 93:8 101:4 104:11
111:6 113:12,14 114:10
115:4,17,19 116:1,2,4 117:10
121:15 122:2,6 123:2,7,13

**claimed**  33:10,23

**claiming**  77:10 113:14 114:8

**claims**  70:10 81:11,17,23
127:22

**clarification**  4:1

**clarify**  47:9 88:6

**clarity**  36:11

**class**  34:11

Case 2:15-cv-00037-RWS   Document 444   Filed 07/24/17   Page 150 of 173 PageID #:  24878

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    150Index: clause..construction

clause  9:9 21:1

clean  11:25

clear  8:7 16:19 17:2 37:15 38:3 70:25 100:15 101:16 104:22 112:11 126:16 134:13, 21 136:25 140:8

client  74:5

close  136:6

closer  57:22

co-authors  33:18

Co-defendants  6:22

code  20:22 38:22 39:1,3,15, 16 49:2

colleague  38:20

collect  112:3

combination  71:21 126:18

commented  21:8

commercial  91:8,10,16,17, 22 92:24

common  42:9 44:25 45:1 79:22

communicate  74:18,20

communication  56:3 86:3

communications  50:15

community  26:23

companies  7:7 115:5,6

company  7:4,7 30:5 44:15 45:9 48:9 52:3 55:20 56:4 67:25 73:3,8 74:5 75:6 84:8 87:5 113:5 127:14 131:22 132:1

company's  54:24

comparability  76:14

comparable  55:14 76:13 99:18

compare  81:15

comparing  81:16

comparison  43:17 81:10,11, 22

comparisons  91:13

compel  64:25

compete  91:3

competent  92:19

competing  42:12,20 45:22 79:22

competition  41:13 42:15,16 43:16,20 78:24 79:5 81:19 82:12

competitive  41:6 43:11,22 44:10,13 45:11 46:9,17 47:8 60:8 78:8

competitors  80:4

compilation  65:25 90:14

compilations  90:1

complain  137:10

complaint  4:24 13:24 14:1 18:15,23,25 19:21 20:20 70:16,19,25 71:3,16

complaints  18:9 20:6

complete  68:23 85:17 89:12, 13

completes  52:24

completion  3:4

component  13:24 14:2 64:12 130:1

components  49:4 68:19 71:1,6 125:9 126:18,23 128:20 139:1 140:1

composed  125:22

comprised  127:23

comprises  108:24

computer  126:2 134:11,12

Comsys  61:2 86:22 87:22 88:6,17 89:2,3,5

concern  22:4 72:22 90:21 91:3

concerned  51:24 88:10 90:23

concerns  9:2 50:3 57:4,25 73:19

conclude  115:13 116:3

concluded  142:6

conduct  13:17 14:24

conducts  113:7

confer  19:19,20 20:7 39:11 42:2 62:13 106:17,21

Conference  3:5

conferred  17:1

confess  13:13

confident  18:5 139:4,18

confidential  41:13,17,18 46:14 114:2 122:25 123:3,11

configure  129:20

configured  140:8,9

confirm  83:14 128:16 130:5 131:10 132:18 136:9 139:16

confirmed  72:4 125:4 126:25 131:8 138:3,7

confirming  39:15

confirms  112:1

confront  43:3

confuse  81:22

confused  4:11 81:9 121:1,22

conjunction  97:8

connect  116:22

connected  70:8 126:3,9 130:9

connection  18:23 48:11 121:14 126:10 134:16

connectivity  31:11

consideration  15:2 82:5 98:1

considerations  25:2 98:16

considered  27:10,12 32:9 37:22 57:7,8 70:23 72:6 76:11 113:23

consist  51:9

consists  127:11

console  125:24 133:20

consolidated  56:17 57:6

constitute  16:1

construction  9:8,11 10:1 21:1

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    151Index: consultant..cusp

**consultant** 131:17,18 132:12

**consulting** 55:6 96:16 97:22

**contact** 31:19 43:10 110:25

**contacted** 109:20 110:9,18
116:5

**contacting** 111:11

**contained** 82:10

**contemplated** 113:8

**contemporaneous** 45:21

**contend** 8:8 9:6 19:1 34:12
50:11

**contending** 31:2 49:21,24

**contest** 5:7,14,19

**contested** 85:16

**contesting** 5:9 20:17

**context** 13:4 22:4 50:14
58:18 106:13

**contexts** 57:14

**continuance** 3:19

**continue** 14:12

**continued** 44:5

**contract** 42:12 56:5

**contrary** 8:9

**contrast** 128:19

**control** 52:19 96:7

**controlling** 25:9

**convenience** 4:2 9:3 10:15
13:20 17:9,21 18:18 19:2,14

**Conversion** 71:9

**convince** 11:7

**copiers** 80:18

**copies** 124:14

**copy** 28:18 32:15 67:6 117:22
140:22 141:1,4,21

**copying** 79:2 80:14,19

**corner** 130:14

**corporate** 31:8 87:10

**correct** 5:8 6:12,24 11:11
30:3 40:8 45:5 47:11,23 53:25

70:20 110:4

**correction** 67:13

**correctly** 37:24 70:1 71:11

**corresponds** 39:4

**counsel** 3:7 39:10,17 42:2,7
72:5 109:20 130:19 131:9
132:13

**counsel's** 129:2 132:11
134:12

**count** 104:24

**counting** 105:3

**countries** 68:6

**country** 8:17

**couple** 16:14 21:21 50:13
60:4 94:6 132:3

**court** 3:2,3,12,17 4:11 5:6,17,
22,24 6:2,10,17,22,25 7:10,16
8:2,10,14,22 9:1,11,14,16,18,
23,25 10:8,23,25 11:5,8,10,
13,16,19,25 12:3,17,20,24
13:2,4,5 14:19,20,23,25 15:1,
3,6,8,10,13 16:19,23,24
17:19,25 18:3,4,11,14,19,21
19:5 20:13,16,17 21:3,6,8,16,
18,22 22:4,9,17,18 23:1,5,8,
11,13,15,21 24:6,9,14,20,22
25:4,13,20 26:11,25 27:14,25
28:11,15,22,25 29:2,10,19
30:1,8,10,16,22 31:1,24 32:14
33:2 34:1,6,18,25 35:5,14,21
36:2,5,13,16,19 37:5,18,25
38:1,3,8,14,17 39:5,25 40:2,9,
14 41:20,23 42:5,16 43:5,22
44:8 45:4 46:1,6,15,24 47:4,
12,15,19,24 48:2,16 49:9,12,
21 50:10 51:12 52:12 53:1,4,
6,7,11,19,24,25 54:2,5,14
55:18 56:12,21 57:10 58:1,18,
20 59:4,10,13,17 60:2,11
61:7,21,25 62:5,11,18 63:19,
21 64:1,25 65:2,13,19 66:5,
10,15,20 67:3,7,10,16,19,23
68:7,14,21 69:1,6,12,23 70:4,
11,14 71:9 72:8,17,20 73:22
74:8,14,20 75:7,14,20 76:1,18
77:4,10,16,20,23 78:2,10,14,
17 79:19 80:5,19,24 81:24
82:8,18,23 83:4,12,16,21
84:4,18 85:2,5,8,19,21,25
86:10,16,19 87:13,17,19,24

88:13 89:1,13,16,19,24 90:4,9
91:6 92:10,22 93:6 94:10,18,
24 95:4,12,19,24 96:8,12,18,
25 97:2,13,16 98:6,19 99:2,8,
12,22,25 100:3,8,13,18
101:24 102:13,20,23,24,25
103:9,11,18,24 104:16 105:9,
18 106:3,7,11,20 107:1,6,13,
16,20,25 108:4,6 109:2,4,14,
16,22,24 110:1,13,20 111:2,8,
18,20 112:8,17,20,24 113:9
114:7,12 115:11 116:6,11,21
117:21 118:5,23 119:4,12,21
120:3 121:1,5,17 122:8,12
123:14,24 124:8,11,12,15,19,
25 125:8,12 126:14,23 129:16
131:2 135:20 136:11,15,19
137:4,19,25 139:1,7,25
140:21 141:3,7,21 142:2,4

**Court's** 7:25 9:5 10:3,10,12
11:13 12:11,17 18:18 21:20
31:14 96:7 104:2 105:23
106:1 124:20,23

**courtroom** 20:23

**covenant** 101:17 102:7,11

**cover** 24:16 60:22 61:14
73:14 108:18 127:22

**covered** 105:22,25 106:4

**covers** 118:15,19 119:3

**Cray** 4:3,5 16:12

**created** 74:13 113:1 115:8
126:13

**creates** 74:11

**creator** 86:10

**critical** 108:17 127:17 136:6
137:23 138:1 140:11

**criticize** 89:16

**criticized** 89:11,12,20

**cross-examination** 66:22

**cross-examine** 137:17

**crux** 138:17

**cumulative** 81:5

**curious** 107:2

**current** 32:24 105:24

**cusp** 14:12

**custodian** 112:25

**custody** 131:15

**custom** 126:20

**customer** 40:24 42:9 43:10 44:25 45:1 64:11 65:6 100:23

**customer's** 105:4

**customers** 42:21 43:17 44:25 71:4,5,7,8 74:19 79:23 104:10,25 132:8 136:3,9

---

**D**

**Daily** 32:21

**damages** 42:19 54:8 55:11 56:18 57:7 90:22 91:4 104:13, 19

**DAT** 133:24 134:6

**data** 64:6,23 65:10 89:4,6 93:22 128:13 130:20 136:5

**database** 105:2 130:13 131:4,7,8,11

**date** 24:13 31:17 127:4,12,15, 17 128:8 129:21 130:2,24 131:2,3 133:18 135:19 136:2, 3,5,6,7 137:4,15,20 138:13, 18,19,20 139:16 140:9,11

**dated** 130:10

**dates** 20:18 125:5 129:22 130:4 131:4

**dating** 137:18

**Daubert** 76:11,12 100:6

**day** 16:20 17:19 32:24 39:11 111:15 116:9 131:9

**days** 12:12,15 20:1

**de** 76:15

**deal** 36:20 81:18,25

**dealing** 33:14 87:20 103:21

**deals** 8:3 77:21

**dealt** 38:8 80:20 94:13

**decide** 13:5 72:11 114:20

**decided** 12:25 13:3 17:22

**deciding** 20:11 65:21

**decision** 5:3 8:11 10:19 12:11,17 16:4

**declaration** 19:25 20:2 28:9

**Defendant** 3:23 7:3 36:18 84:19 90:6 102:6,17

**Defendant's** 4:22 22:22 23:3,8,9 62:14 102:17

**Defendants** 4:25 5:3 9:9 11:3 17:3 22:23 72:5 86:6 102:18 125:2

**defense** 4:23 6:16,18,21 7:18 8:9 16:6 89:23

**defenses** 7:18 8:8 14:7

**definition** 33:1

**delay** 13:9,21 14:5,23 18:6 19:15 94:21

**delayed** 13:18

**delaying** 19:17

**deliberately** 20:18 21:3

**Deloitte** 97:23

**demonstrates** 55:19 75:22

**demonstration** 22:1,3 106:24 124:22,24 125:6 126:5,21 128:1,11 130:9 134:11 135:17 137:12 138:4 139:14,22,23 140:5

**demonstrative** 22:3 57:4 75:22

**demonstratives** 76:2 129:5

**denied** 76:12

**Denton** 14:3

**deny** 14:25 15:3 19:4

**deployments** 71:24

**deponent** 22:6

**deposed** 21:25

**deposition** 22:5,8 48:6,7 49:14 50:18 70:9,23 73:16 103:14 106:25 107:3 110:6, 12,16 112:19 115:17,19,22 116:9,20 117:3,5,11 118:9 119:23 120:16 121:24 122:16 123:20 125:1,3 128:19 129:10 131:9 133:1 136:20 138:5,7 139:9 140:4,23 141:22

**describe** 51:18 74:3 138:10

**describes** 74:4 140:17

**describing** 25:14 51:8 52:7 99:20 119:3

**description** 48:24 74:1,13 81:6,21 103:15

**descriptions** 81:14

**designated** 115:18

**designations** 115:22

**detail** 64:11

**determination** 10:15

**determine** 81:12

**determining** 105:12

**Detroit** 125:4

**developers** 26:4

**develops** 75:23

**device** 34:7

**Dhanani** 3:16 72:18,19,20,21 73:22 76:7,20 77:24,25 78:7, 8,11,16,18 80:5,8,22,25 82:2, 20,25 83:7,13,19,22 84:21 85:4,9,20,23 86:2,13 99:17

**dial** 129:20

**dials** 129:18,20

**difference** 60:18 97:17 118:2

**differences** 63:11

**difficult** 26:17,18,20

**difficulties** 25:11,15,24

**dig** 9:18

**dilatory** 12:1 13:10,17 14:9 20:7

**diligent** 14:8

**Dillon** 33:9,12,16,20 34:10, 11,19,22 35:12,15

**Dillon's** 33:22 34:6

**dip** 104:23

**Direcpc** 33:15 83:8,15,17 95:15,16,18 96:5

**direct** 43:11 113:12

**directed** 34:9 116:1

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    153Index: directly..emergency

directly  43:11 80:4 112:16

directory  39:2,16

directs  46:6

Direcway  77:13,15,17

disagreements  49:17

disclosed  62:25 70:21

discovered  131:24,25

discovery  38:13,20 124:21 132:25

discretion  13:6

discuss  9:1 29:16 79:18

discussed  12:18 39:10 42:2 60:10 68:2 82:14 88:6

discussing  43:9 139:9

discussion  21:10 34:13 73:6 79:21

discussions  78:12

dishes  125:23

dishonest  11:4,5 15:15,22 16:7

dishonesty  16:15

dismiss  5:22,24 6:5,23 12:6, 7,16 16:23,25

dismissal  16:19 101:11,16 102:2,5,9,16

dismissed  12:10 16:16 17:15 100:23 101:3,10,19 102:7

displayed  125:14

dispute  6:8 15:20 17:4 18:11, 14 50:2 51:13 68:25 69:1 70:12 113:22 115:23 117:21

disputed  40:2 128:5

disputes  22:13

disputing  116:11

distinction  102:5

distinguishes  16:9

distracted  15:4

distribution  32:24 130:2

district  7:8 8:16 13:2 14:3

diving  127:21

division  50:22,24 61:19

docket  3:6 12:18 70:25 76:16

document  10:1 24:2,18 25:1 28:3 35:22 40:20 41:4,9,14 42:1,11 43:24 44:11 46:3,8, 15,17 47:8,17 57:9,11 64:4,5 65:23 66:11 67:5 73:17,24 74:1,2,10,18 75:10,13 76:24 77:1,12,17 83:24 84:3,11,12, 14,16 85:12,19,23 86:1,11 87:4,6 88:4 89:10,11,12,13,17 94:11,16 95:11,20 96:3 99:4, 16,19 105:14 108:10,14 109:19 110:25 111:7,17,21 113:17 114:6,9 115:2 116:12, 14,19 117:17,22 118:12,13 119:5,10,24 121:3 123:18

documentation  119:6

documenting  75:3

documents  23:23 29:7 30:18,23 41:11 45:17 54:6,7 56:16,24 57:19,22 58:4,7,9,17 59:22 60:8 64:9,23 66:15 71:25 83:20 84:1,7 87:13,20, 22 88:11,19 89:2,3 90:5 91:11 101:12 103:19 104:8,20 105:9 115:1 116:16,25 117:3,15,18 121:12

dollars  93:20 94:7,8

door  57:17

double  83:18 104:23 105:3

doubt  28:11 74:18 110:15

Doug  33:9

downstream  104:14,25

draft  15:5 83:24,25 84:7

drafting  4:19

draw  35:10

drawn  36:14

drive  22:24 133:24,25 134:6,8

drop  17:11,12

dropped  17:19 36:23 37:8

drove  137:11

DSL  56:6

DVBS-2  81:13

————————————

E

earlier  5:24 12:14,15 34:10 60:7,10,21 63:8,10 67:6,12 86:23 96:21 97:18 99:17 121:3

early  51:6 133:10,21,23

Earth  85:14 86:4 136:23 137:1,22 138:8,11,19,24 139:23 141:12

easier  65:5 88:23

East  68:5

Eastern  68:5

easy  72:25

economic  76:14

effect  26:4,22,23 127:19

efficient  7:24 36:25

effort  13:9

Elbert  23:25 27:9,12 29:7,20 30:22 38:9,14,24 41:2,8 47:9 71:22

Elbert's  32:6 40:25 41:5 46:23 70:21 71:18

Elbit  3:5 14:11 19:18 40:20 42:10,24 43:1,4,10 44:5,15,22 45:2 46:13 72:22,23,25 73:2, 4,8,12,19,20,25 74:3,4,10,13, 24 75:23 109:19

Elbit's  41:6 54:7 70:24 73:13, 24

electronic  124:17

electronically  141:2

elements  114:11

eliminate  58:17 62:9

Elmo  111:22 121:23

email  12:22 38:20 40:17,23 41:8 42:11 43:5 44:9 46:8,19 53:22 82:4 108:14,18 121:24 122:6 123:9 124:1

emailed  115:20

emails  103:19

emergency  3:24 11:9 21:11

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    154Index: employee..extinguishes

employee 33:20 41:4,6 43:8
48:5 50:2,8 52:14 121:25
141:17

employees 42:25 44:19

employment 48:12 50:6
51:14

EMV 88:8

enabled 92:2

encouraged 71:6

end 14:6 31:18 58:13 134:8

endeavor 89:14

ended 132:11

enforceability 114:1

engaged 9:16 46:3 106:14

engine 137:9,11,23

engineer 33:13 108:15

engineers 97:21

enterprise 34:11 55:3 56:1,2
113:7

enterprises 31:9

enters 46:6

entire 55:17,20 57:3,9,11,24
61:6 64:13,17,18 65:7 68:4
86:24 90:1 94:5,9 113:6

entirety 5:11

entitled 11:24 17:16 43:2
74:5 75:15 96:4

entity 13:22 52:6 89:5 103:7

equipment 31:12 65:7
125:25 127:18,22 128:23
131:20 134:20 136:21,25
137:3,4 139:15 140:5

Equity 87:9

era 134:14

error 24:11

essentially 54:24 77:2

establish 64:21 125:6 138:23

established 13:1 17:25 48:7

establishes 26:21 52:5
139:19

establishing 138:15,18

Ethernet 126:3

eve 14:9

evening 102:23 106:2 107:8
141:21

event 4:15 8:4 20:22 21:11

everybody's 91:19

evidence 24:5,19 26:10
27:11,13,24 28:16 41:4 43:3
44:21 48:13 49:2 51:4 57:19
58:15 64:19 66:1 69:9,11,19
75:17 92:20,25 93:4 98:20
104:9,12 113:15 114:23
115:7,13,25 118:16 119:12,22
120:4 123:12,14,15,17,19
125:13

evidentiary 3:11

exact 8:15 65:2 94:4,8 115:1
139:16

examine 127:18

exception 89:8 99:5 113:8
125:19 137:1

excerpt 88:24

excluded 41:22 55:16

exclusion 57:9

excuse 24:11

executes 136:24

executive 49:15,18 50:9
83:24 84:15

executives 43:9

exercise 13:6

exhaustion 101:6,10,14
102:15 104:7,8

exhibit 21:12,21,22 22:16
24:7 25:5 28:19 29:12 36:3,23
37:24 38:4,23,24 39:12 40:15
43:5 45:23 53:24 61:24 63:2,
4,12,15,17 64:2,3 66:17 76:5
79:10 84:21 85:9 90:10 94:14,
15 95:8 96:2,14 100:11,17
103:4,9,12,13,14,17 105:4
106:5,10,15,16 107:24 108:9,
24,25 109:5 111:3 113:10
116:8 118:10 119:17 120:1,7,
13 121:5,20 123:21,25

exhibits 3:20 14:1 22:19,22
23:4,10 29:15,17 30:14 36:24
37:2,3,6,8,10,20 38:18 41:7
42:5,6 47:22 48:4 53:21,23
54:15,19 58:3 59:6 60:5,6,12
62:1,23 63:1,13 66:15 67:11
72:12 79:18 81:18 96:13
100:24 103:23,24 105:21
106:24 107:25 108:21 117:6

exist 15:3 126:17 127:10

existed 8:23 26:12 50:7
129:24 132:22 137:5

existence 13:24

existing 77:13

expect 40:3 127:7

expecting 5:17

experience 86:3 131:8

experiment 126:11

expert 23:24 35:18 39:14,15
42:3 47:2,5 51:4,22 54:8
56:16,18 57:8,14 58:9 59:25
70:5 71:18 93:15 104:13,22
119:2 125:16 129:7 135:8

expert's 46:2 58:8

experts 52:9 92:19

experts' 55:10

explain 48:18 51:22 52:10,20
74:6 84:19 86:1,11 125:11
127:25 135:8

explained 84:20 110:16

explanation 14:21 18:9 51:2
52:21 77:12 135:4

Explorer 48:9

export 68:19 69:4,16 71:20

expressed 114:1,17 134:3

expressive 97:12

expressly 123:15

extended 112:13

extent 7:23 27:4 42:19,21
51:8 73:19 75:21 82:11,16

extinguished 102:18

extinguishes 102:6

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    155Index: extra..fundamental

**extra** 68:4 69:20 81:6

**eye** 102:8 129:14

---

**F**

**face** 14:9 131:13

**faces** 50:16

**facilities** 56:5

**facility** 130:4

**fact** 3:25 4:22 9:2 12:17 16:3 17:20 20:14,25 26:12 27:2,5,6 29:24 31:21 32:12 33:3 34:22 35:11 37:14 39:22 40:2 41:15 43:22 44:13,24 45:1 49:13 57:6 65:18 70:6,12 119:10 139:5

**facto** 76:15

**factors** 10:22 42:19 43:21 80:2

**facts** 11:4,6,16 15:19 19:21, 22 44:2 79:25 85:13

**factual** 70:17 71:15 113:22

**fail** 11:17

**fails** 71:11

**failure** 98:9

**fair** 3:9 15:23 17:14 37:22,23 47:23 51:3,11 56:15,23 57:20 60:1,2,3 61:22 62:13,17 63:20 90:4 101:7 102:4,14,21,22 103:3,17 115:16 116:21,24 117:21 119:5,14,23 120:6,19 121:23 122:10,18,20 141:2

**fairly** 32:18

**faith** 11:24

**fall** 52:21

**familiar** 32:18 112:5

**fashion** 11:7

**feature** 65:11,12

**features** 86:5

**February** 32:4,5 71:19

**Federal** 3:25 4:5,6 5:2 8:18, 20 16:4,9 17:24 102:4

**feeding** 134:16

**fees** 17:12,17

**Feldman** 53:13

**felt** 29:22,23 98:9 129:15

**fence** 89:10

**fight** 17:10

**fighting** 17:6

**figure** 4:8,9 34:7,25 35:7,23 50:15 93:19

**figures** 66:14

**file** 5:14,22,24 6:3,22 7:11 8:23 9:2,4 11:10 15:6,9 19:3, 13,17,21 20:5,9,11 53:15 76:11 116:20 117:17 119:17 129:6

**filed** 3:18,24,25 4:12,24 6:11, 19 8:1,25 9:4 10:11,21 11:3 12:7 13:14,19 14:19 17:5 18:9 19:16 20:3,21 24:7 73:4 80:15

**files** 44:21 112:16 115:3

**filing** 10:9 13:18 20:20 21:6,9 45:13 53:24 59:2 127:4 128:21

**finally** 13:19 19:19

**financial** 31:8 54:18,21,24 55:16,24 57:6,11,19 58:7 61:10,13 87:15

**financials** 56:17

**find** 19:23 64:14 112:14 118:7 119:14,18 120:2

**finds** 70:15

**fine** 29:10 46:18 47:1 57:16 59:17 141:7

**finish** 58:23

**firm** 96:16 97:22

**firsthand** 107:4

**flag** 9:15

**flashing** 57:3

**Flexroute** 135:21 140:7,18

**flows** 112:22

**Flynn** 3:10 39:8 40:8 41:25 42:6 60:17 71:16 77:5,6,11, 19,22 97:5 108:20

**focus** 59:25 61:17,18

**focusing** 57:5

**folks** 112:12

**follow** 15:12 19:22

**follow-up** 122:22

**foreign** 103:7

**forgive** 4:20

**forgot** 103:13

**form** 124:17

**forming** 39:15 72:6

**forms** 88:18

**forum** 77:8

**forward** 4:10 10:13 36:11 69:17 81:13 102:7,11

**forwarding** 43:8

**found** 14:24 17:8 30:23 121:14 129:9,11 130:18

**foundation** 110:5,11

**Fourco** 8:11,19

**fourth** 71:17

**frame** 25:12 76:14 120:10 127:20 128:6

**Francisco** 43:9

**frankly** 4:11 107:13 117:25

**Frega** 43:8

**frequencies** 129:19

**frequency** 130:3

**Friday** 11:15

**frivolous** 6:19 8:1

**front** 4:3 19:11 30:20 33:17 57:4,5,19 65:15 66:12 107:2,5 109:6 115:7

**Fu** 3:10 49:10,12,13 83:14,18 96:20 97:1,3,6,15 106:16

**Fu's** 53:22

**full** 64:11 84:23,24

**fully** 14:14,16

**functionality** 49:5

**fundamental** 113:5

Case 2:15-cv-00037-RWS   Document 444   Filed 07/24/17   Page 156 of 173 PageID #: 24884

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    156Index: game..Honor

## G

**game**  51:11

**gas**  137:11

**gate**  48:9 135:15

**gateway**  134:15 135:1,15

**gave**  48:6,8 65:1 77:8 95:3
    115:17

**gears**  137:9,12

**general**  42:15,16 48:24 51:2,
    22 63:7 72:23 73:2 79:24
    82:15 109:19

**generally**  34:5 51:2,9,18 62:2
    96:24 97:11 118:22

**generic**  49:6

**gentleman**  21:24,25 125:1
    131:17

**Georgia**  42:19 43:21 80:2
    81:19

**get along**  117:19

**Gilat**  76:9,13 99:17,18,24

**Gilbert**  10:21

**Gilstrap**  4:4 16:12

**give**  8:15 15:1 17:12 56:13
    66:8 68:15 118:8,24 120:1
    122:10 128:8

**giving**  71:12 124:20 125:8,20

**globally**  93:14

**globe**  14:14

**good**  3:3,8,13 11:24 23:20,21
    36:6 47:24 49:10 53:7 54:5,14
    56:12,15 57:18 62:2 63:21
    64:16 72:18,20 82:24 101:15
    112:14

**Gooden**  38:25

**government**  31:9

**Grand**  90:18

**granted**  13:12,16 15:25 64:25
    124:25

**granular**  91:11

**great**  97:24

**greatly**  128:5

**greed**  109:16

**grew**  22:1

**gross**  91:5

**grounds**  40:19

**Group**  87:9

**grouped**  83:16

**guarantee**  132:6

**guess**  18:17 27:15 36:24
    57:24 91:13 94:25 106:22
    111:18

**guidance**  21:20

**guys**  42:14 117:19

## H

**half**  9:3

**halfway**  4:14

**hallmarks**  111:14

**Hamachi**  71:9

**hand**  102:22

**handed**  23:13

**handle**  59:2

**handles**  56:5

**hands**  11:25 132:7

**happen**  11:12 14:8

**happened**  11:8 12:12

**happy**  59:19 77:3 120:20

**hard**  21:9 27:21 133:25 141:4

**hardware**  64:18 68:23

**hate**  109:3

**head**  50:22

**hear**  3:19 15:10 21:10 24:23
    27:1,19 30:1 31:24 33:8 39:6
    41:23 46:24 51:19 56:13 58:3
    59:19 68:14 73:22 76:4 77:4
    118:24 134:25

**heard**  9:15 32:19 44:19 52:5
    121:17

**hearing**  3:11 9:12,17 10:7
    11:14 13:15 22:1 23:12 42:1

57:25 58:21 60:10 142:6

**hearsay**  24:4,20,21,22 29:18
    30:10 33:19 48:16,19 49:14,
    20 54:7,10,14 75:7,15 77:10
    82:7,19 86:18 87:21 88:21
    89:2,8 94:16,19,21 95:5,11,
    19,23,25 96:17,19 99:1,5,9,24
    100:12,19 109:25 110:1,2
    118:13,23 119:9

**Heartland**  5:1,10 16:5

**held**  116:9

**helpful**  23:16 58:24,25 70:15
    118:7

**Heritage**  85:12

**hey**  92:7

**heyday**  45:9

**high**  43:9 91:21

**highlight**  38:21

**highlighted**  122:14

**highly**  14:11 41:12 55:10
    108:19 113:17 114:5,22 115:8

**Hill**  3:8,12 10:25 11:1 15:8,11,
    18 18:7 21:19 22:21 26:1,14,
    25 31:13 32:22 36:10 37:12
    38:6 49:23 54:1,12 58:5 73:25
    74:10,17,22 75:8,9,18,21 76:6
    87:18 88:5,15 89:3,18,22
    90:3,8,21 91:8 94:20,25 96:6
    99:2,23 106:21 107:9,14,19
    109:3,15 110:14 124:5,8,10

**history**  85:18

**hit**  11:19 24:12

**HN/HX**  39:1,4 83:13,20

**hold**  13:5

**holding**  71:10

**honest**  13:9 15:19,20 18:10,
    14

**Honor**  3:8,13,16,22 4:17,21
    5:8,20,23 6:1,7,12 7:14,17
    8:5,13 9:13,22 10:6,19,24
    11:1,2,18,21 12:3,9 13:8,12,
    14,16,25 14:4,11,17 15:2,11,
    12 16:25 17:13 18:10 19:1,9
    20:5 21:14,19 22:1,11,15,21
    23:2,6,12,20,22 24:21,24
    25:7,16 26:1,14 27:3,13,19

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    157Index: hooked..indications

28:13,21,24 29:4,22 30:3,9,
18,25 31:4,13,20 32:1,17,22
33:6,8 35:4,24 36:4,6,11,22
37:4,12,23 38:6,12,16,19 39:8
40:8,12,17,23 41:10,19,25
42:18 43:14,25 44:13 45:5,19,
21,25 46:11,18,21 47:1,10,14,
18,21 48:1,4,14,15,20 49:10,
23 50:13,25 52:8,25 53:9,15,
18,24 54:1,3,4,6,12,16,23
55:6,14 56:8,15,23 57:20
58:5,25 59:1,8,12,15 60:1,3,
18 61:4,8,20,23 62:3,10,17,20
63:18,20,25 64:5,20,22 65:9,
14 66:18,25 67:4,13,22,25
68:2,9,13,16 69:4 70:5,19
72:16,18,21 73:25 74:10,17,
23 75:1,9,18 76:6,7,10,11,17
77:6,19,22,25 78:16 79:2,20
80:16 81:4 82:3,9 83:7,19
84:6,23 85:4,7,10,11,20,24
86:17,21 87:18 88:5,15,16,20
89:3,10,18,23 90:8,11,21
91:8,16 92:12,23 93:9 94:20,
22 95:10,13,21 96:1,3,6,9,10,
11,20 97:4,17 98:8,12,24
99:1,2,10,14,16,21,23 100:5,
12,17,20,21 101:6,7,13,23
102:2,4,14,22 103:3,4,12,14,
17,20,23 104:2,6,21 105:17,
19,20 106:4,10,12,16,17,21
107:11 108:9,13,23 109:3,9,
18 110:3,15,21 111:1,6,11,12,
19,23 112:5,9,11,19,23 113:3,
8,11,12 114:23 115:16 116:7,
24 117:14,25 118:3,8,12
119:1,8 120:6,8,11,19,23,25
121:2,9,12,16 122:10,13
124:1,5,6,10,13,16,18 125:17
126:11 127:3,19,22 128:17
129:4 130:7 131:7 133:13,21
134:25 135:22 136:13,16
137:7,21 138:22 139:19
141:25

hooked 68:24 69:3,10 70:7
125:24

hope 11:6,12 15:3 76:3 89:22

horizon 90:22 91:5

hotly 20:17

hour 140:21

hub 125:24 126:6,8,9,13
127:21,23 128:1,9,13,14
129:17,18 130:1,8 134:2,16

135:5 136:22,24

huge 116:17

Hughes 3:5,14 5:7 7:21 11:3
13:1 14:15 19:12 20:5 33:9,
13,15,16,20 39:10,17 40:17,
19,25 41:6,9,12 42:7,9,10,11,
23 43:3,8,9 45:23 46:3,14
48:5,13,25 49:3,15,19 50:4,
11,12,17,22 51:8,15 52:3,8,
16,17 53:13 54:18,21 56:3,5
57:15 60:9 64:12,19 65:1
66:14 68:1 71:1,3,6,8 72:1
77:9 78:8,24 82:4,6,11,16
83:13,20 84:22 85:12,19 87:1,
8 88:9 92:4 93:9,12,20 96:4
101:1,8 103:5,8,15,20,22
104:24,25 105:1,2 109:20
110:19 113:21 114:9,11,14
115:1,14,17,20,21,22 116:2,4,
13 117:8 118:17 119:7,10,13,
19,22 120:20 121:6,13,15,25
122:6 123:10 125:4 127:17
131:16,17,19 132:7 141:17,20

Hughes' 42:23,25 43:12
50:11,16,19 51:16,17,20
55:15,20 57:19 63:24 64:6
79:21,24 85:13 90:24 93:8
108:14 117:11 125:16 134:12
137:2

Hughes's 49:8 63:16

Hughes-business 76:21

Hughes-cellular 67:5,9

Hugo 43:8

hundred 88:19 94:8

HX 84:15

———————————

I

idea 56:13 121:14

ideal 31:10

identical 138:6

identification 20:7

identified 88:7

identifies 73:20

identify 7:22 88:10,14 90:5

IEEE 28:7,12 32:18 97:19

ignoring 16:3 20:18 21:3

ILEVERAGE 106:9,13
109:21 110:7,11 112:12 119:6
124:7

illustrate 138:10

images 125:15

immediately 41:5

imminent 99:3

impeach 66:22

implicate 91:3

implicated 19:23 56:7

implication 93:19

implied 114:1

imply 35:15

implying 46:14

import 115:12 121:8

important 17:22 49:5 92:2
108:10 129:4,15 132:5,21
141:8

importantly 13:11

impossible 27:21

improper 4:23 6:16,23 7:22
8:24 17:2,4,5,10 33:24 34:1,8
35:23 43:16,19 51:25 94:11

improperly 27:9 33:22 35:4,7
40:20 41:9

in-house 108:15

inclined 87:13

include 5:25 6:4 7:12 63:9
108:20

included 56:10 59:18 64:24
109:11 119:16

includes 55:3,5 56:1 64:13
65:10 101:20 108:25

including 31:18 55:1 64:11
95:13

income 61:5,10,18,24

incomplete 89:11,17,21

indication 84:10 111:13

indications 140:17

**indicia** 29:21,23 30:4 31:21 33:21,25 34:3,16 35:20

**indirect** 70:15,20 71:14

**individual** 90:25

**induced** 68:18 69:24,25 70:2 71:14,20

**inducing** 72:1

**indulge** 7:14

**indulgence** 124:20

**industry** 25:17,18 26:9 30:14 33:4 34:5 35:10,11 77:8 96:22,24 97:10 98:3,11,16

**industry's** 25:21

**Inexcused** 14:23

**inexplicable** 18:7

**inexplicably** 13:19

**inflame** 11:22

**inflammatory** 57:23 74:7

**influencing** 68:10,11

**information** 28:7 31:19 41:17,18 42:23 46:14 55:4,9 56:17,19 57:7,8,12,21,23 59:23 60:9 65:16 66:4,8,13 74:12 79:11 81:5 85:14 87:15 112:3 115:12 122:25 123:3,12 128:21,24 130:13

**informed** 42:3 60:3 67:6 133:2,4

**infringe** 71:6 92:15 114:22

**infringement** 23:24 41:11 55:2 68:12,19 69:24 70:2,16, 21,22 71:15,20 72:2 81:12,16 99:20 108:11 113:25 114:9, 15,24

**infringing** 65:11 68:20 69:7, 22 71:2,21 92:18

**injunction** 76:15

**innovative** 97:25

**innovator** 44:18

**inquiry** 81:17

**inside** 52:4 135:17

**inspected** 129:11

**inspection** 133:15

**installation** 68:5

**installations** 69:20

**installed** 126:19

**instance** 22:23 31:2 38:9 55:19 75:24

**instances** 20:4

**institutions** 31:8

**instructions** 81:25 140:10

**intend** 19:13 39:18 42:3 79:25

**intended** 42:8 56:25 68:19

**intending** 43:15 65:14

**intends** 41:8

**intent** 119:20

**intention** 9:24

**interactivity** 97:9

**interested** 61:23 62:1 114:16

**interesting** 128:19

**interface** 128:2,8

**internal** 71:24 118:17

**international** 50:22,23

**internet** 31:9 32:11,12,24 55:5 85:15 96:14 126:7,10,13 127:8 128:4,5,10 134:11,15, 16,19 135:4

**interpreted** 8:18,20 121:10

**interrogatories** 62:24 63:1

**interrogatory** 63:12,14,16 65:5 66:3,7

**interrupt** 36:10

**Intersky** 30:7 79:12,14 81:2, 7,21

**intimately** 4:19

**introduce** 48:21 74:5 75:15

**introduced** 48:12 49:7 113:17

**introducing** 55:8 77:14

**introduction** 46:22 57:10 99:19

**invalidating** 34:12

**invalidity** 23:24

**invent** 98:4

**invention** 27:22 33:11,23 95:18 127:15

**inventor** 33:9,10,23 34:14, 20,22,23 35:15 52:11

**inventors** 26:3

**inventory** 76:15

**invoice** 103:4,15

**involved** 4:19 74:24 76:12 105:10 128:9

**involving** 124:1

**IO** 128:2 135:4

**IP** 31:10

**IRG** 31:6

**IRG-30** 31:7

**irrelevant** 34:7 57:11 59:23 81:17

**ISP** 31:7

**issue** 4:16 10:13 12:25 13:2,5 22:11 26:13 34:2,19 39:13 45:10,14 49:14,20 52:15 57:2 61:12 69:7 74:7 75:14 80:19, 25 83:9 85:16 88:22 89:9 90:13 98:7 99:17,24 101:8,10, 14 102:9,15 103:6 104:3 106:23 107:5,16 108:12,17 111:9 117:15 119:9 124:11 129:5 136:19 137:5 141:8

**issues** 6:15 12:19,22 14:5 15:18 21:21,22 36:17 41:19 48:22 78:21 79:2,6 80:23 81:1 83:2,3 88:8 107:1

**items** 54:13

----

**J**

----

**jet** 98:17

**joined** 3:14 127:14

**joint** 9:8 10:1 21:1 33:18

**journal** 24:3,17 25:3 28:4,19 32:13,18 98:14

**Judge**  4:4 10:15,19 11:13,14 12:21 13:21,25 16:12

**judging**  69:21

**judgment**  13:7

**July**  53:22

**June**  12:23

**juror**  116:3

**jury**  25:6 27:11 33:21 34:14 42:4 51:5 55:9 56:22,25 57:4, 5,13,19 64:10 65:15,20 66:13, 16 68:11 69:1,21 74:6,20 75:6 81:8,15,22,24 89:22 92:7 93:19 104:17,18 105:3 109:7 115:7,13 125:7 127:3,7

### K

**Kaul**  77:8,9 95:15

**Kaul's**  77:12

**keeping**  111:15

**key**  24:12 48:22 133:22

**kick**  94:6

**kind**  36:14 44:5 51:21,25 55:9,11 60:23 65:24 74:25 84:11 87:15 96:6 118:22

**knew**  45:8 135:15

**knowing**  12:14

**knowingly**  71:3

**knowledge**  44:4,5,6 79:24 107:4 127:16

**Kou**  53:14

**Kurt**  3:14,22

### L

**label**  120:11

**labels**  117:9

**laborious**  65:3

**lack**  29:18 137:17

**laid**  71:13,15 110:5,11

**LAN**  128:2

**language**  15:15 97:2

**laptop**  126:2,8,12 130:9 134:14 135:1,15

**large**  56:4 60:5 68:10 88:18

**largely**  10:2 79:21

**late**  13:14

**Latin**  90:17

**law**  4:1,7,9 5:10,16 6:20 7:23 8:9,11,14,16,17,19,21,23,25 14:7 16:1,11 19:2 98:1 101:14,15 102:1,20 103:1,2

**lawsuit**  45:13 73:3,15 91:18 99:18 103:8

**lawyer**  8:14 15:17 108:15 118:18

**lay**  51:22 70:16

**lays**  71:19

**lead**  50:23

**learned**  13:22 25:2,5

**leasing**  132:1

**leave**  46:7 66:23 125:1

**Leaving**  29:16

**Lee**  3:10 24:24 25:7,16,22 30:3,9,12,18,25 31:4 53:18 65:14,22 66:6,12,18,25 67:13 100:17

**left**  32:4 39:23 103:25 105:21 111:23 126:4 130:14

**legal**  71:11

**lengthy**  76:25

**lens**  18:12

**letter**  130:20

**letting**  14:5

**level**  43:9 91:21

**liability**  101:11 102:6,17

**library**  32:13

**license**  101:18 102:1,3,15,16

**licensed**  91:25 101:15

**licenses**  55:14

**licensing**  109:18

**likelihood**  139:20

**limine**  22:2,20 46:6,12 47:4 80:15,20 124:25 129:6

**limit**  89:14,19

**limitation**  47:2 80:12

**limitations**  95:17 113:18

**limited**  32:25 71:7 76:14 77:16 86:7 105:8 112:6

**limiting**  115:11

**lines**  55:1 84:10 123:9

**link**  47:3

**linking**  141:12

**links**  25:12,25

**list**  23:13 36:23 37:7 38:24 39:20,24 40:1 45:23 53:23 63:2 67:16 82:11,21 88:17 111:15 117:7 119:17,25 120:13 135:20

**listed**  32:8 33:16 108:25 139:2

**listener**  26:4,22

**lists**  22:16

**litigate**  14:16

**litigation**  114:18 126:19,21 131:18,23 132:11

**live**  70:8,11 82:23 83:1,9,22 85:9 104:11

**loaded**  134:1,5 136:7

**located**  39:2

**logic**  128:13

**logical**  38:3

**logistics**  14:13

**logo**  31:16

**long**  7:12 14:15 19:3 29:22,23 98:9 100:6 108:23 133:17 141:7

**longer**  37:7 79:7,15

**looked**  39:1 45:8 60:7 71:22 96:21 132:16 133:22 136:4,5

**losses**  87:11

**lost**  65:3 79:7,15 87:3

**lot**  4:8 19:11 37:6,10 56:4

57:11 62:9 65:4

**lots** 84:7

**Louisiana-based** 7:4

**lowly** 8:14

**lying** 131:24

---

**M**

**machine** 134:5

**machinery** 134:4

**made** 11:6 50:1,8 68:25 69:14 74:2 78:25 79:16 95:16 101:7, 20 114:16 115:19 116:4 133:7 136:25 141:11

**main** 43:12 50:16 84:22

**maintained** 4:23 111:25 113:1

**maintaining** 17:9 78:20 82:6

**make** 29:11 32:23 36:1 37:15 46:7 51:4 52:16 66:10 67:14 80:10 81:19 86:6 88:11 107:4, 10 109:5 119:18,24 120:17,23

**makes** 8:7 36:16 45:18 52:14, 18 71:1

**making** 16:4 50:19,20,24 91:19 93:20 94:3

**manage** 56:7

**management** 60:20 96:16 97:22 98:5

**Mandamus** 11:2 12:10 13:4 20:15

**manifested** 49:19

**manipulators** 12:11

**manner** 49:1 86:23 113:7 140:12

**manners** 55:8

**manual** 140:9,17,20

**manuals** 138:10,20

**manufacture** 69:9,18

**manufactured** 68:17

**manufacturer** 98:17

**maps** 114:10

**March** 130:21 133:2 134:24

**marginal** 93:7

**mark** 28:6

**marked** 141:5

**market** 42:20 55:17 57:3,24 64:17 86:24 88:21 89:4,6,7 90:1,14,23,25 91:2,7,14 93:4, 10,12,16,17,22 94:5,9,23 95:2

**marketers** 42:24

**marketing** 43:9 50:16 51:16 61:3 71:25 73:24 74:15,17 92:3

**marketplace** 42:22 43:17 44:6,22 79:25 80:3 82:13,16 91:25 92:14 104:14

**Markets** 88:3 90:12

**marking** 119:7

**Markman** 9:17,21

**Martinez** 54:3,8,14 55:7 65:16 66:13

**Maryland** 19:7

**massive** 17:18

**material** 26:5 31:22 32:8 33:24 112:4

**materials** 23:23 28:23

**matter** 9:1 10:2 13:3 20:1,10 26:17 27:7 29:24 30:13 50:2, 3,6 72:11 107:22 108:8 115:14 124:9 135:2,5,10,16 137:16

**mattered** 44:15,16

**matters** 3:20 14:10 21:12 88:12 134:25 135:6 137:20

**Mckinsey** 96:16 97:10 98:5

**means** 128:3 137:12

**meant** 65:22

**medical** 111:16

**medium** 31:9

**meet** 19:18,19,20 20:7 39:11 42:2 62:13

**meets** 33:1 69:8

**Melissa** 3:13,15

**member** 107:3

**members** 110:4

**memory** 7:5

**mention** 4:14 9:12 14:17 78:4 93:16

**mentioned** 20:25 28:3 59:13 66:3 71:14 81:20 82:4 106:23

**mentioning** 9:7

**mentions** 85:13

**meritlesss** 8:22

**meritorious** 6:18 8:1

**Messineo** 21:24 22:6 124:9 125:11 126:16 127:13,15 128:14 129:19 130:10 131:7 132:3,10 133:17 134:13,22 136:20,25 138:3,18 139:3

**Messineo's** 126:25 135:25 139:9 140:4,23 141:9

**met** 17:1

**Michigan** 125:18

**Microsoft** 94:6,7

**middle** 68:5 87:9 125:23

**MIL** 79:2

**million** 85:3 90:17,18 93:2,18 94:2,3

**mind** 26:9 95:9 129:23

**minds** 17:22

**mine** 118:9

**minor** 22:13

**minutes** 121:11

**mirror** 79:21

**misappropriation** 40:12 41:10,18 42:4 45:16,24 47:3

**misfiled** 10:5

**mislead** 11:17

**misleading** 11:7 12:5 15:15 85:22,24 86:1

**misplaced** 118:9

**misrepresentation** 21:6

**misrepresents** 20:15

Case 2:15-cv-00037-RWS   Document 444   Filed 07/24/17   Page 161 of 173 PageID #:  24889

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                    161Index: missing..objections

**missing**  8:6

**misspeak**  110:4

**misspoke**  61:9

**misstatements**  45:6

**mistaken**  25:21 27:23

**misunderstanding**  60:4

**misunderstood**  10:8

**misuse**  46:10

**modem**  56:6 139:13

**modems**  139:10,21

**modern**  134:14 137:11

**modifications**  133:7

**modified**  132:6,8,20

**modulation**  130:3

**module**  128:3,8

**Mohadjer**  131:17,21 132:2
  138:14 141:10,13

**Mohadjer's**  141:16

**moment**  106:18 118:8 121:5
  122:10

**Monday**  125:4 130:15,22

**money**  65:4 101:9

**monitor**  133:21

**monitoring**  43:1 44:22 79:22
  80:11

**months**  12:14,15 13:18
  14:19,21,22 19:6,8,16 20:10,
  20 45:12

**moonlighting**  51:25

**morning**  107:7,10,11 120:1
  140:24 141:24 142:3

**motion**  3:18 5:14,22,24 6:3,
  10,14,16,19,23 7:12 8:1,7,22,
  23 9:2,5,12,15 10:5,12,15,20
  12:6,7,9,12,17 13:14,19
  14:20,25 15:2,24 16:24 17:2,
  5,22 19:2,13,16 20:3,6,12,21
  21:3,12 22:2,20 64:25 80:15,
  20 129:6

**motions**  9:10

**mouse**  133:22

**Movant**  3:21

**move**  3:20 6:4 21:12 36:11
  40:11 59:5 62:20 73:14
  100:11 106:9

**moved**  38:11

**Moving**  76:20 82:2

**mud**  11:22

**multiple**  18:9 55:1,25

**N**

**named**  21:24 67:25 68:23
  131:17

**narrative**  44:20

**narrow**  24:1 108:12

**narrowband**  86:3,5,8

**narrowed**  22:13

**native**  64:9

**nature**  91:2

**Navarro**  41:5

**needed**  35:12

**network**  3:5 11:3 28:12 69:3,
  10 70:11 72:2 86:3 141:17

**newer**  134:7,23 139:13

**newspaper**  31:22

**newspapers**  30:21

**nexus**  92:24

**night**  36:23 37:9

**non-accused**  55:5

**non-data**  48:23

**non-hearsay**  25:7 26:7,8,11,
  21 28:2 33:3 98:22

**non-infecting**  34:14

**non-infringing**  92:13,18

**non-obviousness**  30:4
  34:17

**none-obviousness**  97:13

**nonetheless**  102:3

**North**  55:24 90:17 92:2 93:3,
  12,17

**note**  9:20 27:8 29:1 38:21
  40:4 55:10 67:11 71:16
  101:25 103:7

**noted**  46:21 54:17

**notice**  10:2,7 14:18,19 21:2
  114:9,15 115:8,10 116:4
  119:7

**noticed**  88:6

**noting**  109:12

**notion**  44:14

**November**  127:4,15 140:14

**number**  12:18 36:23 47:11
  53:21,24 57:16,17 63:17 71:1
  76:9 87:4 90:11 91:24 103:16
  109:1,18 115:4,6 120:11
  126:23 130:11,23 141:15

**numbers**  53:16 54:25 55:12,
  19 57:12 61:1,14 64:14,23
  65:6 68:10 87:1 88:14,22
  90:19,22 108:17 119:16
  120:14

**numerous**  71:24

**O**

**oath**  44:19 128:16 139:17

**object**  62:15 88:14 90:6
  95:10

**objected**  67:20 117:8

**objecting**  40:18 54:9 99:19

**objection**  24:20 28:19 29:3
  30:2,11,17 33:2 36:3 37:21,24
  38:2 47:18,20 48:15,17 52:22
  53:13 54:23 58:2,3 61:17,18
  62:23 66:21,23 67:21 68:7
  72:12 73:2 75:10,17 76:17,18,
  23 77:3,23 78:1,2,10,20,21
  79:17 80:16,21 82:1,3,7,19
  83:10,22,23 84:5,20,22 85:5,
  9,11,21 86:12,22 89:2 94:13,
  19,21 95:6,8,9,20,25 96:12,
  14,19 98:23 99:9,12 100:9,10
  103:1 108:12,23 109:22 110:2
  113:10 118:6,23 120:4
  123:22,23 136:17

**objections**  18:16 22:17,22,
  25 23:3,8,9 36:24 37:3,17,19
  38:9 39:24 40:5 48:14,15

Case 2:15-cv-00037-RWS Document 444 Filed 07/24/17 Page 162 of 173 PageID #: 24890

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE, on 07/20/2017                    162Index: objective..parts

63:4,7,8,17,21 67:2 72:13
76:2 78:14,25 82:24 83:1,4,10
86:15,20 99:25 107:24

**objective** 30:4

**obtain** 23:4

**obtained** 36:22 40:20 41:9,13
46:14 131:16 132:1

**obtaining** 20:2

**occur** 22:6

**occurred** 11:5 22:6

**occurring** 22:3

**October** 136:5

**offense** 15:14,22

**offer** 12:16,18 14:20 35:14
76:1 85:17 96:4 102:21
105:10 114:25 127:2

**offered** 16:23,25 25:1 26:24
27:1 33:4 35:17 37:7 45:15
49:25

**offering** 17:11 27:5 30:13
35:6 51:21 80:17 82:9,10

**offerings** 79:12

**Office** 94:7

**OFFICER** 3:2 53:4,6 142:4

**offices** 31:8,9

**offshore** 7:8

**older** 139:12

**omitted** 109:12

**one-stop** 56:8

**one-time** 93:25 111:14

**one-way** 95:18

**online** 97:5

**open** 21:19 57:16

**opened** 16:20 132:19,20

**opening** 20:19 47:10 70:22

**operate** 48:25 49:5,8 140:19

**operated** 51:20 138:8,9,20,
25 140:2,8,12,13

**operates** 101:17 139:24

**operating** 49:7 87:11 138:13

140:1,19

**operation** 6:14 12:7 133:9
138:12 140:5

**operations** 48:21

**operator** 125:23

**opined** 71:22,23

**opinion** 6:17 10:16 70:23
113:25

**opinions** 10:18 39:15 55:11
58:8 72:7 92:20

**opponent** 95:14

**opportunity** 49:16 124:20

**opposed** 26:23 65:10 81:11,
16,23 86:8

**opposing** 49:24 50:1

**order** 7:25 11:13,14 12:18,23
29:5 39:22 64:11 68:22

**ordered** 47:12 85:8 89:24
96:8 123:24

**ordering** 64:25

**orders** 10:18 64:11

**ordinary** 74:2,11 131:11

**orient** 24:6

**orientation** 126:15

**origin** 127:12 135:19

**original** 4:24 6:8 12:4 14:1,20
16:8 18:23

**originally** 64:22 117:6
119:16

**originates** 46:2

**origins** 125:5

**outdoor** 125:19 133:13,16
137:2

**outset** 106:23

**overcome** 20:8

**overnight** 140:23

**overrule** 28:19 33:2 36:2
52:22 72:12 80:20 82:1,19
84:20 86:11 94:13 98:23
99:12 100:8 113:9 118:6

**overruled** 37:4,19,22 38:2,10

63:22 76:18 78:3 83:5 100:1
118:7

**overruling** 123:23

**overseas** 68:10,20 71:21,24
72:3

**overview** 125:9

**ownership** 87:10

_____

**P**

**p.m.** 53:23

**Pacific** 42:19 43:21 80:2
81:19

**pages** 63:14 88:20,24 109:6
122:18

**paid** 42:22 52:16 101:9

**Pankratz** 3:14,22 4:17 5:8,20,
23 6:1,6,12,24 7:2,14,17 8:5,
13 9:13 10:6,23,24 15:12,14
16:25 18:17,20 19:1,9 21:5,
14,17,18 136:16,20 137:7,21
138:3 139:3,8 140:3,25
141:10,25

**paper** 38:12 124:13 141:1

**papers** 7:6 11:10

**paragraph** 41:1,3 46:23 47:6,
11 59:24 71:2,3,5,18

**part** 8:6 34:7 35:18 44:10
51:24 57:4 58:6 62:1 77:15,21
78:5 80:15 85:2 88:9 89:20
90:7 104:19 116:24 119:6
122:14,18 133:18 135:10,11
138:1 141:22

**participants** 93:3

**parties** 10:2 12:10,16 15:21
16:16,20 17:11,15,16 18:11,
16 22:12 36:14 42:15,17,20
43:20 53:20 58:11,16 70:12
76:13 80:3 91:3 115:18 128:4
140:22

**parties'** 82:15 91:5

**partners** 117:20

**parts** 62:14,15 70:7 71:20
90:5,16 93:11 115:23 126:14
127:11,12,24

**party** 11:23,24 13:18 14:5,7 19:25 20:2,8 24:2,18 29:7 36:15 49:4,24 50:1 61:2 63:10 95:1,14 101:2 103:8 111:4 132:1 133:3

**party's** 50:1

**passed** 42:23

**passing** 128:14

**past** 22:7 99:9 102:13,18

**patent** 9:16 41:19 44:6 51:5 68:3 81:11 91:23 93:1 101:5, 10,14 104:6,7 106:13 108:17 109:11 111:12 113:4,6,24 114:4 118:14,18,19 119:3 124:3 127:5,22 128:22

**patented** 91:19

**patentee** 101:21

**patents** 30:6 44:4 73:15,18 76:13 91:22 92:8,21 93:5 106:14 109:7,11 114:16,21 122:3

**path** 9:21 26:6 39:4 110:24

**pathway** 97:8

**Patrick** 3:10 39:8

**payment** 102:10

**peep** 14:23

**pending** 4:4 5:2

**people** 74:12 96:23 98:4,11, 18 111:12

**perceived** 10:20 26:19

**percent** 45:10 93:12,13

**perception** 26:16,20

**performance** 27:17

**period** 19:3,6,12,15 112:13

**periodic** 60:20 61:15

**periodical** 31:23 32:13,19, 22,23 99:6

**periodicals** 30:19,21

**permissible** 55:15

**permission** 51:23

**permitted** 92:1

**person** 107:8,9 129:11

**personal** 48:5 85:14 86:4 127:16 136:23 137:1,22 138:8,11,19,24 139:23 141:12

**personally** 139:6

**PES** 21:25 22:2 86:4,7 106:23 124:21 127:3,8 128:5 133:10 134:8,18 138:15

**pestering** 9:15

**petition** 11:2 20:14 21:2

**photographs** 129:8

**phrase** 86:2

**pick** 38:10 133:23

**picked** 35:11

**picking** 59:15 139:5

**picture** 85:17

**pictures** 75:24 76:1 125:15, 17,20 127:6

**piece** 43:14

**pieces** 127:20 136:22 137:15, 23

**place** 13:1 18:1 54:11 95:1

**plain** 12:6,8

**Plaintiff** 34:21 37:7 38:1 46:6 47:6 54:19 59:20 62:7 72:9 83:11 87:14 88:23 90:5 94:5 104:19 105:23 106:6 108:11 111:6

**Plaintiff's** 22:22 23:3,9,24 103:13 111:6 113:20 139:2

**Plaintiffs** 3:9 5:12 24:25 29:13 30:13 39:9 49:11 53:12, 17 76:22 78:19 79:16 108:17 113:14 115:15 117:4

**plan** 65:22 66:10,12

**planning** 66:16

**Plastrik** 108:15 121:25

**play** 58:19

**player** 91:24 93:10

**pleading** 7:19,20,22 71:10

**pleas** 14:9

**pled** 69:16 70:2,20

**plenty** 83:25

**point** 13:7 15:9 17:22 22:8 26:14 27:14 45:19 50:24,25 58:18 63:11 64:22 80:22 81:20 84:16 91:16 92:18,24 96:25 101:22 102:25 104:21 106:6,8 109:4 118:5 119:21 120:3 122:22 128:7,17 134:10 135:7,25 139:22 141:11

**pointed** 12:21 71:24

**pointing** 88:12 92:5

**points** 13:3 16:15 31:8

**Ponder** 3:15 23:2,6,9,12,17 36:4,6,7,10,19,22 37:8,18,23 38:7,11,16,18 39:5 40:4,11,15 41:21,23 45:5 46:1,11,18 47:9,13,16,20,25 48:3,20 49:9 51:12,15 52:24 53:8,9,12,20 54:3,6,16 55:22 56:16 58:20, 25 59:8,11,15 60:15,18 61:8, 21 62:3,6,14,20 63:24 64:2 66:3,7 67:1 86:17,20 87:22,25 88:7,16 90:10 91:16 92:12,23 93:9 94:15 95:7 96:2,9,13 97:17 98:8,24 99:10,14 100:4, 5,10,14,19 101:13,25 103:4, 10,12,19,25 105:20 106:4,9, 12,17 107:20,23 108:2,5,9,22 109:9,17,23,25 110:20,21 111:5,10 112:24 113:3,11 114:8,13 116:7,14 117:14,24 118:8 119:1 120:7,22 121:2,8, 19 122:13,21 123:21,25 124:6 141:6

**Ponder's** 40:3

**portfolio** 111:12 113:6 114:4

**portion** 56:24,25 75:11,12 77:16 78:3 80:16 90:2 117:5 128:4

**portions** 58:10 88:25 89:9

**POSITA** 98:14

**POSITAS** 97:20

**position** 4:22 5:3 15:21 29:22 91:19 98:20 100:3

**positioning** 80:2 82:15

**positive** 27:13 29:24

**possibly** 16:5 135:4,5

**post-'97** 135:2,10,11,16

**post-date** 127:11

**potential** 79:1 112:4

**potentially** 59:23 68:11

**powerful** 31:7

**PR4-3** 14:18,19,22

**practical** 98:13

**practice** 92:20

**Pradham** 95:15

**Pradman** 77:8,9

**praise** 30:5,14 33:4 94:22
  98:2,6

**praised** 30:6

**pre** 135:1

**pre-'97** 129:16 135:12

**pre-1997** 127:8 138:8,10
  139:4,20

**pre-admitted** 53:21

**pre-critical** 136:2 138:13,18,
  19,20 140:9

**pre-date** 128:15,21,25

**pre-dated** 128:24 130:6

**pre-dates** 127:4

**pre-dating** 139:17

**pre-hearing** 9:8 10:1

**preceded** 137:20

**preclude** 22:2 92:4

**precludes** 46:22

**precluding** 46:13

**predicting** 90:17

**prefer** 89:16 120:20,22

**preference** 89:13 107:11

**prejudice** 35:25 48:17 81:6,
  9,16 93:7 100:23 101:3,11,16,
  20 102:2,5,10,17 114:7

**prejudicial** 14:11 35:4,6,7,8
  41:12 49:1 52:9,13 55:10
  59:23 68:9 69:21 73:19 75:5
  80:7 85:11 94:3 108:19

113:17 114:6,22 115:8 119:2
127:9 134:17

**preliminary** 14:9 46:22

**preparations** 15:5

**prepared** 19:10 22:7,17
  70:14 118:14 131:10

**preparing** 13:15 32:8

**presence** 31:8

**present** 7:18 12:3 15:17
  22:17 36:15 42:3 75:4

**presentation** 11:4,5 48:6,8
  67:25 72:23 73:1 76:25 77:7,8
  78:24 114:2,17

**presentations** 52:2

**presented** 24:5 25:6 36:12
  91:4 129:7

**presenting** 11:6 43:19

**preservation** 5:4 6:13 76:10

**preserve** 17:15 76:17

**preserved** 12:4 76:19

**preserves** 6:8

**preserving** 100:3

**president** 50:9

**press** 94:16 99:20,23

**presumption** 39:6

**pretend** 12:9,24 16:15 17:24

**pretending** 12:12 18:3

**pretrial** 3:5 39:22

**pretty** 56:24 112:14

**prevent** 94:9

**preventing** 92:10

**previous** 32:17 79:21

**previously** 12:5,25 37:13

**price** 63:24 105:10,14

**priced** 104:13

**prices** 65:7

**pricing** 64:13 93:24 104:9
  105:4,8

**primarily** 40:18 75:7

**primrose** 110:24

**print** 96:15

**printed** 31:22 96:4 99:6

**prior** 9:11 12:6,16 26:7,11,15
  34:12 53:13 63:4 95:18 96:7
  105:23 125:13 140:13

**Private** 87:9

**problem** 27:4 41:2,15 44:12
  46:2 62:9 63:6 75:8 77:20
  92:9 93:9 95:4 97:17 114:5
  131:14

**problematic** 46:10 61:3
  88:25 90:7

**problems** 10:20

**procedure** 22:12 29:11 76:3
  129:14

**procedures** 22:19

**proceed** 3:11,16 4:10 5:18
  106:19 125:8

**proceeded** 125:3 136:21

**proceeding** 6:25 58:22
  124:18

**proceedings** 9:21 20:15

**processing** 128:13

**processor** 128:12

**produce** 117:18

**produced** 64:22 93:23 115:2,
  3 116:15 117:1,17 118:12
  119:15 125:16,20 130:15,18
  138:4

**product** 30:7 33:15 34:10,11,
  13,14 49:3 68:12 77:2 79:12
  81:7,17,23 91:9 94:1 114:11
  118:18

**product-by-product** 65:1

**production** 73:7

**products** 30:15 39:2,4 48:25
  49:5,8 51:10,16,20 55:4 56:10
  64:7,12,16,21 68:17 71:23
  79:14 81:10,12,15,21 85:13,
  16 92:5,6,7,13,19,20 101:5,
  17,18 104:10

**profile** 73:3,8

Case 2:15-cv-00037-RWS   Document 444   Filed 07/24/17   Page 165 of 173 PageID #:  24893

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,  on 07/20/2017                           165Index: profit..reasonable

**profit** 87:11

**profitability** 55:11

**profits** 79:7,15

**progress** 84:7

**project** 61:16,17 111:14

**promoting** 95:2

**proof** 16:21

**proper** 5:7,13,21 6:13 75:16 76:5 89:25

**properly** 27:9

**proposal** 68:4

**propose** 22:9 62:7 63:13 86:22 87:12,14 124:2,18 125:10

**proposed** 43:18 62:25 68:2

**prove** 95:24

**proven** 140:10

**proves** 127:7

**provide** 47:5 65:1 84:14 102:23 106:13

**provided** 81:5 115:16 119:7, 19 122:7 132:12

**providing** 97:8

**provision** 18:21 52:22

**publication** 28:12 31:17 32:2 86:18 87:21 96:16 97:19 99:6 100:16

**publications** 25:18,23 35:9 86:21 88:22

**published** 31:17 33:13 34:23 89:5

**publisher** 31:19

**publishing** 55:9 61:2 89:6

**pull** 7:15 67:24 76:24 97:5 122:11 124:17

**pulled** 28:14 32:12

**purchase** 114:3

**purchased** 133:3

**purely** 16:21,22

**purport** 28:3 134:18

**purported** 125:1

**purportedly** 132:8

**purporting** 31:22 130:23

**purports** 32:3,15 84:14 85:14 90:15 94:16 96:15 109:19 113:12,14 118:14 131:4

**purpose** 10:8 35:18,19 69:20 74:25 75:12 112:2,15 113:23 114:3 126:18 127:2

**purposes** 37:15 80:14,17 119:8 126:20

**put** 15:4 16:2,3,8 19:19 44:2, 17,21 45:17 57:18 63:21 64:19 65:4,14 66:12,16 74:23 89:25 90:4 95:10 98:13 113:19 114:9 116:1 119:7 121:6 126:16 129:24 130:20 135:23

**puts** 97:11

**putting** 10:3 53:16 89:11,12 114:14 115:7 129:23

**puzzled** 41:25

**PX** 24:1,16 29:16 33:7 38:19 40:5,6,15 45:20 47:16 54:22 64:3 73:1 76:9,24 81:2 83:23 85:10 87:2 88:2 90:11 103:10 113:11

---

**Q**

**qualified** 70:10

**qualify** 70:10 75:1

**quantities** 64:21 93:24

**quantity** 65:4

**question** 6:7 15:25 31:14 35:2 36:13 50:7 75:18 104:17 122:23,24 123:1 125:12 130:25

**questioning** 96:24 117:4

**questions** 34:5 49:3 57:15 95:16 133:11

**Quick** 53:14

**quicker** 59:9

**quickly** 108:7

**quote** 31:6

---

**R**

**raise** 9:14,19 11:21 12:8 18:22,24 40:2 57:24 60:16 76:3 106:22 107:12

**raised** 6:16 9:23 12:15 37:25 66:22 131:14

**raises** 19:13

**raising** 21:15 22:24 39:12

**Ramaswamy** 50:23

**Ramesh** 50:20,21

**Ranga** 3:10

**range** 31:10

**rarely** 10:2

**rating** 54:25

**Raven** 48:1,5 49:14 50:14 51:15,19

**Raven's** 51:14

**raw** 64:6,8 65:10

**re-argue** 120:24

**re-sells** 131:19

**reach** 13:3

**reached** 26:3 53:20 63:23 112:16

**reaching** 65:24

**read** 4:12 5:11 10:17 13:14 18:1 37:1 53:10 59:8 122:2 123:14 136:4

**reader** 20:19

**reading** 7:6 25:23 112:8

**ready** 3:11,16 14:14

**real** 41:15 75:12

**realize** 19:7

**realized** 51:23

**reason** 11:21 14:7 25:10 28:11 32:14 39:20 40:18 57:18 58:7 64:20 66:21 109:13 132:4

**reasonable** 19:3,6 56:20 80:6 115:13 116:3

Case 2:15-cv-00037-RWS   Document 444   Filed 07/24/17   Page 166 of 173 PageID #:  24894

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,  on 07/20/2017                    166Index: reasons..reservation

**reasons** 16:21,22 18:8 38:23 50:14 82:14

**rebut** 66:22

**rebuttal** 41:1 47:10 72:7

**recall** 20:24 22:2

**receive** 81:24

**received** 63:6

**receivers** 112:4

**recent** 63:3

**recently** 44:23

**receptive** 89:22

**recess** 53:3,5

**recite** 4:20

**recognizes** 102:5

**recognizing** 95:1

**recollection** 7:6 107:16,18 110:17,18,23 115:4 123:6 124:23

**recommendation** 104:3

**record** 3:4,7 11:11 15:3 18:5 20:15 21:9 36:15 37:15 40:4 53:16 65:17,20 70:18 71:22 73:13 74:1,9 75:2 110:6,10,15 111:8,10,16 112:7,25 113:8 130:15,17,19,20,23,25 131:7, 13 141:14

**recorded** 53:22 110:17,22

**records** 54:24 119:15 138:14

**red** 84:10

**redact** 84:25 86:25 88:11

**redacted** 62:7 63:5,7,17 78:6 87:14

**redacting** 77:21 85:3,6

**redaction** 78:3

**refer** 122:2

**reference** 53:13 84:24 85:12

**references** 53:14 73:9,11

**referred** 30:24 99:17 116:23 123:5

**referring** 66:7 98:4 100:22 111:24

**reflecting** 20:14 84:12

**reflection** 11:16

**reflective** 133:9

**refresh** 107:16,18 124:23

**refreshed** 110:18

**refusing** 19:18

**regard** 14:18 89:9 103:20

**region** 91:1

**regions** 91:10

**regular** 13:1 17:25 113:6,7

**regularly** 89:5

**relate** 43:23 52:17 79:1

**related** 52:3 65:10 79:5 81:13 88:8 91:12

**relates** 48:4 50:12 64:12 99:16

**relating** 71:25 80:2

**relation** 21:25

**relationship** 50:3,4,7 73:15 103:21,22

**relative** 80:2 91:14

**release** 94:17 99:20,23

**released** 84:8

**relevance** 25:20 34:19 45:1 46:9 68:7,8,9,15,16 69:13 72:10,12 73:18 77:4,11 79:18, 20 80:6,11 81:20 83:24 84:2, 4,20 85:10 91:6 93:6 100:1 103:23 105:8 118:18,24 125:7

**relevant** 10:14 11:20,22 25:1 26:23 27:12,16,17,19 28:1 30:4 34:2,4 35:2 41:19 42:7, 14,17 43:6,13,20 44:7 45:3, 11,13 68:13 69:23 77:1 79:5, 25 80:1,4 82:14 91:2 94:10 98:10,22 101:2,12 104:8,15 105:14 123:17 125:12 127:14 128:2,6 132:4,8 135:25 137:6, 13

**reliability** 99:4 111:14

**reliance** 54:9

**relied** 23:24 29:7 38:25 39:14, 15 74:14 104:13 127:6

**relief** 7:19 11:9

**relies** 29:21 54:8 55:7 65:20 66:13 111:13

**rely** 57:14 90:1 97:2 104:16

**remain** 79:6

**remainder** 29:15 47:21

**remaining** 22:25 64:3 67:21 80:16,25 83:22 86:13 108:1

**remains** 8:11

**remedy** 11:23,24

**remember** 117:24 132:2,24

**remnant** 22:11

**remote** 132:16 137:2

**remove** 84:25

**removed** 63:8

**repeated** 18:6

**replace** 117:9

**replaced** 108:24 117:12

**reply** 56:14 118:25

**report** 30:22,24 32:8 33:14 35:18 38:25 40:25 41:1,3 46:23 47:6,10 58:10,14 61:15 65:17 70:22,24 71:18,19 88:3, 18 90:12 125:16 129:7,10

**reporting** 60:20

**reports** 54:21,25 55:16 57:21 58:2 59:3 61:3 86:22 88:6 89:7 93:11 97:11

**representation** 40:3

**representations** 129:3

**represented** 39:17 73:13 79:16 113:20 130:19

**represents** 28:17 50:17

**request** 4:15 9:20 106:22 117:12

**required** 7:20

**requirement** 102:1

**requires** 6:15 28:16 98:2

**reseller** 100:25

**reservation** 5:4

reserve 7:22

reserved 4:25 5:15 70:13

reserving 5:9 106:7

resolution 17:14

resolve 9:11 49:20 61:22 80:23

resolved 22:14 36:13,17 37:17

resolves 100:19

resort 75:25

resources 4:8

respect 9:17 29:12,15 47:16 52:8 54:20 63:1 69:4,16,18 83:2 101:16,18,22 120:15,16, 17 123:22,23 128:24

respected 97:20

respectfully 9:13,22 10:6

respective 22:16

respond 49:16 68:15 77:5 139:1

responding 70:23

response 6:7 8:15 15:5,9 24:23 27:1 30:2,10,12 31:25 35:24 41:24 46:24 49:13 56:13 62:21 63:3,9,11,22 64:24 65:5,13 66:3,7 69:13 73:23 79:20 80:13 84:5 89:1 94:18,20 96:18 110:2 115:15 117:1 118:24 123:10

responses 62:24 63:4,8,14, 16

responsive 7:19,21 11:10

rest 36:21 44:9 58:21 62:12, 18 86:15

rested 10:19

restrict 61:25

result 11:9 22:8

resume 53:3 140:24 141:24

resuscitate 18:15

retrieved 32:5,7

return 81:14,21

revenue 55:21 56:10 57:21

61:1,14,19 64:7,14 65:10 84:23,24 87:1,4 90:15 105:21

revenues 55:15 57:3 65:18 85:3 87:11 91:5 93:8 105:15

reverse 120:14

review 4:5 55:23 60:13,20 140:23

reviews 62:10

Revolution 102:8

revolved 86:23

reward 14:5,24

rewarded 13:17

rid 17:21

rights 5:4

rise 3:2 53:4,6 71:12 142:4

risk 105:2

road 137:11

Rog 62:21 63:22

role 34:6 55:17

rolled 91:18

roof 133:14,16

Rosenfeld 115:3 117:16,18 118:13 121:4,14

Rosenfeld's 116:9,20 117:17 119:17 120:15 121:21

Rospsha 73:16

rotate 61:1

royalties 55:13

royalty 55:13 56:20 93:25 101:4 102:2 104:23

rule 6:3,10,13,14,16 7:11,15, 17 8:1,3 12:7,8 16:2 33:1 52:22 57:3,25 62:2 64:24 86:24 94:9 98:8 131:1

ruled 4:13 9:20 12:19 16:24 59:21

ruling 21:11 36:17 46:6,12, 13,22 47:4 59:18 60:12 96:7 104:3 105:23,24 120:14,16

running 93:25 110:9 138:19 139:24

S

sale 93:25 113:4

sales 51:15 55:4,20 57:23 64:6,8,23 65:7,10 66:1,14 68:10 89:4 90:24,25 91:18,23 92:7,19,25 93:2,22,23 101:7,8 102:13,18 103:21 104:18 105:15,21 112:4 114:2

sat 14:22

satellite 25:12,25 48:8 50:15 51:6,13,17 52:2 73:11,14 84:22 88:3 90:12 97:7 125:23

satisfied 52:21 64:18 84:18 85:1

schedules 58:10,13 65:24

Schroeder 11:15 12:21 13:21,25

Schroeder's 10:16,19 11:14

scope 50:2,4,5,6,10 51:14,18 52:4

screen 25:9 124:17

script 50:21

scroll 40:21 47:17 64:13 99:15 118:20,22

search 141:4

seated 3:3 53:7

secondary 25:2 29:21,23 33:21,24 34:3,16 35:19 98:1, 15

secret 41:10 45:16,24

section 20:19 118:21

sections 72:22 79:1,4

SECURITY 3:2 53:4,6 142:4

seek 11:24 17:16 39:12,19,21 66:23 124:21

seeking 3:18 4:1 46:7 86:25 90:1

sees 65:20

segment 89:5

select 53:2

self-authenticate 31:15

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,  on 07/20/2017                    168Index: self-authenticating..speak

**self-authenticating** 30:19 31:3,23 32:2 99:7

**self-serving** 111:16

**selfishly** 106:25

**sell** 7:4,7 101:21

**selling** 93:20 94:7 106:14 111:12 113:5

**sells** 71:3

**send** 62:7 115:10 123:4 141:2

**sense** 75:22 94:25 125:21

**sentence** 5:6,11 9:9 38:21 113:25 114:2,21

**separate** 4:18 135:9

**separately** 135:21

**serial** 130:11,23 141:15

**service** 54:25 55:20,21 56:1, 8 95:18 96:5

**services** 55:5,6 56:2,3 71:9

**serving** 128:10

**set** 67:2 86:20 126:1,5 129:21

**settled** 123:18

**Sevis** 13:22 14:2

**shakes** 125:11

**share** 93:16

**shared** 41:6 43:10,23 44:14 46:20

**sharing** 44:10 46:16 47:7

**sheet** 109:11

**shift** 137:9

**shifting** 137:12

**ship** 130:24 131:4

**shipment** 64:15

**Shiron** 30:5 42:9,13 43:1,4 44:5,15,22 45:2,8,9,23 60:9 73:5 79:5,14,18,24 80:9,11 82:13 94:16,24 97:24 106:14 111:11 112:11 114:4

**Shiron's** 30:15 79:22 82:16 94:22

**Shiron/elbit** 42:22

**shocked** 18:2

**shop** 43:18 56:8

**short** 62:4 133:17

**show** 13:8 25:9 31:1 35:10 39:25 40:25 42:22 43:5 45:16 50:21 54:25 56:21 60:14 62:14 91:2 92:20,24 96:21,22, 23 104:17,19 105:3,10,13 126:12,23 129:15 131:2 134:18 136:14 139:7,23

**showed** 12:22 13:25 72:1 122:19

**showing** 26:3,8,22 65:18 68:10 69:20 91:9 94:22 98:10 122:2 130:8

**shown** 56:25 57:13 92:15 119:22 121:10 129:9 130:12 131:3,9 136:13 140:19

**shows** 26:1,15 41:8 45:2 104:12 105:14 109:19 110:25 112:7

**shuffling** 38:11

**sic** 86:6

**sicker** 103:13

**side** 15:21 37:22 62:14 87:10 94:21 106:25 126:7,8

**sides** 52:10 89:10

**significance** 75:12

**significant** 93:10 113:4

**signs** 99:3

**similar** 4:3 6:25 29:6,9 78:21 86:23 90:13 96:3,10,20 119:5

**simple** 76:22

**simplify** 92:23

**simply** 11:21 32:8,20 35:3,25 69:10 76:10,16

**sincerely** 21:5,7

**single** 63:4

**sir** 6:24 24:8 90:3 109:15 124:10 130:16

**sits** 133:13

**sitting** 19:11 20:10

**size** 90:23 91:6

**skeptical** 35:11

**skepticism** 26:2 27:5,6 29:21 34:4 96:21 97:10

**skewing** 90:22 91:4 94:4,8

**skipping** 29:2

**slide** 19:10 71:17 72:4 79:8, 10,13 81:2 125:14 126:15,22 127:13,21 128:12,17 129:17 130:1,14 131:6,15 132:14,23 133:1 135:20,23 139:2

**slides** 60:22 61:14 132:4

**slip** 37:13 109:11

**slots** 48:23

**small** 31:9 32:22

**smaller** 134:6

**Smith** 3:13,14,17

**smooth** 31:11

**so-called** 125:5

**software** 126:19 134:1,2,5 135:21 136:1,8,24 137:21,24 138:13,18 139:24

**sold** 7:8 64:12,18,21 65:4,7 73:4 105:7 111:15 140:10 141:15,18,19

**sole** 67:21

**solely** 33:16 105:1

**solution** 26:2,6,18,20 31:7 62:16 68:1 86:8

**Solutions** 85:12

**sort** 4:7 26:21 31:19 42:4,12 98:2

**SOTM** 73:10,13

**sounds** 25:13 51:21,24 62:16 80:5

**source** 38:22 39:1,3,14,16 49:2 57:15,17

**space** 32:20 44:18

**Spaceway** 76:25 77:1,7,14, 21 78:3,4,5

**speak** 135:10

Case 2:15-cv-00037-RWS  Document 444  Filed 07/24/17  Page 169 of 173 PageID #: 24897

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,  on 07/20/2017                    169Index: speaking..summaries

speaking 29:14

speaks 50:16

special 33:7

specific 11:18 16:14 19:22 20:4 36:16 55:12 56:9,23,25 63:7 65:6 117:3 126:17 128:25 136:16 137:18 141:15, 18

specifically 35:12 49:25 81:21 105:24 113:20 115:9

spent 65:3

sponsoring 74:2

sponte 4:4 16:12

spreadsheet 60:22 64:6 65:15 105:21 109:18 111:25 112:2,15

spreadsheets 56:19 60:6

square 111:23

squash 109:3

stack 116:17

staffing 107:1

stage 14:12

stand 14:14

standard 31:11

standing 48:14

standpoint 51:1

stands 55:23

start 22:9,18,21 23:17 38:18 54:21 72:24 78:22 91:21 100:22 106:10 136:17 142:3

started 5:6

starting 38:21 61:5 69:15 79:10 122:1,20 140:6

starts 86:2

state 3:7 4:1,7,9 5:10 6:19 8:15,23 16:1,10 23:18,23 24:12 26:8 27:15,16,18 28:1 84:13 139:17

stated 129:10

statement 9:9 10:1 14:22 18:7 21:1 29:23 38:25 39:18 43:6 49:24,25 50:3,8 61:5,10,

24 97:1 137:25

statements 33:22 52:14,15, 20 61:11,13,18 95:16,22

states 7:18 19:2 21:2 68:12, 18,25 69:4,18,22 70:3,7 71:2, 8,10

stating 80:14

Station 85:15 86:4 136:23 137:1,22 138:8,11,19,24 139:23 141:12

statutes 8:19,20

stay 3:19,24 11:23 13:9,12, 14,17 14:4,24,25 15:2,25 16:11,13 21:12

stayed 4:4,5,6 16:13

stays 24:12

step 15:16 87:25

stepping 87:12

steps 20:5

sticker 103:14

stipulated 39:22

stipulation 22:12 53:21

stitch 79:25

stop 136:12

story 74:25

straightforward 34:15

Street 98:14

strength 87:5

strengths 43:12

stretching 7:5

strictly 60:21

strings 12:22

strong 15:15

strongest 35:25

struggling 35:21

studies 33:12

stuff 58:19

stupid 93:19

sua 4:4 16:12

Sub-saharan 91:23

subject 63:22 65:23 78:3 79:2 99:25 121:4 137:23

submit 8:25 20:6 101:15 103:20 108:18 110:11 113:3 118:3 131:1 135:18 139:21 141:16

subpoena 117:1

subsection 30:20

substantially 22:13

substantive 9:16 12:25

substantively 9:18

success 91:8,10,15,17,23 92:24,25

successful 68:12

Sudarshan 3:10 22:7 42:18 43:7,25 44:12 47:1 50:13 68:16 69:13 70:4,5 72:8 79:20 81:20 82:9 84:6 85:7 95:13,21 96:1,11 97:4 104:2,21 105:17, 19 106:1 110:3 111:19,21 112:9,19,22 124:10,13,16 131:3 135:22 136:12,15

sudden 16:19

suddenly 12:10 16:16 17:8,9 20:11

sue 101:17 102:7,11

sued 91:25 92:15 117:20

sufficient 28:16 71:10 112:25 125:6

suggest 12:2 34:22 40:19 41:17 43:15 45:15 48:25 49:8 62:3,6 87:14 115:8 130:13

suggested 41:12

suggesting 35:22 41:3 43:19 46:13

suggestion 37:4 46:12 58:21,24 106:1

suggests 20:16 33:21 34:13 135:12

suit 13:18

summaries 58:12,14 60:24 65:25

**summarized** 58:9 61:14

**summary** 58:13 65:1 83:25
84:15 118:14 126:22

**supersonic** 98:13

**supplier** 13:24 14:2 49:4

**supplies** 137:2

**supply** 49:5

**support** 28:17 41:16 58:8
98:19 128:5

**supported** 102:1 121:14

**supports** 120:5

**suppose** 22:24

**supposed** 16:15 113:5
114:19 140:18

**Supreme** 8:10,14

**surprise** 12:13 17:19

**surprised** 16:17,18 39:11
71:23

**surprising** 17:20

**suspect** 32:14 134:25

**suspicions** 125:4

**sustain** 66:20,23 75:17 95:5,
25 96:12 103:1 120:4

**sustained** 106:6

**sustaining** 58:2 123:22

**switch** 33:13 43:7 73:7 79:9
97:6

**system** 14:2 22:3,5 33:15
34:20 43:13 68:4,23,25 70:8
71:2 77:13,14,15,17 84:15
124:22,24 125:6,9,13,18,22
126:12,16,24 127:2,4,6,9,10,
23 128:9,11 129:11,12,13,21,
24 130:2,9 133:10 134:1,5,18,
21 135:17 138:9,11 140:7

**systems** 3:5,6 11:4 70:6
73:9,11 75:23 86:3 126:3

———————————

**T**

———————————

**T.C.** 5:1,10 16:5

**table** 65:5

**tabulated** 110:9

**tabulation** 104:22

**tabulations** 105:1

**tactic** 12:1 13:10

**tactics** 20:7

**tag** 123:19

**takes** 69:6 108:22

**taking** 20:5 23:3 66:17

**talk** 11:18 34:4 86:21 92:6
116:14

**talked** 56:16 83:3 92:12
114:14

**talking** 18:18,19 34:15 40:24
45:22 51:20 85:2,15 86:24
90:22 91:5,22 92:11 93:15
101:19 122:6 139:11

**talks** 8:6 25:11 79:13 87:5,8,9
118:21

**tape** 136:5,8,9

**TCP/IP** 25:11,25 27:17

**teaching** 26:2

**team** 107:3 110:4

**technical** 33:14 97:19 98:3

**technological** 50:25

**technologies** 48:9 56:6
74:24 91:13,14

**technology** 44:16 45:3 48:24
51:3,6,9,17,18,22 52:2,7,8,11
73:14,20 82:17 84:22 91:20
92:1 95:17 97:7,25 118:22
128:10

**tee** 21:22

**telephone** 72:2

**telling** 16:7 37:5 42:13 75:5
114:22 115:21

**tells** 52:1

**temptation** 81:14

**tender** 140:22

**tentative** 104:3

**term** 12:5 77:7 98:3

**terminal** 31:10 125:19,25

126:6,9 127:23 130:8,12
133:15,19 136:23,24 138:13,
15,19,25 141:12,18,19

**terminals** 126:8 130:7,10
131:16,21,25 132:6,9,11
133:3 134:2 137:22

**terms** 9:23 11:25 76:15 91:9
100:1 126:15

**terrestrial** 55:5 56:3

**terribly** 127:9

**territorial** 68:4 69:20

**testified** 49:15 116:12,16
117:11,23 119:19 120:9
128:19 129:19 130:10 131:24
135:16 139:3

**testifies** 115:19

**testify** 74:24 136:2 141:13,14

**testimony** 24:4,19 28:9 32:6,
7 42:25 45:7 47:2,5 48:6 49:6
70:6 105:6 110:5,8,22 111:18,
25 112:5,15 115:18,24,25
116:18,22 120:2 121:3,9,10,
13,18,20,22,24 122:5,8,14
125:10 126:25 127:1,18
128:18 130:8 131:6 133:11
134:24 135:7,8,12,25 137:19
138:1,14,17,22 139:19 141:8,
16

**testing** 70:6 140:19

**Texas** 14:3 19:7

**text** 7:15 12:8 88:7

**theory** 6:25 7:3 70:21 71:11
72:6

**thing** 9:23 14:17 31:19 60:20
88:16 98:2 103:6 112:6
114:19

**things** 6:6 11:19 13:8 20:8
26:21 37:13 58:13 61:11,19
75:23 76:16 81:13 88:7 93:11,
20 104:13 109:6 111:15
135:17 137:18

**thinking** 32:6 107:6

**Thirteen** 61:8

**thought** 9:19,22 10:4,9 17:8
35:10 72:9 82:16 128:14
130:4 132:5 133:19 135:14

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                                    171Index: throw..vendors

**throw** 11:22

**Thrucomm** 141:18,19

**tie** 91:22 93:4 98:2

**tied** 56:9 57:22

**time** 5:2,14 6:17,20 7:25 9:18
12:13 13:5 17:1 19:3,6,12
25:12,18,19,21,24 26:9,12,16,
19 34:11,15 48:5,23 50:8 65:4
66:24 67:1 76:14 77:13 84:13
95:17 100:6 107:15 112:13
123:6 126:17 127:17,18,20
128:6 129:13 130:16,24 137:6
141:17

**timeliness** 19:4

**Times** 99:1

**timing** 17:20 106:22

**tinge** 45:24

**title** 77:6

**today** 3:9 38:2 39:12,18 67:12
78:12 107:2

**told** 65:2 116:13 121:6 127:13
132:24 135:11

**tomorrow** 62:19 105:13
106:8 118:4

**tone** 20:13

**top** 31:16 32:4 112:21

**total** 55:15 61:1,13 64:7 65:18
87:4,11 90:17,18

**Touche** 97:23

**tough** 95:21

**track** 112:16 130:24

**tracking** 60:9 82:12

**trade** 41:9 45:16,24

**training** 140:13

**transaction** 111:11 112:11

**transactional** 113:4

**transactions** 64:8

**transcript** 11:14 118:9
122:16

**transfer** 4:2 8:24 9:3 10:20
13:19 14:20 17:9 19:13 20:3
21:4

**transfers** 4:18

**transmission** 123:13

**transmitted** 113:21 118:16
119:10,13

**treatise** 25:3,5

**trial** 4:9 8:14 14:9,12,15 15:5
22:12,19 39:13 63:3,12 66:11
76:3

**trigger** 11:9

**trillion** 90:19

**trouble** 95:24

**true** 21:4 33:10 36:20 49:17,
20 117:14

**truth** 25:14,16 26:24 27:2,7
29:24 30:12 82:10

**tune** 129:18

**turn** 27:22 53:23 54:3,18
55:11 59:4 60:25 63:24 67:1
72:21 78:19 79:8 81:1,2 86:17
90:10 94:15 95:7 100:20
108:7 109:17 129:20 140:3

**turned** 23:7

**Turning** 76:8 83:13,19 130:7

**turns** 29:4,5

**two-thirds** 31:5

**two-way** 90:15 91:12 92:2
93:3 97:8

**tying** 132:23

**type** 24:3 26:5 61:19 81:22
84:7,11 94:4,8 105:3 112:6
115:7 130:12 134:7

**types** 61:11

**typically** 59:21 60:23

**typographical** 24:11

---

## U

**U.S.** 91:22,23

**ultimate** 10:19

**ultimately** 10:15,21 26:3

**unable** 128:8

**underlying** 17:25 27:6 58:7

65:16 70:17 73:5 108:19

**undermine** 115:23

**understand** 7:5 9:6,25
10:11,14 18:10,18 20:19 35:5
43:16 47:21 48:16 52:12,14
55:7,18 65:6 70:1 75:14,15
77:11 79:14,17 80:10 86:6,14
88:13 89:18 93:6 95:4 96:1
112:7 123:22

**understanding** 6:2 7:11
10:18 36:20 37:6,19,24 38:23
40:6 46:11 122:24 128:23,25

**understood** 23:2 29:11

**underwent** 132:15

**undisputedly** 68:17

**unfair** 48:17 114:12,13,23

**unfairly** 35:8 52:13 119:2

**Uniloc** 90:21 91:4

**Unilock** 94:5

**unit** 55:13 57:23 125:19
133:13,16 137:2

**United** 68:12,17,25 69:4,18,
22 70:2,7 71:2,7

**units** 65:2 77:15 101:19,22
104:24 105:1,7

**universe** 35:9

**unknown** 127:11,12 135:19

**unlike** 32:17

**unrelated** 52:6 109:7

**unsettled** 4:1 16:1,10

**unsure** 107:14

**upstream** 104:14

**utterance** 27:2

**uttering** 14:23

---

## V

**validity** 114:1

**valuable** 82:17

**variety** 44:2 91:14

**vendors** 43:18

ELBIT SYSTEMS LAND AND C4I, LTD vs HUGHES NETWORK SYSTEMS, LLC, ET AL
PRETRIAL CONFERENCE,   on 07/20/2017                                172Index: venue..year

**venue** 4:1,23 5:1,5,7,13,15,
   19,21,25 6:4,5,8,17,23 7:22
   8:24 12:8,11 13:20 14:7,10,20
   16:21,22,24 17:2,4,10 18:15,
   19,22 20:16

**venue-related** 19:21

**verifies** 141:14

**version** 117:10 120:8 124:1

**versions** 60:21 62:7 63:7
   88:19 116:15 139:13

**versus** 3:5 71:9 102:8

**viable** 72:10

**vice** 50:9

**video** 48:1 49:16,19 51:1
   129:13

**videos** 50:19,20,24 129:8
   138:4

**view** 3:24 16:21 72:1 81:8
   125:11 126:20 129:16 137:23

**viewed** 10:14 18:11,12

**vintage** 134:13,20,22

**violating** 55:16

**violation** 131:1

**Virginia** 19:24

**virtually** 17:4

**voice** 20:14

**Volkswagen** 10:21

**voluminous** 64:9

**VSAT** 86:2 90:15 91:12 92:3
   93:3 122:3

**vying** 45:2

―――――――――
**W**
―――――――――

**wait** 90:19

**waiting** 17:21 19:5

**waive** 7:12 14:7

**waived** 12:5 16:5

**waiver** 4:14,16,21,22 5:5 8:3
   12:8 13:3 16:2

**waking** 20:11

**walk** 70:14 125:10 126:14

**walked** 110:24

**Wall** 98:14

**Wallace** 3:10 24:24

**wanted** 17:15 29:10 35:14
   60:16 107:12 133:8

**wanting** 25:13

**warehouse** 131:22

**warrant** 57:9,10

**waste** 4:8

**wasting** 7:25

**ways** 118:1

**Wear** 102:8

**website** 115:20,21 116:1,2,12
   121:6 123:5,7

**week** 22:7

**weeks** 19:15,25

**weight** 115:24

**well-known** 50:15

**Wesley** 3:8

**Westlaw** 96:4

**wheat** 135:9

**Wicker** 70:9,22 72:4 127:6
   128:19 129:4,9 132:23,24
   135:6,11,14 137:17

**Wicker's** 128:18 129:7,16
   133:1,10

**wide** 31:10

**wife** 48:10

**wilfulness** 114:19

**willful** 108:11 114:9,24

**willfulness** 44:1,3,7 45:14
   80:1 113:15 119:8

**wished** 14:16

**wishes** 102:24

**withdraw** 47:18,20 53:14
   54:12 72:25 83:10 95:7,9
   100:10 106:16 119:25 120:2

**withdrawing** 40:5 42:5 53:12
   60:1 76:23 78:12,14 86:14

**withdrawn** 29:13 36:24 37:2,
   11,13,20 38:1,4 40:1,6 47:22
   54:15,20 64:3 67:12,14,15,18
   76:22 78:19 82:21 83:11
   86:14 95:8 96:13 100:17,25
   106:6,18 108:4,5

**withdrew** 37:14 103:17

**witness'** 20:2

**witnesses** 14:13 19:23,24
   20:8 43:3 49:2 114:25 118:1
   137:17

**won** 94:17

**word** 10:17

**word-for-word** 18:2

**words** 70:19 71:13 101:17

**work** 33:12,14,18 34:13,23
   51:10,24 52:6,17 58:6,16 98:4
   107:10 118:17 126:1 131:18
   138:11

**worked** 34:10,11 112:12
   127:16 140:5

**working** 61:16,17 98:17

**works** 6:3 49:3,4 51:3,15 52:8
   75:23 98:16 137:16 141:3

**world** 50:15 74:19 90:16
   93:18,21

**worldwide** 91:1,7 93:17

**worth** 92:8 98:20

**writ** 4:12,15,17

**writing** 55:4

**writs** 3:25

**written** 6:17 15:5,9

**wrong** 8:12 20:22 35:1 57:16
   135:19

**wrongful** 46:3,16 47:7

**wrote** 82:6

―――――――――
**Y**
―――――――――

**y'all** 4:12

**Yale** 3:10 49:10

**year** 9:3 65:2 75:4 92:3

**years**  8:12,21 59:22 99:5

**yesterday**  3:24 4:5,12 13:15

**York**  99:1

---

## Z

---

**Zain**  67:25

**zoom**  28:6